IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

_____

MICHAEL J. RODRIGUEZ,

                         Plaintiff,          Civil Action No.
                                             9:14-CV-0418 (DNH/DEP)

        v.

DAVE FAVRO, *et al.*,

                         Defendants.

_____

<u>APPEARANCES</u>:                          <u>OF COUNSEL</u>:

<u>FOR PLAINTIFF</u>:

MICHAEL J. RODRIGUEZ, *Pro Se*
14-A-3203
Southport Correctional Facility
Box 2000
Pine City, NY 14871

<u>FOR DEFENDANTS</u>:

LEMIRE, JOHNSON & HIGGINS, LLC          GREGG T. JOHNSON, ESQ.
P.O. Box 2485                           BRADLEY J. STEVENS, ESQ.
2534 Route 9
Malta, NY 12020

DAVID E. PEEBLES
CHIEF U.S. MAGISTRATE JUDGE

## REPORT AND RECOMMENDATION

*Pro se* plaintiff Michael J. Rodriguez, who is now a New York State prison inmate, has commenced this action against Clinton County, Clinton County Sheriff David Favro, and Jail Administrator Michael Smith, pursuant to 42 U.S.C. § 1983, alleging that the defendants deprived him of his civil rights by denying him the right to freely exercise his chosen religion in violation the First Amendment. Plaintiff's claims relate to a directive by officials at the Clinton County Jail ("CCJ") prohibiting Rodriguez, a Rastafarian, from wearing a religious head covering at certain times within the facility.

Currently pending before the court is a motion brought by defendants seeking the entry of summary judgment dismissing plaintiff's complaint. For the reasons set forth below, I recommend that defendants' motion be granted.

## I.   BACKGROUND[1]

Plaintiff is a prison inmate currently being held in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS") at the Southport Correctional Facility ("Southport"), located in Pine City, New York. *See generally* Dkt. No. 32; Dkt. No. 26-6 at 2. Prior to his incarceration with the DOCCS, including at the times relevant to his claims in this action, plaintiff was confined at the CCJ. *See generally* Dkt. No. 1.

On February 13, 2014, plaintiff was booked into the CCJ after being charged with promoting prison contraband in the first degree. Dkt. No. 26-12 at 2; Dkt. No. 26-13 at 2. That charge related to the drug suboxone.[2] Dkt. No. 26-6 at 5. Plaintiff's felony history included prior charges of robbery in the first degree, criminal possession of a controlled substance, and promoting prison contraband. *Id*.

As a general rule, at the time plaintiff was confined in the CCJ, inmates were allowed to wear certain religious head coverings in

_____

[1]      In light of the procedural posture of the case, the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in plaintiff's favor. *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).

[2]      Suboxone is a prescription drug used for the treatment of opiate dependence and is a Schedule III controlled drug under the Federal Controlled Substances Act. Dkt. No. 26-11.

accordance with their sincerely held religious beliefs. Dkt. No. 26-12 at 2; Dkt. No. 26-13 at 2. Those head coverings could be worn throughout the facility, subject to physical search and inspection by officials for concealed contraband. *Id*. Pursuant to the established policies and practices at the facility, the rule can be modified based on the specific security risk an inmate poses at the time of booking or throughout his incarceration at the facility. *Id*. Inmates who are mobile or transferred throughout the facility present the greatest security risks due to the possibility of obtaining contraband from other inmates. Dkt. No. 26-12 at 2; Dkt. No. 26-13 at 3. Searches of inmates during movement pose additional security risks because the officers conducting the searches cannot divert their attention from the search to observe other inmates. Dkt. No. 26-12 at 3; Dkt. No. 26-13 at 4.

The booking sheet prepared for plaintiff by CCJ staff upon his entry into the jail on February 13, 2014, reflected that he is a Rastafarian. Dkt. No. 26-3 at 4. In accordance with his religious beliefs, plaintiff contends that his head should be covered at all times unless he is "stepping into the temple" or washing his head. Dkt. No. 26-6 at 6-8. Plaintiff does not wear his head covering, which he refers to as a crown, in the shower or when he

prays. Dkt. No. 26-6 at 7-8; Dkt. No. 28 at 3. Plaintiff's crown measures approximately eleven inches in length and eleven inches in height. Dkt. No. 26-4 at 2-3; Dkt. No. 28-3 at 17-18. During plaintiff's booking, Corrections Officer Dragoon, who is not a named defendant, told plaintiff that there was a policy in place at the facility regarding religious head-coverings and that plaintiff was not permitted to wear his crown throughout the entire facility. Dkt. No. 26-6 at 19; Dkt. No. 28-1 at 2. In response, plaintiff asked to speak with a supervisor, and was advised that he could file a grievance regarding the issue. *Id.*

During his incarceration at the CCJ, plaintiff was permitted to wear his crown in his cell and housing unit, but not outside of his housing unit. Dkt. No. 26-13 at 3. In particular, due to security risks, plaintiff was not allowed to wear his crown during facility movements. *Id.*; Dkt. No. 26-6 at 11. Plaintiff was required to remove his crown when he used the law library, engaged in recreation, transferred cells, or attended court appearances. Dkt. No. 16-13 at 3; Dkt. No. 26-6 at 15-16. Plaintiff voluntarily chose to use the law library and participate in recreation with the knowledge that he would not be permitted to wear his crown while engaging in those activities. *See, e.g.,* Dkt. No. 26-6 at 16.

Over the period of his incarceration at the CCJ, plaintiff used the law library seven times and was transported to court on approximately five or six occasions.[3] Dkt. No. 26-6 at 15-16; Dkt. No. 26-8. During each visit to the law library and court, plaintiff was not permitted to wear his crown. Dkt. No. 26-6 at 15-18. In addition, plaintiff was not allowed to wear his crown when he was transferred to different cell locations or during recreation. *Id.* at 16-18. At his deposition in connection with this matter, plaintiff testified that he was transferred approximately four times, and the transfers lasted "a matter of minutes." *Id.* at 17-18.

Plaintiff was permitted to practice his religion in his cell. Dkt. No. 26-6 at 13. Plaintiff prayed every day, morning and night, for between thirty minutes and two hours. *Id.* at 13-15.

While incarcerated at the CCJ, plaintiff was involved in three fights. Dkt. No. 26-6 at 20-21. As a result of an incident on March 17, 2014, plaintiff agreed to be confined to a "24-hour lock." Dkt. No. 26-5 at 4-8; Dkt. No. 26-13 at 5. One week later, on March 24, 2014, plaintiff engaged in another altercation. Dkt. No. 26-5 at 9; Dkt. No. 26-13 at 9-14. On June 10, 2014, plaintiff was involved in a third fight that resulted in sixty-day "lock in"

---

[3]     Plaintiff filed eleven requests to use the law library, and was granted permission on seven occasions. Dkt. No. 26-8.

sentence. Dkt. No. 26-5 at 16-25; Dkt. No. 26-13 at 5.

Plaintiff filed one grievance regarding his ability to wear his crown while confined in the CCJ. Dkt. No. 26-6 at 25. On or about February 16, 2014, the grievance was forwarded to the grievance coordinator, Sergeant Ryan ("Ryan"), who is not a named defendant. Dkt. No. 28-1 at 3; Dkt. No. 28-3 at 14. On March 7, 2014, plaintiff was interviewed by Ryan, who determined that "[j]ail [p]olicy states you may wear your crown in your cell, and housing unit. Day area." Dkt. No. 28-3 at 15. Plaintiff appealed Ryan's decision to defendant Michael Smith, the Clinton County Jail Administrator, who concluded that plaintiff "may wear [his] religious item in [his] housing unit." *Id.*; Dkt. No. 26-13 at 1. Plaintiff disagreed with defendant Smith's decision and, on March 20, 2014, appealed the determination to the Citizen's Policy and Complaint Review Council ("CPCRC"). Dkt. No. 26-10 at 3; Dkt. No. 28-1 at 3; Dkt. No. 28-3 at 15. On August 5, 2014, the CPCRC issued a decision regarding plaintiff's appeal, finding that he could exercise his beliefs and wear his crown to the extent that it "does not constitute a threat to the safety, security and good order of the facility." Dkt. No. 26-10 at 2. In March 2014, prior to receiving the decision of the

CPCRC, plaintiff filed his complaint in this action.[4] Dkt. No. 2 at 5; Dkt. No. 26-10 at 2.

On July 22, 2014, after 160 days of incarceration at the CCJ, plaintiff was transferred to the custody of the DOCCS. Dkt. No. 26-13 at 2; Dkt. No. 26-3 at 7. During his confinement at the CCJ, plaintiff was required to remove his crown for less than twenty-five hours for mandatory transports and approximately 110 hours for voluntary transports.[5] *Compare* Dkt. No. 26-14 at 5 *with* Dkt. No. 28 at 2. In total, plaintiff was not permitted to wear his crown for approximately 135 hours while confined at the CCJ. *Id*.

Plaintiff did not discuss the restrictions regarding his head-covering with defendant Dave Favro, nor did he receive any communication from that individual. Dkt. No. 26-6 at 27-28. Similarly, although defendant Smith responded to plaintiff's grievance appeal, he and plaintiff did not have any conversations regarding plaintiff's right to wear his crown. *Id*. at 28.

---

[4]     The date that plaintiff's complaint was deemed "filed" with the court is disputed and will be discussed more completely below in Part III.B. of this report.

[5]     While defendants have not cited any record evidence for this proposition proffered in their statement of undisputed material facts pursuant to rule 7.1(a)(3) of the local rules of practice for this court, Dkt. No. 26-14 at 5, plaintiff has admitted the proffered fact in his response to defendants' statement of undisputed material facts, Dkt. No. 26-10 at 2.

## II.  PROCEDURAL HISTORY

Plaintiff commenced this action with the filing of a complaint and an accompanying application to proceed *in forma pauperis* ("IFP"). Dkt. Nos. 1, 2. Following an initial review of the complaint pursuant to 28 U.S.C. §§ 1915(e)(2)(B), 1915A, District Judge David N. Hurd issued an order granting plaintiff's IFP application and approving the filing of his complaint, subject to dismissal of all claims asserted against defendant Clinton County Jail and substitution of Clinton County ("County") in place of the CCJ as a defendant. *See generally* Dkt. No. 10.

Following the close of discovery, defendants filed a motion for summary judgment seeking dismissal of plaintiff's complaint on multiple grounds, including (1) plaintiff's failure to exhaust his administrative remedies; (2) the lack of evidence supporting plaintiff's First Amendment claims; (3) the lack of personal involvement of defendants Smith and Favro; (4) qualified immunity; and (5) the absence of any evidence from which a reasonable factfinder could conclude that defendant County promulgated a policy or custom through which any municipal actor violated plaintiff's constitutional rights. *See generally* Dkt. No. 26. Plaintiff has since responded in opposition to the motion, and defendants have submitted a

reply in further support of their motion. Dkt. Nos. 28, 30. Defendants'

motion, which is now fully briefed and ripe for determination, has been

referred to me for the issuance of a report and recommendation pursuant

to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule

72.3( c). *See* Fed. R. Civ. P. 72(b).

III.    DISCUSSION

    A.    Legal Standard Governing Motions for Summary Judgment

        Summary judgment motions are governed by Rule 56 of the Federal

Rules of Civil Procedure. Under that provision, the entry of summary

judgment is warranted "if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a

matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S.

317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247

(1986); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391

F.3d 77, 82-83 (2d Cir. 2004). A fact is "material" for purposes of this

inquiry, if it "might affect the outcome of the suit under the governing law."

*Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of N.Y.*, 426 F.3d 549,

553 (2d Cir. 2005). A material fact is genuinely in dispute "if the evidence is

such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue, and the failure to meet this burden warrants denial of the motion. *Anderson*, 477 U.S. at 250 n.4; *Sec. Ins. Co.*, 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences, in a light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255; *Jeffreys*, 426 F.3d at 553; *Wright v. Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998). The entry of summary judgment is justified only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *Bldg. Trades Employers' Educ. Ass'n v. McGowan*, 311 F.3d 501, 507-08 (2d Cir. 2002); *see also Anderson*, 477 U.S. at 250 (finding summary judgment

appropriate only when "there can be but one reasonable conclusion as to the verdict").

### B.    Exhaustion of Available Administrative Remedies

In support of their motion for summary judgment, defendants contend that dismissal of plaintiff's complaint is warranted in light of the fact that plaintiff failed to exhaust the administrative remedies available to him at the CCJ prior to filing this action. Dkt. No. 26-15 at 11-13. In response, plaintiff argues that the CPCRC did not issue a timely response to his grievance appeal, filed on March 20, 2014. Dkt. No. 28-1 at 3. Specifically, plaintiff contends that, although the CCJ Inmate Handbook provides that the CPCRC will render a decision within forty-five business days, he did not receive a response to his appeal until on or about August 5, 2014, well beyond the forty-five day deadline. *Id*.; *see also* Dkt. No. 26-9 at 31.

The Prison Litigation Reform Act of 1996 ("PLRA"), Pub.L. No. 104–134, 110 Stat. 1321 (1996), which imposes several restrictions on the ability of prisoners to maintain federal civil rights actions, expressly requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such

administrative remedies as are available are exhausted. 42 U.S.C. § 1997e(a); *see also Woodford v. Ngo*, 548 U.S. 81, 84 (2006) ("Exhaustion is . . . mandatory. Prisoners must now exhaust all 'available' remedies[.]"); *Hargrove v. Riley*, No. 04-CV-4587, 2007 WL 389003, at *5-6 (E.D.N.Y. Jan. 31, 2007) ("The exhaustion requirement is a mandatory condition precedent to any suit challenging prison conditions, including suits brought under Section 1983.").[6] This limitation is intended to serve the dual purpose of affording "prison officials an opportunity to resolve disputes concerning the exercise of their responsibilities before being haled into courtl[,]" and to improve the quality of inmate suits filed through the production of a "useful administrative record." *Jones v. Bock*, 549 U.S. 199, 204 (2007) (citations omitted); *see Woodford*, 548 U.S. at 91-92; *see also Johnson v. Testman*, 380 F.3d 691, 697 (2d Cir. 2004). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002).

---

[6]     All unreported cases cited to in this decision have been appended to this report for the convenience of the *pro se* plaintiff.

The failure of a prisoner to satisfy the PLRA's exhaustion requirement is an affirmative defense that must be raised by a defendant in response to an inmate suit. *Jones*, 549 U.S. at 212. In the event the defendant establishes that the inmate plaintiff failed "to fully complete[ ] the administrative review process" prior to commencing the action, the plaintiff's complaint is subject to dismissal. *Pettus v. McCoy*, No. 04-CV-0471, 2006 WL 2639369, at *1 (N.D.N.Y. Sept. 13, 2006) (McAvoy, J.); *see also Woodford*, 548 U.S. at 93 ("[W]e are persuaded that the PLRA exhaustion requirement requires proper exhaustion."). "Proper exhaustion" requires a plaintiff to procedurally exhaust his claims by "compl[ying] with the system's critical procedural rules." *Woodford*, 548 U.S. at 95; *see also Macias v. Zenk*, 495 F.3d 37, 43 (2d Cir. 2007).

A comprehensive inmate grievance process existed at the CCJ at the times relevant to this action. Dkt. No. 26-9 at 31; Dkt. No. 38-3 at 19. The policies governing that process are set forth in an inmate handbook, a copy of which plaintiff acknowledged receiving upon being processed into the jail. *Id.*; *see also* Dkt. No. 26-6 at 19. According to the procedures set forth in the handbook, while inmates at the CCJ are encouraged first to informally communicate problems to housing unit officers, if they are

unable to resolve the issue in that manner, they are instructed to complete a complaint/grievance form, which is first reviewed by a housing unit officer, and then, if unresolved, is forwarded to the grievance coordinator as part of the formal grievance process. Dkt. No. 26-9 at 31; Dkt. No. 28-3 at 19. The grievance process provides inmates with the opportunity to appeal adverse decisions of the grievance coordinator to the jail administrator, and any adverse decision from that official can be appealed to the New York State Commission of Correction. *Id*. Inmates are informed that they can expect to receive a decision receive a decision from the NYS Commission of Corrections within forty-five business days. *Id*.

In this instance, there is no dispute that plaintiff filed a grievance regarding the restrictions on wearing his head covering and appealed the adverse decision at the facility level to the CPCRC on March 20, 2014. Dkt. No. 26-10 at 3-4; Dkt. No. 28-3 at 14-17. Nor do the parties dispute that the CPCRC did not issue its decision regarding plaintiff's appeal until August 5, 2010. Dkt. No. 26-10 at 2; *see also* Dkt. No. 28-1 at 4. Plaintiff filed his complaint in this action, however, on March 19, 2014, well before the CPCRC rendered its decision. Dkt. No. 2 at 5. While plaintiff contends that he "filed" his complaint on March 25, 2014, Dkt. No. 28-2, that

contention is legally irrelevant in light of the undisputed evidence that, even assuming he filed his complaint on that date, his complaint was filed months prior to issuance of the CPCRC's decision, and indeed well prior to expiration of the forty-five business days time within which the CPCRC is supposed to decide appeals to that body.[7] Accordingly, plaintiff failed to exhaust the available administrative remedies before filing this action. *See, e.g., Neal v. Goord*, 267 F.3d 116, 122-23 (2d Cir. 2001), *overruled on other grounds by Porter v. Nussle*, 534 U.S. 516 (2002); *accord, Casey v. Brockley*, No. 13-CV-1271, 2015 WL 8008728, at *5 (N.D.N.Y. Nov. 9, 2015) (Dancks, M.J.), *report and recommendation adopted by* 2015 WL 7864161 (N.D.N.Y. Dec. 3, 2015) (Hurd, J.), ("Receiving a decision from CORC *after* commencing litigation does not satisfy PLRA's requirement that administrative remedies be exhausted before filing suit, and any claim not exhausted prior to commencement of the suit must be dismissed without prejudice." (emphasis in original)).

---

[7] It is worth noting that plaintiff's insistence that he filed his complaint on March 25, 2014 is misguided. Under this circuit's "prison mailbox rule," the date of filing is deemed to be the date that the prisoner-plaintiff delivered his complaint to a prison guard for mailing to the court, which is presumed to be the date that the complaint was signed. *Houston v. Lack*, 487 U.S. 266, 276 (1988); *Noble v. Kelly*, 246 F.3d 93, 97 (2d Cir. 2011). Thus, for the purposes of this motion, the date upon which plaintiff filed his complaint is March 19, 2014, a day before he appealed the grievance determination to the CPCRC. Dkt. No. 2 at 5.

Plaintiff's failure to exhaust administrative remedies, however, does not warrant dismissal of his complaint without further inquiry. In a series of decisions rendered since the enactment of the PLRA, the Second Circuit has prescribed a three-part test for determining whether dismissal of an inmate-plaintiff's complaint is warranted for failure to satisfy the PLRA's exhaustion requirement. *See, e.g., Hemphill v. N.Y.*, 380 F.3d 680, 686 (2d Cir. 2004); *see also Macias*, 495 F.3d at 41. Those decisions instruct that, before dismissing an action as a result of a plaintiff's failure to exhaust, a court must first determine whether the administrative remedies were available to the plaintiff at the relevant times. *Macias*, 495 F.3d at 41; *Hemphill,* 380 F.3d at 686. In the event of a finding that a remedy existed and was available, the court must next examine whether the defendant has forfeited the affirmative defense of non-exhaustion by failing to properly raise or preserve it, or whether, through his own actions preventing the exhaustion of plaintiff's remedies, he should be estopped from asserting failure to exhaust as a defense. *Id*. In the event the exhaustion defense survives these first two levels of scrutiny, the court must examine whether the plaintiff has plausibly alleged special circumstances to justify his failure to comply with the applicable administrative procedure requirements. *Id.*

In this instance, the record fails to reveal any basis on which plaintiff's failure to exhaust could be excused under *Hemphill* and its progeny. As is detailed above, a comprehensive inmate grievance process existed at the CCJ at the relevant times. Dkt. No. 26-9 at 31; Dkt. No. 28-3 at 19. That grievance policy was set forth in an Inmate Handbook, a copy of which plaintiff acknowledged receiving upon being processed into the prison. *Id.*; Dkt. No. 26-6 at 19. Plaintiff was familiar with that grievance process, and knew it was available to him, as evidenced by the grievance filed by him while incarcerated at the CCJ. Dkt. No. 28-3 at 14-16. Indeed, a copy of plaintiff's grievance, and his detailed recounting of the process demonstrate that, during his custody in the CCJ, the grievance process was available to him. *Id.*; Dkt. No. 28-1 at 2-3. Accordingly, there is no evidence in the record upon which a reasonable factfinder could conclude that the grievance process was unavailable to plaintiff at the relevant times.

Turning to the second inquiry, there is no record evidence that suggests defendants forfeited the exhaustion defense, and plaintiff has not alleged as much.[8]

---

[8] Defendants asserted the exhaustion defense in their answer. Dkt. No. 20 at 3.

Finally, nothing in the record suggests that special circumstances exist that could justify plaintiff's failure to exhaust the available administrative remedies. The CPCRC's failure to act within the time frame set forth in the Inmate Handbook does not constitute a special circumstance justifying plaintiff's failure to exhaust. *See, e.g., Casey*, 2015 WL 8008728, at *6 (citing cases); *Quinn v. Stewart*, No. 10-CV-8692, 2012 WL 1080145, at *6 (S.D.N.Y. Apr. 2, 2012) ("The administrative exhaustion requirement directs courts to evaluate solely whether grievance procedures were satisfied *at the time that an action was initially filed*." (emphasis in original)). Accordingly, I recommend defendants' motion be granted based on plaintiff's failure to exhaust the available administrative remedies prior to filing this action.

C.    Merits of Plaintiff's First Amendment Religious Freedom Claims

As an alternative ground for dismissal of plaintiff's complaint, defendants contend that, based upon the record now before the court, no reasonable factfinder could conclude that defendants violated plaintiff's First Amendment rights to freedom of religion because any alleged burden upon plaintiff's religious beliefs resulting from defendants' actions is far outweighed by legitimate penological interests. Dkt. No. 26-15 at 13-15.

While inmates confined within prison facilities are by no means entitled to the full panoply of rights guaranteed under the United States Constitution, including its First Amendment, the free exercise clause of that provision does afford them at least some measure of constitutional protection. *See Pell v. Procunier*, 417 U.S. 817, 822 (1974) ("In the First Amendment context . . . a prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system."). That right, however, is not without limits, and the task of defining the contours of that right in a prison setting requires striking a delicate balance between the rights of prison inmates and the legitimate interests of prison officials tasked with maintaining prison security. *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348-49 (1987); *Ford v. McGinnis*, 352 F.3d 582, 588 (2d Cir. 2003); *Benjamin v. Coughlin*, 905 F.2d 571, 574 (2d Cir. 1990). When determining whether the decision to restrict an inmate from wearing religious headwear outside of his housing unit impinges upon that individual's First Amendment free exercise right, the inquiry is "one of reasonableness, taking into account whether the particular [act] affecting [the] right . . . is 'reasonably related to legitimate penological interests.'"

*Benjamin*, 905 F.2d at 574 (quoting *Turner v. Safley*, 482 U.S. 78, 89 (1987)); *Ford*, 352 F.3d at 588; *see also Farid v. Smith*, 850 F.2d 917, 925 (2d Cir. 1988).

As a threshold matter, "[t]he prisoner must show . . . that the disputed conduct substantially burdens his sincerely held religious beliefs."[9] *Salahuddin*, 467 F.3d at 274-75. In evaluating this factor, the court must be wary of "'question[ing] the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds.'" *McEachin*, 357 F.3d at 201 (quoting *Hernandez v. Comm'r of Internal Revenue*, 490 U.S. 680, 699 (1989)). Instead, a court should consider only whether the particular plaintiff has "demonstrate[d] that the beliefs professed are sincerely held and in the individual's own scheme of things, religious." *Ford*, 352 F.3d at 588 (quotation marks omitted). Once a plaintiff satisfies this burden, defendants must then "bear the relatively limited

---

[9]     The Second Circuit has yet to decide whether the "substantial burden" test survived the Supreme Court's decision in *Emp't Div. v. Smith*, 494 U.S 872, 887 (1990), in which the Court suggested that application of the test "puts courts in 'the unacceptable business of evaluating the relative merits of differing religious claims.'" *Ford*, 352 F.3d at 592 (quoting *Emp't Div.*, 494 U.S. at 887); *see also Holland v. Goord*, 758 F.3d 215, 220-21 (2d Cir. 2014) (declining to decide whether a prisoner must show, as a threshold matter, that the defendants' conduct substantially burdened his sincerely held religious beliefs in connection with a First Amendment free exercise claim). In the absence of any controlling precedent to the contrary, I have applied the substantial-burden test in this matter.

burden of identifying the legitimate penological interests that justifying impinging conduct." *Salahuddin*, 467 at 275. "[T]he burden[, however,] remains with the prisoner to 'show that these penological concerns were irrational.'" *Ford*, 352 F.3d at 595 (quoting *Fromer v. Scully*, 874 F.2d 69, 74 (2d Cir. 1989)) (alteration omitted).

The court then asks whether a defendant's conduct, which allegedly deprives the plaintiff of his free exercise rights, is reasonably related to some legitimate penological interest. *Ford*, 352 F.3d at 594; *see also Washington v. Gonyea*, 538 F. App'x 23, 26 (2d Cir. 2013) ("Even if Defendants-Appellees substantially burdened [the Plaintiff-Appellant]'s sincerely held religious believes, their actions do not constitute a constitutional deprivation if they were reasonably related to legitimate penological interests." (quotation marks omitted)). To evaluate whether a challenged regulation or decision by prison officials is reasonable,[10] courts must evaluate the following four factors:

> [(1) Whether the challenged regulation or official
> action has a valid, rational connection to a
> legitimate governmental objective; [(2)] whether
> prisoners have alternative means of exercising a

---

[10] Indeed, the Second Circuit has held that "[a]n individualized decision to deny a prisoner the ability to engage in religious exercise is analyzed in the same ways as a prison regulation denying such exercise." *Salahuddin*, 467 F.3d at 274 n.4.

> burdened right; [(3)] the impact on the guards,
> inmates, and prison resources of accommodating
> the right; and [(4)] the existence of alternative
> means of facilitating exercise of the right that have
> only a de minimis adverse effect on valid
> penological interests..

*Salahuddin*, 467 F.3d at 274 (footnote omitted).

In this case, defendants do not challenge the genuineness of

plaintiff's religious beliefs. The threshold issue in this case, then, is whether

the decision to limit the locations where plaintiff could wear his crown

substantially abridged plaintiff's sincerely held religious beliefs. "[A]

substantial burden exists where the state puts substantial pressure on an

adherent to modify his behavior and to violate his beliefs." *Jolly v.

Coughlin*, 76 F.3d 468, 477 (2d Cir. 1996) (quotation marks and alterations

omitted). On the one hand, plaintiff acknowledged that he did not wear his

crown continuously, throughout every day, *compare* Dkt. No. 26-14 at 7

*with* Dkt. No. 28 at 3, and plaintiff testified at his deposition that he

removed his crown to shower and pray and while at his home. Dkt. No. 26-

6 at 7-8. Moreover, plaintiff had "no problem" removing his crown for

search and inspection. Dkt. No. 26-6 at 29. On the other hand, however,

plaintiff contends that, according to his religious beliefs, his "head shall be

covered at all times . . . [out] of respect to [his] creator," except when he is

in temple or praying. *Id.* at 6, 7-8, 13. In light of all of this evidence, I find that a reasonable factfinder could conclude that defendants' decision to limit where plaintiff could wear his crown substantially burdened plaintiff's sincerely held beliefs. *See Ford*, 352 F.3d at 593-94 ("The relevant question in determining whether [the plaintiff]'s religious beliefs were substantially burdened is whether participation in [a particular celebration], in particular, is considered central or important to [the plaintiff]'s practice of Islam.").

Turning to the second prong of the analysis, and assuming that defendants' refusal to allow plaintiff to wear his crown in certain locations within the jail substantially burdened plaintiff's beliefs, I conclude that defendants have nonetheless demonstrated a compelling interest in maintaining security. The Second Circuit addressed the constitutionality of prison regulations that restricted the wearing of crowns to designated areas based upon legitimate security interests in *Benjamin v. Coughlin*, 905 F.2d 571 (2d Cir. 1990). In *Benjamin*, the defendants maintained that the size of crowns and the ease with which contraband could be smuggled, posed security concerns. *Benjamin*, 905 F.2d at 578-79. The court held that "legitimate security reasons are raised in support of the present policy.

Preventing the smuggling of contraband, such as weapons and drugs, comports with the type of penological interests contemplated under the *Turner/Shabazz* standard." *Id.* at 578.

Here, defendants Favro and Smith have explained that the crown is the largest religious head covering permitted to be worn at the CCJ and, due to its size, it poses the largest risk for concealing contraband and/or weapons. Dkt. No. 26-12 at 3; Dkt. No. 26-13 at 4. While the parties disagree regarding the precise dimensions of plaintiff's crown, it is undisputed that the crown measures approximately eleven inches in length and eleven inches in height. Dkt. No. 26-4; Dkt. No. 28-3 at 17-18. Defendants Smith and Favro also explain that, while head coverings can be worn throughout the facility subject to search and inspection, the rule can be modified based on the specific security concerns that an individual inmate poses during his incarceration at the facility. Dkt. No. 26-12 at 2; Dkt. No. 26-13 at 2. They note that the times when inmates are "mobile" create the highest security risks. Dkt. No. 26-12 at 2; Dkt. No. 26-13 at 3. Conducting searches of inmates during times of movement poses security risks because, as an officer is conducting a search of an inmate, he cannot observe and watch other inmates. Dkt. No. 26-12 at 3; Dkt. No. 26-13 at 4.

Although the parties disagree as to whether plaintiff was designated as "an initial security risk" at his booking, *compare* Dkt. No. 26-14 at 2 *with* Dkt. No. 28 at 1, plaintiff admits that he was processed into the CCJ in February 2014 after having been charged with promoting prison contraband. Dkt. No. 26-6 at 4. One month later, plaintiff was involved in two physical altercations with other inmates. *Id.* at 21-23; *see also* Dkt. No. 26-5 at 4-14. As a result of a third incident in June 2014, plaintiff received a sixty-day "lock in" sentence. Dkt. No. 26-5 at 16; Dkt. No. 26-13 at 5.

While plaintiff contends that he posed no security risk while at CCJ because "at no time while being house at [the CCJ] was [he] found to be in possession of prison contraband," Dkt. No. 28-1 at 3, such backwards reasoning does not address the potential security risk that prison staff assigned to plaintiff in light of his history of promoting prison contraband and fighting while incarcerated at the CCJ. Similarly, neither plaintiff's cooperation with prison officials during searches, nor the existence of security cameras throughout the facility, *id.* at 4-5, detract from the legitimate security risk posed by both the crown itself as a means of concealing weapons and other contraband and plaintiff, who prison officials felt posed a heightened security risk based on his past behavior.

Accordingly, in light of *Benjamin* and the security considerations highlighted by defendants, I find that no reasonable factfinder could conclude that defendants' decision to limit where plaintiff could wear his crown was unreasonable or irrationally related to a legitimate penological concern. *See Jihad v. Fabian*, No. 09-CV-1604, 2011 WL 1641885, at *18 (D. Minn. Feb. 17, 2011) (holding that the prison policy prohibiting the plaintiff from wearing his kufi outside of designated areas was narrowly tailored to serving compelling interests of prison safety and security); *see also Jones v. Rowley*, No. 08-CV-1094, 2009 WL 7042244, at *4 (D. Md. April 20, 2009) ("As a matter of law, the court concludes this heightened security concern is well founded. The regulation restricting plaintiff's wearing of a . . . 'crown' does not comprise a violation under [section] 1983 . . . since crowns are large and may be used to conceal contraband, including weapons and drugs."); *see also Muhammad v. Lynaugh*, 966 F.2d 901, 902-03 (5th Cir. 1992) (finding that corrections officers' testimony that weapons can "easily be secreted inside a Kufi cap" was persuasive evidence that the prison regulations restricting the use of Kufi caps are reasonably related to a legitimate penological interest of prison security).

Turning to the factor regarding whether the plaintiff had an alternative means of exercising the alleged burdened right, in this case, the court is not aware of any other means of exercising this particular religious belief other than physically wearing the crown. There is record evidence, however, demonstrating that plaintiff received some accommodations for his religious beliefs. Plaintiff was permitted to pray in his cell, at any time, without any limitations. Dkt. No. 26-6 at 13-15. In addition, he was able to wear his crown in his cell and housing unit without restriction. Dkt. No. 26-13 at 3. During plaintiff's 160 days of incarceration (less than 3,850 hours) at the CCJ, plaintiff was required to remove his crown for approximately 135 hours. Dkt. No. 26-14 at 5; Dkt. No. 28 at 2. On balance, in light of the security considerations suggested by defendants, as well as the accommodations already provided to plaintiff, in my view no reasonable factfinder could conclude that defendants' decision to refuse to allow plaintiff to wear his crown continuously throughout the facility was unreasonable. Accordingly, I recommend that plaintiff's First Amendment claim be dismissed.

D.    <u>Qualified Immunity</u>

Defendants also contend that, even if the court finds that plaintiff suffered a deprivation of his First Amendment rights, defendants Favro and Smith are protected by the doctrine of qualified immunity. Dkt. No. 26-15 at 18-20.

"Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012); *see also Pearson v. Callahan*, 555 U.S. 223, 231 (2009); *Sudler v. City of N.Y.*, 689 F.3d 159, 174 (2d Cir. 2012). The law of qualified immunity seeks to strike a balance between "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson*, 555 U.S. at 231. Government officials are shielded from liability by qualified immunity when making "reasonable mistakes" concerning the lawfulness of their conduct. *Sudler*, 689 F.3d at 174 (citing *Saucier v. Katz*, 533 U.S. 194, 206 (2001), *abrogated on other grounds by Pearson*, 555 U.S. 223)).

Because qualified immunity is "an immunity from suit rather than a mere defense to liability," *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985), the Supreme Court has "repeatedly . . . stressed the importance of resolving immunity questions at the earliest possible stage in the litigation," *Pearson*, 555 U.S. at 231 (quoting *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (per curiam)).

The determination of whether a government official is immune from suit is informed by two factors. *Doninger v. Niehoff*, 642 F.3d 334, 345 (2d Cir. 2011). Specifically, the inquiry turns on whether the facts alleged, taken in a light most favorable to the plaintiff, show that the conduct at issue violated a statutory or constitutional right, and if so, whether that right "was clearly established at the time of the challenged conduct." *Terebesi v. Torreso*, 764 F.3d 217, 230 (2d Cir. 2014) (citing *Reichle*, 132 S. Ct. at 2093). The Supreme Court has said that an officer's "conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083 (2011) (quotation marks and alterations omitted). "To this end, a plaintiff need not show a case 'directly on point,

but existing precedent must have placed the statutory or constitutional question beyond debate.'" *Terebesi*, 764 F.3d at 230 (quoting al-Kidd, 131 S. Ct. at 2083). However, "[e]ven where the law is 'clearly established' and the scope of an official's permissible conduct is 'clearly defined,' the qualified immunity defense also protects an official if it was 'objectively reasonable' for him at the time of the challenged action to believe his acts were lawful." *Higazy v. Templeton*, 505 F.3d 161, 169-70 (2d Cir. 2007) (citations omitted). This "objective reasonableness" part of the test is satisfied if "officers of reasonable competence could disagree on [the legality of the defendant's actions]." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

In this instance, even assuming plaintiff is able to establish a constitutional violation, I recommend a finding that defendants Favro and Smith are entitled to qualified immunity based upon my conclusion that it was objectively reasonable for them to believe that their conduct did not violate plaintiff's constitutional rights. As a threshold matter, at the time of the alleged incidents, "there [was] no clearly established law requiring prisons to permit inmates to wear religious head coverings at all times." *Uhuru v. Hart*, No. 07-CV-7361, 2009 WL 3489376, at *15 (C.D. Cal. Oct.

27, 2009) (citing *Khatib v. Cnty. of Orange*, No. 07-CV-1012, 2008 WL 822562 *10 (C.D.Cal. Mar. 26, 2008), *reversed on other grounds by Khatib v. Cnty. of Orange*, 639 F.3d 898 (9th Cir. 2011)); *see also Benjamin*, 905 F.2d at 578-79 (upholding prison regulation that limited the prisoners' rights to wear their Rastafarian crowns to certain locations within the prison). In any event, a person in defendants' positions could have reasonably concluded that weapons or contraband might be concealed under plaintiff's crown, and, therefore, restricting plaintiff's right to wear his crown to certain locations in the jail would not violate any clearly established constitutional right. *See Nicholas v. Tucker*, No. 95-CV-9705, 2001 WL 228413, at *2 (S.D.N.Y. March 8, 2001) (finding that the defendant was entitled to qualified immunity because an officer in the defendant's position could have concluded that contraband could have been concealed under the plaintiff's kufi). Accordingly, defendants Favro and Smith are entitled to qualified immunity.

      E.    <u>Punitive Damages</u>

     Defendants also seek dismissal of plaintiff's punitive damages claim against defendant County. Dkt. No. 26-15 at 20. It is well established that, as a municipal entity, defendant County is not subject to exposure to

punitive damages, including for claims brought under 42 U.S.C. § 1983. *Ciraulo v. City of N.Y.*, 216 F.3d 236, 238 (2d Cir. 2000) (holding that the Supreme Court's decision in *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247 (1981), precludes an award of punitive damages against a municipality under section 1983). Because plaintiff's complaint asserts only claims arising under section 1983 against defendant County, I recommend that any punitive damage claim that may be considered as having been asserted against that defendant in plaintiff's complaint be dismissed.

IV.    <u>SUMMARY AND RECOMMENDATION</u>

Because plaintiff failed to file and pursue to completion a grievance regarding the claims asserted in his complaint prior to filing this action, he is procedurally barred from pursuing those claims in federal court. Turning to the merits of the plaintiff's First Amendment free exercise claim, I find that the record lacks any evidence from which a reasonable factfinder could conclude that any defendant violated plaintiff's rights. Moreover, even assuming that plaintiff's clearly established constitutional rights were violated by one of the defendants Smith or Favro in this case, it was

objectively reasonable for them to believe that their conduct did not violate plaintiff's rights.[11]

It is therefore hereby respectfully

RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 26) be GRANTED and plaintiff's complaint be DISMISSED.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir.1993).

It is hereby ORDERED that the clerk of the court serve a copy of this

---

[11]     In light of my recommendations that defendants' motion be granted in its entirety based on plaintiff's failure to exhaust available administrative remedies, on the merits, and based upon qualified immunity, I have not addressed defendants' remaining contentions regarding plaintiff's municipal liability claim against defendant County or the personal involvement of defendants Favro and Smith.

report and recommendation upon the parties in accordance with this

court's local rules.

David E. Peebles
U.S. Magistrate Judge

Dated:      March 9, 2016
            Syracuse, New York


Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

C   Only the Westlaw citation is currently available.

United States District Court,
E.D. New York.
Wayne HARGROVE, Plaintiff,
v.
Sheriff Edward RILEY; Nassau County Correctional
Facility, et al; Nassau County University Medical Staff
and Nassau County Correctional Facility, Defendants.
**Civil Action No. CV-04-4587 (DGT).**

Jan. 31, 2007.

Wayne Hargrove, Ossining, NY, pro se.

Alexander V. Sansone, Troy & Troy, Lake Ronkonkoma,
NY, Joseph Carney, Mineola, NY, for Defendants.

*MEMORANDUM AND ORDER*

TRAGER, J.

**\*1** Inmate Wayne Hargrove ("Hargrove" or "plaintiff")
brings this *pro se* action pursuant to 42 U.S.C. § 1983
against the Nassau County Sheriff, Nassau County
Correctional Facility ("NCCF") and NCCF's medical staff,
(collectively, "defendants"), seeking damages for injuries
allegedly caused by defendants while he was incarcerated
at NCCF. Defendants now move for summary judgment
pursuant to Fed.R.Civ.P. 56 arguing, *inter alia,* that
Hargrove's claims should be dismissed because he failed
to exhaust administrative remedies, as required by the
Prison Litigation Reform Act of 1995 ("PLRA"), 42
U.S.C. § 1997e. For the following reasons, defendants'
motions for summary judgment are granted.

**Background**

On August 27, 2004,[FN1] Hargrove filed a complaint,
alleging that defendants violated his civil rights when they
forcibly administered purified protein derivative skin tests
("PPD test") to test for latent tuberculosis ("TB") in April
2002, 2003 and 2004 while he was incarcerated at NCCF.
Complaint, Ex. C; Aff. in Opp. at 1-4, Ex. A. Hargrove
named Nassau County Sheriff Edward Reilly ("Reilly"),
NCCF and Nassau County University Medical Staff [FN2] as
defendants.[FN3] On November 22, 2004, after discovery,
County Defendants and NHCC Defendants filed separate
motions for summary judgment pursuant to Fed.R.Civ.P.
56. Both defendants properly filed a Local Rule 56.1
Statement and served Hargrove a Notice to *Pro Se* Litigant
Opposing Motion for Summary Judgment, pursuant to
Local Civil Rule 56.2.

FN1. Hargrove signed the complaint August 27,
2004. The *pro se* clerk's office received and filed
the complaint on September 20, 2004. Under the
prison mail-box rule, a *pro se* prisoner's
complaint is deemed filed when it is delivered to
prison authorities. *See, e.g., Walker v.
Jastremski,* 430 F.3d 560, 562 (2d
Cir.2005)(deeming *pro* se prisoner's § 1983
action filed on date complaint was handed to
prison officials). There is no evidence in the
record as to when Hargrove handed the
complaint to prison officials. However, it is clear
the operative date is between August 27, 2004
and September 20, 2004. As discussed, *infra,*
both of these dates occur before Hargrove
properly exhausted the administrative remedies
available to him at NCCF.

FN2. The Nassau County University Medical
Staff are employed by the Nassau Health Care
Corporation ("NHCC"). Pursuant to the
Correctional Center Health Services Agreement
between the County of Nassau and NHCC, dated
September 24, 1999, NHCC provides medical
services for inmates at NCCF. County Defs.'s

© 2010 Thomson Reuters. No Claim to Orig. US Gov.
Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

Not. of Motion, Decl., at 1.

FN3. Reilly and NCCF are represented separately from NHCC. Accordingly, when a distinction is necessary, Reilly and NCCF will be referred to as "County Defendants" and Nassau County University Medical Staff and NHCC will be referred to as "NHCC Defendants."

**(1)**

**Tuberculosis Testing at NCCF**

Upon entering NCCF, new prisoners must first go through medical intake. Aff. of Kim Edwards, ("Edwards Aff.") ¶ 3. This standard process usually takes seventy-two hours. Edwards Aff. ¶ 4. During medical intake, NCCF tests inmates for TB. Aff. of Getachew Feleke ("Feleke Aff.") ¶ 3. NCCF generally uses a PPD test to detect latent TB. Feleke Aff. ¶ 3. However, if an inmate has previously tested positive for TB, it is NCCF's policy to test for TB using an x-ray instead.[FN4] Feleke Aff. ¶ 3. As part of its Infectious Disease Program, NCCF re-tests inmates for TB each year, beginning after they have been housed in that facility for one year. Edwards Aff. ¶ 5.

FN4. According to WebMD, "[a] tuberculin skin test should not be done for people who have a(1) Known TB infection [or a] (2) Positive tuberculin skin test in the past. A second test may cause a more severe reaction to the TB antigens." Jan Nissl, RN, BS, *Tuberculin Skin Tests,* WEBMD, h t t p : / / www.webmd.com/hw/lab_tests/hw203560.asp (last visited Jan. 31, 2007).

**(2)**

**Hargrove's Tuberculosis Testing at NCCF**

On March 15, 2002, Hargrove was incarcerated at NCCF.

NHCC Defs.' 56.1 Statement ¶ 1. Before entering the general population, Hargrove was processed through medical intake. NHCC Defs.' 56.1 Statement ¶ 2. The NCCF Medical Intake Chart for Hargrove, dated March 15, 2002 ("3/15/02 Chart"), shows that Hargrove informed medical staff that he had previously been exposed to tuberculosis. NHCC Defs.' Notice of Mot., Ex. C, at 1; NHCC Defs.' 56.1 Statement ¶ 2. The 3/15/02 Chart also shows that Hargrove reported testing positive to a prior PPD test and that he had been treated for TB in 2000. NHCC Defs.' Notice of Mot., Ex. C, at 1. Hargrove alleges that he was exposed to and treated for TB in 1997. Hargrove's Aff. in Opp. to Mot. for Summary Judgment, ("Aff. in Opp."), Ex. A at 1-2. Defendants contend that Hargrove was given an x-ray during the medical intake process because of his reported positive PPD test, and that the x-ray was negative, showing no active TB infection. NHCC Defs.' 56.1 Statement ¶ 2; Edwards Aff. ¶ 3. Without specifying a date, Hargrove generally states that his "request to be x-rayed was denied." Aff. in Opp. at 3.

**\*2** Pursuant to NCCF's Infectious Disease Program, after being incarcerated in NCCF for a year, Hargrove was scheduled to be re-tested for TB. Edwards Aff. ¶ 5; NHCC Defs.' 56.1 Statement ¶ 4. On May 24, 2003, Hargrove was given a PPD skin test. Edwards Aff. ¶ 5; NHCC Defs.' 56.1 Statement ¶ 4. This test was negative. Edwards Aff. ¶ 5; NHCC Defs.' 56.1 Statement ¶ 4. According to Hargrove, he requested an x-ray instead of a PPD test because of his previous exposure to TB, but was forced to submit to the PPD test. He also alleges that defendants threatened to put him in "keep lock" or "lock up" unless he submitted to the PPD test.[FN5] Complaint, Ex. C; Aff. in Opp. at 1-4, Ex. A.

FN5. Hargrove has made contradictory statements about being placed in "keep lock" or "lock up". It is unclear whether he is alleging that defendants threatened to place him in "lock up" unless he submitted to the PPD test or whether he was actually placed in "lock up" until such time that he agreed to submit to the PPD tests. For example, in his complaint, Hargrove states that when he "refused to submit to another [PPD] test, the Correctional Authorities were brought in and placed [him] in lock up." Complaint ¶ 4. In a hearing before Magistrate Judge Bloom on

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

January 31, 2005, Hargrove stated that he took the PPD tests because he was told that he would be placed in "lock up" until he submitted to the test. Hr'g Tr. 6:1-18; 9:5-10:10. In Exhibit B to his complaint, Hargrove alleges both that he was given an unwarranted TB shot and that when he refused the same shot he was placed in "keep lock." Complaint, Ex. B. There is no evidence in the record that Hargrove was ever segregated from the general population while housed at NCCF, outside of the seventy-two hour initial medical intake period. Aff. of Sgt. Neumann ("Neumann Aff.") at 1-2 (referring to prison records showing Hargrove's holding locations which demonstrate that he never placed in "lock up"); NCCF 56.1 Statement ¶ E. Whether or not Hargrove was actually placed in "lock up" is not a material fact for purposes of this motion; as explained in detail, *infra,* Hargrove's failure to exhaust administrative remedies under the PLRA precludes a consideration of the merits of his Section 1983 claim.

The following year, in June of 2004, Hargrove was scheduled to be retested. Edwards Aff. ¶ 6; NHCC Defs.' 56.1 Statement ¶ 5. Because of the contradiction between the negative May 2003 PPD test and his reported positive history, NCCF contacted the Infectious Disease Department of the Nassau County Medical Center. Edwards Aff. ¶ 6. It was suggested that Hargrove be given a two-step PPD test, administered fifteen days apart. Feleke Aff. ¶ 4; Edwards Aff. ¶ 6. Hargrove was given these two PPD skin tests in June 2004. Edwards Aff. ¶ 6; NHCC Defs.' 56.1 Statement ¶ 5. Again, Hargrove alleges that these tests were administered against his will and under threat of being placed in quarantine. Complaint, Exs. A, B; Aff. in Opp., Ex. A.

On December 3, 2004, Hargrove was seen by a physician's assistant. NHCC Defs.' 56.1 Statement ¶ 6. During this meeting, Hargrove complained of a dry cough and that the site on his forearm where the June 2004 PPD tests had been administered was red and swollen. NHCC Defs.' 56.1 Statement ¶ 6; 11/28/04 Sick Call Request.

Hargrove's December 18, 2004 chart notes a positive PPD

test and an order was placed in the chart that Hargrove not be submitted for future PPD tests. Edwards Aff. ¶ 7; NHCC Defs.' 56.1 Statement ¶ 8. *See also* 11/19/2004 Grievance.

Hargrove alleges that the following physical ailments were caused by the PPD tests: chronic coughing, high blood pressure, chronic back pain, lung infection, dizzy spells, blurred vision and a permanent scar on both his forearms. Complaint, Ex. C; Aff. in Opp. at 3-4.

**(3)**

**NCCF's Inmate Grievance Procedure**

NCCF has had an inmate grievance program ("IGP") in place since 2001. Aff. of Kenneth Williams, ("Williams Aff."), at 2. NCCF's IGP is carried out in conformance with the New York State Commission of Corrections Minimum Standards and Regulations for Management of County Jails and Penitentiaries ("Minimum Standards"). *Id.*

The IGP is designed to resolve complaints and grievances that an inmate may have regarding the inmate's care and treatment while incarcerated at NCCF. Williams Aff. at 2. Upon entering NCCF, all inmates receive a copy of the NCCF inmate handbook, which outlines the IGP. *Id.*

**\*3** The record does not include an actual copy of NCCF's IGP, but the NCCF's IGP is detailed in the affidavit of NCCF Investigator Kenneth Williams. [FN6] The IGP encourages inmates to resolve their grievances informally with the staff member assigned to the inmate housing unit first. *Id.* If an acceptable resolution cannot be reached, inmates must then proceed through the formal three-step process set out in the IGP. *Id.* at 3.

FN6. Hargrove does dispute any statements made by Investigator Williams regarding the inmate grievance procedure, time limits or its availability to him. Furthermore, Hargrove does

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

not dispute that he received a handbook outlining the IGP.

The first step requires an inmate to submit his grievance form [FN7] to the Inmate Grievance Unit by placing it in a locked box located in each housing area, "within five days of the date of the act or occurrence giving rise to the grievance." [FN8] *Id.* at 2-3. NCCF indexes all grievance forms filed by inmates in a log book and in a computer system. *Id.* at 1, 3. Once a grievance form is received by the Inmate Grievance Unit, the grievance is investigated and the inmate will receive a written determination of the outcome from the Inmate Grievance Coordinator in Section II of the grievance form. [FN9] *Id.* at 3. The inmate is then given a choice to accept or appeal the decision by checking the desired selection and signing his name in Section III of the grievance form. *See, e.g.,* 11/19/2004 Grievance form. If the inmate is not satisfied with the decision of the Inmate Grievance Coordinator, the inmate may appeal the determination to the Chief Administrative Officer. Williams Aff. at 3. Finally, if the inmate is not satisfied with the Chief Administrative Officer's determination, the inmate may appeal to the New York State Commission of Correction Citizen's Policy and Complaint Review Council ("Council"). *Id.* at 3. The Council will then render a final determination. *Id.* at 3.

FN7. The grievance forms contain four sections to be utilized throughout all three steps of the IGP. Section I provides space for the inmate to explain his complaint and the actions he requests as relief. Section II is for the decision of the Inmate Grievance Coordinator. Section III is titled "Acceptance/Appeal of Grievance Coordinator's decision" and contains two mutually exclusive options which the inmate must choose one or the other: "I have read and accept the Grievance Coordinator's decision," or "I have read and appeal the Grievance Coordinator's decision." Section IV provides space for the decision of the Chief Administrative Officer.

FN8. Hargrove has not argued that he was unaware of this five-day deadline.

FN9. There is no evidence in the record specifying the how long an inmate has to appeal inaction by the Inmate Grievance Unit.

**(4)**

**Authenticity of the Grievance Forms and Other Documents Submitted by Hargrove**

In support of his allegations that he continuously informed defendants that he had been exposed to TB and, therefore, should not have been given PPD tests, Hargrove submitted three letters with his complaint, two of which were addressed to the Inmate Grievance Committee and one of which was addressed to "To whom this may concern." Complaint, Exs. A-C. He also submitted five complaint letters written to Sheriff Reilly, seventeen sick call requests and nine grievance forms during discovery and with his Affidavit in Opposition to Defendants' Motion for Summary Judgment, explaining that some of the medical records and notarized letters were "missing." Aff. in Opp, Ex. A at 2. Defendants call the authenticity of most of these documents into question, contending that Hargrove never submitted any grievance form or complaint letter before he filed his complaint. County Defs.' Mem. of Law at 16-21; County Defs.' 56.1 Statement at ¶¶ B2, C3, D3.

Kenneth Williams, an investigator at NCCF in the Inmate Grievance Unit, testified that he reviewed all of the grievance forms, complaint letters and sick call requests annexed to Hargrove's Complaint and to Hargrove's Affidavit in Opposition to Defendants' Motion for Summary Judgment. Williams Aff. at 2. Williams testified that he examined the grievance records at NCCF and searched "for any grievances by plaintiff/inmate Hargrove" and found "only two." [FN10] Williams Aff. at 1. The first grievance, dated November 19, 2004, complained that the medical staff continued "forcing [Hargrove] to take a T.B. shot while [he] keep[s] telling them that [he] has been exposed to T.B." 11/19/2004 Grievance; Williams Aff. at 1. In response to this grievance, Hargrove's "positive" TB status was noted in his medical records and an order was placed in Hargrove's medical chart, stating that Hargrove not be subjected to future PPD tests. 11/19/2004 Grievance, Section II;

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

Williams Aff. at 1; NHCC Defs.' 56.1 Statement ¶ 8; Edwards Aff. ¶ 7. In Section III of the 11/19/2004 Grievance, Hargrove acknowledged that he had read the Grievance Coordinator's decision, and that he chose to accept the decision instead of appealing it. 11/19/2004 Grievance. The other grievance received by the Grievance Unit, dated May 11, 2005, complained of an unrelated matter. 5/11/2005 Grievance (complaining of back problems and requesting the return of his medical shoes); Williams Aff. at 1. Thus, Williams concluded that, beside the 11/19/2004 and 5/11/2005 Grievance Forms, none of the other documents were "received by the grievance unit, and, given the locked box system, the grievance-forms were never submitted by plaintiff/inmate." Williams Aff. at 2.

> FN10. It is NCCF's procedure to forward to the attention of the Grievance Unit all official grievance forms and complaint letters-even ones not specifically addressed to the Grievance Unit. Williams Aff. at 3.

*4 A visual examination of the grievance forms Hargrove submitted in support of his claims suggests forgery. Five of the nine grievance forms were requests to stop PPD testing. *See* April 19, 2002 grievance; April 28, 2002 grievance; April 20, 2003 grievance; April 28, 2003 grievance; November 19, 2004 grievance. The remaining grievance forms concerned Hargrove's requests for medical shoes. *See* March 18, 2002 grievance; July 6, 2002 grievance; February 20, 2003 grievance; May 11, 2005 grievance. Of the grievance forms complaining of unwanted PPD tests, the April 28, 2002 grievance form is a patent photocopy of the April 19, 2002 grievance form, and the April 28, 2003 grievance form is a patent photocopy of the April 20, 2003 grievance form, with only the handwritten dates changed. The only potentially authentic grievance forms relating to Hargrove's complaint about the PPD testing are dated April 19, 2002, April 20, 2003, and November 19, 2004. Of these grievance forms, only the November 19, 2004 has been authenticated by NCCF personnel. *See generally* Williams Aff. at 1-4.

Turning to the complaint letters addressed to Reilly, many contain notary stamps cut from the bottom of unrelated

documents and photocopied onto the bottom of the complaint letters. *See* County Defs.' Mem. of Law at 18-21. C.O. Thomas McDevitt and C.O. Paul Klein, both of whom perform notary services for prisoners at NCCF, have submitted sworn affidavits, stating that they kept individual Notary Log Books covering all dates relevant to this litigation. Aff. of C.O. Klein, ("Klein Aff."), at 1; Aff. of C.O. McDevitt, ("McDevitt Aff."), at 1. McDevitt's Notary Log Book shows that he notarized only one document for Hargrove. This document, dated May 13, 2002, was a motion related to Hargrove's criminal trial. McDevitt Aff. at 1-2. Hargrove signed the Notary Log Book acknowledging receipt of that notarized motion. McDevitt Aff. at 2. McDevitt states that he never notarized any other documents for Hargrove. McDevitt Aff. at 2. However, McDevitt's stamp and signature dated May 13, 2002 (the date of the legitimate notarization) appear on Hargrove's letter to Sheriff Reilly dated May 10, 2002. County Defs.' Not. of Motion, Ex. A.

These facts repeat themselves in regard to the documents bearing the notary stamp and signature of Klein. Klein had performed several legitimate notarizations for Hargrove in connection to Hargrove's criminal trial. Klein Aff. at 1-2. Hargrove signed Klein's Notary Log Book acknowledging receipt of those notarized documents. Klein Aff. at 2. However, Klein states that he never notarized any of Hargrove's letters addressed to Sheriff Reilly that bear Klein's stamp and signature. Klein Aff. at 2. On all of the documents that Hargrove submitted bearing Klein's stamp and signature, the dates and signatures of Klein match identically to the dates on which he had performed legitimate notarizations for Hargrove in connection with his criminal trial. Defendants argue it is clear that the documents bearing the stamps and signatures of McDevitt and Klein were not actually notarized by these notaries. County Defs.' Mem. of Law at 17-22.

*5 Hargrove does not deny these allegations. Instead, he resubmits the documents that McDevitt and Klein testify they did not notarize with his Affidavit in Opposition and insists that the documents "refute[ ] the assertions put forth by the defendants." Aff. in Opp. at 2.

**Discussion**

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

**(1)**

**Summary Judgment Standard**

A motion for summary judgment is granted when "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A court ruling on a summary judgment motion must construe the facts in the light most favorable to the non-moving party and draw all reasonable inferences in his favor. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986); *Williams v. Metropolitan Detention Center,* 418 F.Supp.2d 96, 100 (E.D.N.Y.2005). Defendants, the moving party in this action, bear the burden of demonstrating the absence of a genuine issue of material fact. *Baisch v. Gallina,* 346 F.3d 366, 371 (2d Cir.2003).

As Hargrove is proceeding *pro se,* his complaint must be reviewed carefully and liberally, and be interpreted to "raise the strongest argument it suggests," *Green v. United States,* 260 F.3d 78, 83 (2d Cir.2001), particularly when civil rights violations are alleged, *see, e.g., McEachin v. McGuinnis,* 357 F.3d 197, 200 (2d Cir.2004). Plaintiff's complaint does not specify the legal theories upon which it relies, but, in construing his complaint to raise its strongest arguments, it will be interpreted to raise claims under 42 U.S.C. § 1983. *See, e.g., Dufort v. Burgos,* No. 04-CV-4940, 2005 WL 2660384, at *2 (E.D.N.Y. Oct. 18, 2005) (liberally construing plaintiff's complaint, which failed to specify the legal theory or theories upon which it rested, as, *inter alia,* a claim under 42 U.S.C. § 1983); *Williams,* 418 F.Supp.2d at 100 (same).

**(2)**

**Prison Litigation Reform Act**

**a. Purpose of the Prison Litigation Reform Act**

The PLRA was intended to "reduce the quantity and improve the quality of prisoner suits." *Woodford v. Ngo,* --- U.S. ----, 126 S.Ct. 2378, 2387 (2006) (quoting *Porter v. Nussle,* 534 U.S. 516, 524 (2002)). It seeks to eliminate unwarranted interference with the administration of prisons by federal courts, and thus " 'affor[d] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case.' " *Woodford,* 126 S.Ct. at 2387 (quoting *Porter,* 534 U.S. at 525).*See also Booth v. Churner,* 532 U.S. 731, 739 (2001). Formal grievance procedures allow prison officials to reconsider their policies, implement the necessary corrections and discipline prison officials who fail to follow existing policy. *See Ruggiero v. County of Orange,* 467 F.3d 170, 177-78 (2d Cir.2006).

**b. The Exhaustion Requirement**

The PLRA's "invigorated" exhaustion provision, 42 U.S.C. § 1997e(a), provides the mechanism to reduce the quantity and improve the quality of prisoners' suits by requiring that prison officials have the opportunity to address prisoner complaints through internal processes before allowing a case to proceed in federal court. *Woodford,* 126 S.Ct. at 2382 (citing *Porter,* 534 U.S. at 524).Section 1997e(a) provides that:

**\*6** [n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other federal law, by a prisoner confined in any jail, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).

The exhaustion requirement is a mandatory condition precedent to any suit challenging prison conditions, including suits brought under Section 1983. *Woodford,* 126 S.Ct. at 2383;*Ruggiero,* 467 F.3d at 174;*Williams,* 418 F.Supp.2d at 100-01. The exhaustion provision is applicable to suits seeking relief, such as money damages, that may not be available in prison administrative proceedings, as long as other forms of relief are obtainable through administrative channels. *Giano v. Goord,* 380 F.3d 670, 675 (2d Cir.2004); *see also Woodford,* 126 S.Ct. at 2382-83 ("[A] prisoner must now exhaust

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

administrative remedies even where the relief sought-monetary damages-cannot be granted by the administrative process.") (citing *Booth*, 532 U.S. at 734).

In June 2006, the Supreme Court held that the PLRA requires "proper exhaustion" before a case may proceed in federal court. *Woodford*, 126 S.Ct. at 2387. "Proper exhaustion" requires a prisoner to use " 'all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits).' " *Ruggiero*, 467 F.3d at 176 (citing *Woodford*, 126 S.Ct. at 2385 (emphasis in original)). Although the level of detail necessary to properly exhaust a prison's grievance process will vary from system to system, *Jones v. Bock*, 127 S.Ct. 910, 2007 WL 135890, at *12 (Jan. 22, 2007), "proper exhaustion" under the PLRA " 'demands compliance with [that] agency's deadlines and other critical procedural rules.' " *Ruggiero*, 467 F.3d at 176 (quoting *Woodford*, 126 S.Ct. at 2386). Thus, the PLRA's exhaustion requirement is not satisfied by "untimely or otherwise procedurally defective attempts to secure administrative remedies." *Ruggiero*, 467 F.3d at 176 (citing *Woodford*, 126 S.Ct. at 2382).

**(3)**

**Exhaustion Analysis: Hargrove did not Exhaust the Administrative Remedies Made Available by NCCF prior to Bringing Suit**

Section 1997e(a) of the PLRA applies to Hargrove's complaint; Hargrove was and continues to be confined in a correctional facility, *see Berry v. Kerik*, 366 F.3d 85, 87 (2d Cir.2004), and Hargrove's claim is about a "prison condition" within the meaning of the PLRA, *see Williams*, 418 F.Supp.2d at 101. *See also Sloane v. W. Mazzuca*, No. 04-CV-8266, 2006 WL 3096031, at *4 (S.D.N.Y. Oct. 31, 2006) (recognizing PLRA's application to complaint alleging retaliation by prison officials for plaintiff's refusal to consent to a PPD test). Thus, the merits of Hargrove's Section 1983 claims can only be addressed if it is first determined that Hargrove properly exhausted each claim under Section 1997e(a) of the PLRA before filing his complaint in federal court.

**\*7** Hargrove has submitted both forged [FN11] and authentic grievance forms in opposing defendants' motions for summary judgment. Excluding, for the moment, the forged documents, NCCF's records reflect that Hargrove did not submit his first grievance until after he filed the instant complaint. Williams Aff. at 1. Hargrove's first grievance complaining of unwanted PPD testing is dated November 19, 2004, Williams Aff. at 1, two to three months after Hargrove filed his complaint. Additionally, this first grievance, dated November 19, 2004, was submitted five months after the last PPD test was administered to him in June 2004. NHCC Defs.' 56.1 Statement ¶¶ 5,6. This five-month period far exceeds the five-day window provided by NCCF's IGP. Since Hargrove failed to comply with the IGP's deadlines, he did not properly exhaust the available administrative remedies. *Ruggiero*, 467 F.3d at 176 (" 'untimely or otherwise procedurally defective attempts to secure administrative remedies do not satisfy the PLRA's exhaustion requirement.' ") (quoting *Woodford*, 126 S.Ct. at 2382).

> FN11. Based on an examination of the documents themselves, as well as the uncontradicted testimony of the notaries performing services for prisoners at NCCF, *see generally* Klein Aff.; McDevitt Aff., and of the investigator in the Inmate Grievance Unit, *see generally* Williams Aff., it appears that many of the documents submitted by Hargrove are forgeries. However, in order to view the facts in the light most favorable to Hargrove, and so as to avoid making findings of fact in a summary judgment motion, for the purposes of the exhaustion analysis, all of the documents will be considered to be authentic. However, for purposes of the sanctions analysis, the documents will be explored and the consequences of Hargrove's misrepresentations will be addressed.

Furthermore, even if the falsified grievance forms Hargrove submitted in support of his claim are considered authentic, they are still untimely. The diagnostic TB tests (whether x-ray or PPD tests) were given to Hargrove on March 15, 2002, May 24, 2003 and in June of 2004, but the grievance forms Hargrove submitted complaining of unwanted PPD tests are dated April 19, 2002, April 28, 2002, April 20, 2003, April 28, 2003 and November 19,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

2004. None of these grievances were filed "within five days of the of the date of the act or occurrence giving rise to the grievance." Williams Aff. at 3. There is no evidence in the record suggesting that NCCF's IGP allows for a tolling of the five-day time limit in which to file a grievance.[FN12]

> **FN12.** Even if the submitted grievances had been filed within the proscribed time period, they only show that Hargrove's grievances reached an Inmate Grievance Coordinator, the first formal step of NCCF's three-step administrative grievance process; Hargrove never appealed to the Chief Administrative Officer. By failing to take the next available step in NCCF's IGP, Hargrove failed to satisfy the mandatory exhaustion requirement. *See, e.g., Williams, 418 F.Supp.2d at 101, 102* (dismissing *pro se* complaint where plaintiff could only show he exhausted two of the four-step process mandated by prison's administrative process).

While the letters to Reilly and sick call requests show that Hargrove attempted to bring his complaints about the PPD testing to the attention of the prison staff, *see, e.g.,* Aff. in Opp., Exs. A-D, NCCF's IGP requires use of formal grievance forms. Thus, writing complaint letters and submitting sick call requests did not properly exhaust NCCF's available administrative remedies. *See, e .g., Hernandez v. Coffey,* No. 99-CV-11615, 2006 WL 2109465, at *4 (S.D.N.Y. July 26, 2006) (holding letters did not satisfy plaintiff's exhaustion obligation); *Williams, 418 F.Supp.2d at 101* (holding that because plaintiff's efforts to convey his medical condition through letters and conversations with the warden and medical staff did "not include the required steps of the PLRA's administrative remedy process," plaintiff failed to exhaust); *Mills v. Garvin,* No. 99-CV-6032, 2001 U.S. Dist. LEXIS 3333, at *8 (S.D.N.Y. Mar. 2, 2001) ("letter writing is not the equivalent of an exhaustion of administrative remedies under the PLRA").

As Hargrove failed to properly exhaust his administrative remedies, this action is precluded by 42 U.S.C. § 1997e(a) unless Hargrove can establish excuse for his failure to exhaust.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

**(4)**

**No Grounds to Excuse Plaintiff's Failure to Exhaust**

**\*8** Exhaustion is an affirmative defense that defendants have the duty to raise. *Jones,* 2007 WL 135890, at * 8-11;*Sloane,* 2006 WL 3096031, at *4;*Williams, 418 F.Supp.2d at 101.* Once argued by the defendants, a plaintiff has an opportunity to show why the exhaustion requirement should be excused or why his failure to exhaust is justified. *See Ruggiero, 467 F.3d at 175;Collins v. Goord, 438 F.Supp.2d 399, 411 (S.D.N.Y.2006)* ("[T]he Second Circuit has cautioned that 'while the PLRA's exhaustion requirement is 'mandatory,' certain caveats apply.' ")(internal citations omitted). Thus, before concluding that a prisoner failed to exhaust available administrative remedies as required by Section 1997e(a) of the PLRA, the following three factors must be considered: (1) whether administrative remedies were actually available to the prisoner; (2) whether defendants have either waived the defense of failure to exhaust or acted in such a way as to estop them from raising the defense; and (3) whether special circumstances, such as a reasonable misunderstanding of the grievance procedures, exist justifying the prisoner's failure to comply with the exhaustion requirement. *Ruggiero,* 467 F.3d at 175 (citing *Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004)).[FN13]

> **FN13.** Courts in the Second Circuit have questioned what effect, if any, the Supreme Court's recent decision in *Woodford* requiring "proper exhaustion" may have on the three-step *Hemphill* inquiry. The Second Circuit has yet to address this issue. *See Ruggiero, 467 F.3d at 175-76* (declining to "determine what effect *Woodford* has on our case law in this area ... because [plaintiff] could not have prevailed even under our pre-*Woodford* case law"). To date, district courts have acknowledged the tension, but resolved to apply *Hemphill* to exhaustion claims until instructed otherwise by the Second Circuit. *See, e.g., Larkins v. Selsky,* 04-CV-5900, 2006 WL 3548959, at *9, n. 4 (S.D.N.Y. Dec. 6,

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

2006) (applying the current law of the Second Circuit to exhaustion claims); *Sloane,* 2006 WL 3096031, at *5 ("Until such time as the Court of Appeals considers the impact of *Woodford,* if any, on its prior rulings, this Court must follow the law of the Second Circuit. The Court will therefore apply the current law of this circuit to the exhaustion claims."); *Collins v. Goord,* 438 F.Supp.2d at 411 n. 13 (acknowledging that *Woodford* and *Hemphill* may be in tension, but deciding exhaustion claims under *Hemphill* inquiry); *Hernandez v. Coffey,* No. 99-CV11615, 2006 WL 2109465, at *3 (S.D.N.Y. July 26, 2006) (same). Here, Hargrove does not prevail under *Hemphill;* therefore, there is no occasion to address the potential effect *Woodford* may have had in his case.

**a. Whether administrative remedies were "available" to Hargrove**

The first step in the *Hemphill* inquiry requires a court to determine whether administrative remedies were available to the prisoner. *Hemphill,* 380 F.3d at 686. The test for assessing availability is an "objective one: that is, would a similarly situated individual of ordinary firmness have deemed them available." *Id.* at 688 (internal quotation marks omitted). In making this determination, "courts should be careful to look at the applicable set of grievance procedures." *Abney v. McGinnis,* 380 F.3d 663, 668 (2d Cir.2004). Exhaustion may be considered unavailable in situations where plaintiff is unaware of the grievance procedures or did not understand it, *Ruggiero,* 467 F.3d at 179, or where defendants' behavior prevents plaintiff from seeking administrative remedies,[FN14] *Hemphill v. State of New York,* 380 F.3d 680, 686 (2d Cir.2004).

FN14. Case law does not clearly distinguish between situations in which defendants' behavior renders administrative remedies "unavailable" to the plaintiff and cases in which defendants are estopped from asserting non-exhaustion as an affirmative defense because of their behavior. As such, there will be some overlap in the analyses.

Here, Hargrove has not claimed that NCCF's administrative grievance procedure was unavailable to him. In fact, Hargrove demonstrated his access to and knowledge of NCCF's IGP by filing proper grievances on November 19, 2004 and on May 10, 2005. Hargrove did not dispute any part of Investigator Williams's affidavit detailing the IGP and its availability to inmates since 2001. Specifically, Hargrove did not dispute, upon entering the facility, that he received a copy of the inmate handbook outlining the IGP. He has not claimed that he is unfamiliar with or unaware of NCCF's IGP. Hargrove has not alleged that prison officials failed to advance his grievances [FN15] or that they threatened him or took any other action which effectively rendered the administrative process unavailable.

FN15. Although not specifically alleged, interpreting the evidence to "raise the strongest argument," Hargrove may be arguing that NCCF's IGP was not available to him because the Grievance Coordinator failed to respond to his grievances. In the single grievance regarding PPD tests that defendants concede is authentic, Hargrove writes, "[n]ow for the third time your office refused to answer my grievances so please look into this matter because the T.B. shot is [sic] effecting my health." 11/19/04 Grievance. This language implies that Hargrove filed grievances in the past and received no response from the Inmate Grievance Coordinator. Furthermore, Hargrove wrote on one of the submitted copies of the November 19, 2004 grievance that "[t]his is the only accepte[sic] that Plaintiff got back from all grievances and letters that the Plaintiff sent to Sheriff Riley and his medical staffs about his staff making [sic] take T.B. test for 3 year[s]." County Defs'. Not. of Motion, Ex. A, 11/19/2004 grievance.

First, it must be reiterated that filing of the initial grievances was untimely. However, even assuming *arguendo* that the original grievances had been timely filed, district courts in the Second Circuit have held that the "lack of a response from the [Inmate Grievance Review Committee] does not excuse an inmate's obligation to exhaust his

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

remedies through available appeals." *Hernandez v. Coffey,* 2006 WL 2109465, at *3-5. *See also Hemphill,* 380 F.3d at 686 ("Threats or other intimidation by prison officials may well deter a prisoner of 'ordinary firmness' from filing an internal grievance, but not from appealing directly to individuals in positions of greater authority within the prison system"); *Acosta v. Corr. Officer Dawkins,* No. 04-CV-6678, 2005 WL 1668627, at *3 (S.D.N.Y. July 14, 2005) (inmate required to appeal lack of response to exhaust administrative remedies); *Mendoza v. Goord,* No. 00-CV-0146, 2002 U.S. Dist. LEXIS 22573, at *6 (S.D.N.Y. Nov. 21, 2002) ("If, as a result of a negligent error by prison officials-or even their deliberate attempt to sabotage a prisoner's grievance-the prisoner [does not receive a response] on his complaint, he is not thereby forestalled from appealing"). Hargrove did not assert or offer evidence suggesting that he appealed the unresponsiveness or that those appeals were not advanced.

**\*9** Additionally, Hargrove's transfer from NCCF to Sing Sing Correctional Facility ("Sing Sing") in July 2005 did not excuse his previous failure to properly exhaust. *See, e.g., Sims v. Blot,* No. 00-CV-2524, 2003 WL 21738766, at *4 (S.D.N.Y. July 25, 2003) (determining that failure to exhaust administrative remedies is not excused by transfer to another facility); *Santiago v. Meinsen,* 89 F.Supp.2d 435, 440-41 (S.D.N.Y.2000) (determining that plaintiff should not be "rewarded" for failing to participate in grievance procedure before being transferred). Hargrove had ample opportunity to properly file his grievances and to appeal their results as required by NCCF's procedures while he was imprisoned at NCCF. The last PPD test Hargrove complains of was given in 2004; therefore, Hargrove had until June or July of 2004 to timely file his grievance in accordance with NCCF's IGP. Hargrove was not transferred to Sing Sing until July 2005. County Defs.' Mem. of Law at 2. Thus, Hargrove's transfer cannot excuse his previous failure to properly exhaust.

**b. Estoppel**

The second step of the inquiry asks whether defendants are estopped from raising exhaustion as a defense. Specifically, "whether the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it, or whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Hemphill,* 380 F.3d at 686 (internal citations omitted).

Here, Hargrove has not made any statements that would permit a finding that defendants should be estopped from raising the affirmative defense of exhaustion or that defendants waived the right to raise the defense. Defendants first raised the PLRA's exhaustion requirement as an affirmative defense in their respective answers. *See* County Defs.' Am. Answer at 3; NHCC Defs.' Answer at 1. County Defendants raised it again in their motion for summary judgment. *See* County Defs.' Mem of Law at 15-23. Thus, defendants are not estopped from raising the affirmative defense now. *See, e.g., Sloane,* 2006 WL 3096031, at *8 (exhaustion defense not waived where defendants first raised it in their motion to dismiss).

Additionally, defendants have not threatened Hargrove or engaged in other conduct preventing him from exhausting the available administrative remedies. *Cf. Ziemba v. Wezner,* 366 F.3d 161, 162 (2d Cir.2004) (holding defendants were estopped from asserting non-exhaustion because of prison officials' beatings, threats and other conduct inhibiting the inmate from filing proper grievances); *Feliciano v. Goord,* No. 97-CV-263, 1998 WL 436358, at *2 (S.D.N.Y. July 27, 1998) (holding defendants were estopped from asserting non-exhaustion where prison officials refused to provide inmate with grievance forms, assured him that the incidents would be investigated by staff as a prerequisite to filing a grievance, and provided prisoner with no information about results of investigation). Hargrove has not argued otherwise. *See Ruggiero,* 467 F.3d at 178 (holding defendants were not estopped from asserting a failure to exhaust defense where plaintiff pointed to no affirmative act by prison officials that would have prevented him from pursing administrative remedies); *Sloane,* 2006 WL 3096031, at *8 (finding no estoppel where plaintiff did not argue that defendants prevented him from pursuing the available administrative remedies); *Hernandez,* 2006 WL 2109465,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

at *4 (finding no estoppel where plaintiff did not argue that any threats or intimidation prevented him from pursuing his appeals). Thus, for the same reasons that administrative remedies were not deemed unavailable to Hargrove, defendants are not estopped from raising a failure to exhaust defense.

### c. Special circumstances

**\*10** Even where administrative remedies are available and the defendants are not estopped from arguing exhaustion, the court must "consider whether 'special circumstances' have been plausibly alleged that justify 'the prisoner's failure to comply with administrative procedural requirements.' " Hemphill, 380 F.3d at 688 (quoting Giano, 380 F.3d at 676). For example, plaintiff's reasonable interpretation of regulations differing from prison official's interpretation has been held to constitute a "special circumstance." Giano, 380 F.3d at 676-77. No special circumstances have been alleged that would excuse Hargrove from availing himself of administrative remedies. See Sloane, 2006 WL 3096031, at *8; Freeman v. Goord, No. 02-CV-9033, 2004 U .S. Dist. LEXIS 23873, at * 9-10 (S.D.N.Y.2004) (granting motion to dismiss where "there is no evidence in the record ••• of any 'special circumstances' in this action.")

**(5)**

### Hargrove's Failure to Exhaust, in Addition to his Fraud on the Court, Warrants Dismissal with Prejudice

Hargrove has not sufficiently rebutted the defendants' assertion of failure to exhaust, and a liberal reading of his submissions does not reveal any grounds to excuse that failure.

Because Hargrove filed a complaint in federal court before filing a grievance, permitting his unexhausted and unexcused claim to proceed would undercut one of the goals of the exhaustion doctrine by allowing NCCF to be haled into federal court without the "opportunity to correct

its own mistakes with respect to the programs it administers." Woodford, 126 S.Ct. at 2385. See also Ruggiero, 467 F.3d at 178 (citing Porter, 534 U.S. at 525). Thus, his complaint must be dismissed.

In general, dismissal without prejudice is appropriate where plaintiff has failed to exhaust but the time permitted for pursuing administrative remedies has not expired. Berry v. Kerik, 366 F.3d 85, 87 (2d Cir.2004). Dismissal with prejudice is appropriate where "administrative remedies have become unavailable after the prisoner had ample opportunity to use them and no special circumstances justified failure to exhaust." Berry, 366 F.3d at 88. Here, Hargrove's administrative remedies were available to him during his entire period of confinement at NCCF. He remained incarcerated in NCCF throughout the time period in which he alleges the PPD tests were given. He could have exhausted remedies for his grievances at any time. Therefore, Hargrove had ample opportunity to seek administrative remedies but failed to do so. Because there is no evidence in the record that administrative remedies are still available to Hargrove, as the five-day time period had run, and because Hargrove has alleged no special circumstances justifying his failure to exhaust, his complaint is accordingly dismissed with prejudice. Berry, 366 F.3d at 88 (upholding dismissal with prejudice where plaintiff had no justification for his failure to pursue administrative remedies while they were available.)

**\*11** Additionally, defendants' have moved for sanctions based on Hargrove's alleged submission of falsified evidence. If a party commits a fraud on the court, the court has the inherent power to do whatever is reasonably necessary to deter abuse of the judicial process. Shangold v. The Walt Disney Co., No. 03-CV-9522, 2006 WL 71672, at *4 (S.D.N.Y. January 12, 2006) (citing Chambers v. NASCO, Inc., 501 U.S. 32, 44 (1991)). Fraud upon the court has been defined as "fraud which seriously affects the integrity of the normal process of adjudication." Gleason v. Jandrucko, 860 F.2d 556, 559 (2d Cir.1988); McMunn v. Mem'l Sloan-Kettering Cancer Center, 191 F.Supp.2d 440, 445 (S.D.N.Y.2002). In order for a court to grant sanctions based upon fraud, it must be established by clear and convincing evidence that a party has "sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter by ... unfairly hampering

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

the presentation of the opposing party's claim or defense." *McMunn*, 191 F.Supp.2d at 455 (quoting *Aoude v. Mobil Oil Corp.*, 892 F.2d 1115, 1119 (1st Cir.1989).

After carefully reviewing the allegedly fraudulent documents, it must be concluded that Hargrove consciously falsified these documents. *See, e.g., Shangold*, 2006 WL 71672, at *1, *3 (finding clear and convincing evidence of fraud where plaintiffs fabricated a timeline and plot outlines to advance their claims); *McMunn*, 191 F.Supp.2d at 446 (finding clear and convincing evidence of fraud where plaintiff edited audio tapes and represented that they were unedited during discovery). The notaries performing services for prisoners at NCCF testify that they never notarized many of the documents supplied by Hargrove. *See* Klein Aff.; McDevitt Aff. Furthermore, a visual examination of the documents themselves makes it clear that many of the documents submitted by Hargrove are forgeries.

In considering what sanction to impose, courts consider the following five factors: (i) whether the misconduct was the product of intentional bad faith; (ii) whether and to what extent the misconduct prejudiced the plaintiffs; (iii) whether there was a pattern of misbehavior rather than an isolated instance; (iv) whether and when the misconduct was corrected; and (v) whether further misconduct is likely to occur in the future. *Scholastic, Inc. v. Stouffer*, 221 F.Supp.2d 425, 444 (S.D.N.Y.2002) (citing *McMunn*, 191 F.Supp.2d at 461).

Here, Hargrove's deception was not an isolated instance; he fabricated the dates on many grievance forms, in addition to improperly duplicating notary stamps on complaint letters to make them look authentic. Klein Aff. at 2; McDevitt Aff. at 2; County Defs.' 56.1 Statement ¶¶ C3, D3. He submitted these forgeries to defendants during discovery and again as exhibits to his Affidavit in Opposition to Defendant's Motion for Summary Judgment. A severe sanction is warranted as Hargrove's forgeries were intentional, he never corrected them once their authenticity was challenged and he continues to insist on their veracity. Aff. in Opp. at 1-4. Given that there is clear and convincing evidence that Hargrove has continuously and consciously perpetrated a fraud on the court through his submission of fraudulent documents and sworn

affirmations of those documents' authenticity, dismissal with prejudice is especially appropriate. *See, e.g., Shangold*, 2006 WL 71672, at *5 (dismissing with prejudice where plaintiffs fabricated evidence to advance their claims); *Scholastic*, 221 F.Supp.2d at 439-444 (dismissing with prejudice where plaintiff produced seven pieces of falsified evidence); *McMunn*, 191 F.Supp.2d at 445 (dismissing with prejudice where plaintiff "lie[d] to the court and his adversary intentionally, repeatedly, and about issues that are central to the truth-finding process").

## Conclusion

**\*12** Because Hargrove did not satisfy the exhaustion requirement under the PLRA, defendants' motions for summary judgment are granted. Further, considering the fraud Hargrove perpetrated on the court, the claims are dismissed against all defendants with prejudice. The Clerk of the Court is directed to close the case.

SO ORDERED:

E.D.N.Y.,2007.
Hargrove v. Riley
Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2639369 (N.D.N.Y.)
(Cite as: 2006 WL 2639369 (N.D.N.Y.))



**C**
Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
James PETTUS, Plaintiff,
v.
Jospeh McCOY, Superintendent, Deputy Ryan,
Defendants.
**No. 9:04-CV-0471.**

Sept. 13, 2006.

James Pettus, Comstock, NY, pro se.

Charles J. Quackenbush, New York State Attorney
General, The Capitol Albany, NY, for Defendants.

### DECISION and ORDER

THOMAS J. McAVOY, Senior District Judge.

**\*1** Plaintiff commenced the instant action asserting
various violations of his constitutional rights arising out of
his placement at the Southport Correctional Facility. In his
Complaint, Plaintiff alleges that he was improperly sent to
the Special Housing Unit ("SHU") at a maximum security
facility and that being in SHU has put his life in jeopardy.
Currently before the Court is Defendants' motion for
summary judgment pursuant to Fed.R.Civ.P. 56 seeking
dismissal of the Complaint in its entirety for failure to
exhaust administrative remedies.

### I. FACTS[FN1]

> FN1. The following facts are taken from
> Defendants' statement of material facts submitted

pursuant to N.D.N.Y.L.R. 7.1(a)(3). These facts
are deemed admitted because they are supported
by the record evidence and Plaintiff failed to
submit an opposing statement of material facts as
required by Rule 7.1(a)(3). Plaintiff was
specifically advised by Defendants of his
obligation to file an opposing statement of
material facts and to otherwise properly respond
to the motion for summary judgment.

Plaintiff is an inmate in the custody of the New York State
Department of Correctional Services. Plaintiff signed the
instant Complaint on April 7, 2004. On his Complaint
form, Plaintiff indicated that there is a grievance
procedure available to him and that he availed himself of
the grievance procedure by filing a complaint with the
IGRC [FN2], followed by an appeal to the superintendent of
the facility, and then to the Central Office Review
Committee in Albany. The Complaint indicates that
Plaintiff is "waiting for response from Albany." The
Complaint was filed on April 27, 2004.

> FN2. Inmate Grievance Review Committee.

On April 12, 2004, prior to the filing of the instant
Complaint, Plaintiff filed a grievance relating to the issues
presented in this case. On April 19, 2004, the IGRC
recommended that Plaintiff's grievance be denied. Plaintiff
then appealed that decision to the facility Superintendent.
In the meantime, on April 27, Plaintiff commenced the
instant litigation. On May 3, 2004, after Plaintiff filed the
Complaint in this case, the Superintendent denied
Plaintiff's grievance. On May 5, 2004, Plaintiff appealed
the decision to the Central Office Review Committee in
Albany. On June 23, 2004, the Central Office Review
Committee denied Plaintiff's appeal. Plaintiff did not file
any other grievances in connection with the matters raised
in this lawsuit.

Defendants now move to dismiss on the ground that
Plaintiff commenced the instant action before fully
exhausting his available administrative remedies.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2639369 (N.D.N.Y.)
(Cite as: 2006 WL 2639369 (N.D.N.Y.))

## II. DISCUSSION

The sole issue presented is whether Plaintiff was required to complete the administrative process before commencing this litigation. This issue has already been addressed by the Second Circuit in *Neal v. Goord,* 267 F.3d 116 (2d Cir.2001). The issue in that case was "whether plaintiff's complaint should have been dismissed despite his having exhausted at least some claims during the pendency of his lawsuit." *Id.* at 121. The Second Circuit held that "exhausting administrative remedies after a complaint is filed will not save a case from dismissal." *Id.*

In this case, Defendants have established from a legally sufficient source that an administrative remedy is available and applicable. *Mojias v. Johnson,* 351 F.3d 606, 610 (2d Cir.2003); *see also* 7. N.Y.C.R.R. § 701.1, *et seq.* Plaintiff's Complaint concerns his placement in SHU at a maximum security facility. These are matters that fall within the grievance procedure available to NYSDOCS inmates and are required to be exhausted under the Prison Litigation Reform Act, 42 U.S.C. § 1997e. Plaintiff has failed to demonstrate any applicable exception to the exhaustion requirement. Because Plaintiff commenced the instant litigation prior to fully completing the administrative review process, the instant Complaint must be dismissed without prejudice. *Neal,* 267 F.3d 116.

## III. CONCLUSION

**\*2** For the foregoing reasons, Defendants' motion for summary judgment is GRANTED and the Complaint is DISMISSED WITHOUT PREJUDICE. The Clerk of the Court shall close the file in this matter.

IT IS SO ORDERED.

N.D.N.Y.,2006.
Pettus v. McCoy
Not Reported in F.Supp.2d, 2006 WL 2639369 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

2015 WL 8008728
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Eric Casey, Plaintiff,

v.

M. Brockley, Correctional Officer, Great Meadow
Correctional Facility; H. Colvin, Correctional
Officer, Great Meadow Correctional Facility;
A. Mayo, Correctional Officer, Great Meadow
Correctional Facility; C. Goodrich, Correctional
Officer, Great Meadow Correctional Facility;
Wanninger, Correctional Officer, Great
Meadow Correctional Facility; H. Clapper,
Registered Nurse, Great Meadow Correctional
Facility; T. Hermance, Registered Nurse,
Great Meadow Correctional Facility; Boyce,
Registered Nurse, Great Meadow Correctional
Facility; and S. Racette, Superintendent, Great
Meadow Correctional Facility, Defendants.

9:13-CV-01271 (DNH/TWD)
|
Signed 11/09/2015

**Attorneys and Law Firms**

Eric Casey, 1881 Pitkin Avenue, Apt. 1C, Brooklyn, NY
11212, pro se.

Hon. Eric T. Schneiderman, Attorney General for the State of
New York, The Capitol, Ryan E. Manley, Esq., of Counsel,
Albany, NY 12224, for Defendants.

*ORDER AND REPORT-RECOMMENDATION*

THÉRÈSE WILEY DANCKS, United States Magistrate
Judge

## I. INTRODUCTION

**\*1** This pro se prisoner civil rights action, commenced
pursuant to 42 U.S.C. § 1983, has been referred to me for
Report and Recommendation on the issue of exhaustion of
administrative remedies by the Honorable David N. Hurd,
United States District Judge, pursuant to 28 U.S.C. § 636(b)
and Local Rule 72.3(c). (Dkt. No. 49.) Plaintiff Eric Casey

asserts the following claims: (1) Eighth Amendment claim
resulting from excessive force used against him in violation
of his right to be free from cruel and unusual punishment; and
(2) Eighth Amendment violation resulting from the failure to
provide adequate medical care. (Dkt. No. 1 at 10–13. [1] )

Currently pending before the Court is Defendants' motion
to dismiss for failure to exhaust administrative remedies,
pursuant to Federal Rule of Civil Procedure 12(b)(6). (Dkt.
No. 37.) For the reasons that follow, the Court recommends
that Defendants' motion to dismiss be granted without
prejudice as to all defendants.

## II. BACKGROUND

At the time this action was commenced Plaintiff was a
prison inmate in Department of Corrections and Community
Supervision ("DOCCS") custody being held at Great
Meadow Correctional Facility ("GMCF"). (Dkt. No. 1 at 5.)
On May 22, 2013, at approximately 5:00 p.m., Plaintiff claims
that he was returning to his cell and was "hit from behind
in the back of [his] head with a hard object" as he entered
the stairwell area. (Dkt. No. 1 at 7.) Plaintiff claims that
he "fell to the floor and was brutally beaten" by Defendant
correctional officers M. Brockley ("Brockley"), H. Colvin
("Colvin"), A. Mayo ("Mayo"), C. Goodrich ("Goodrich"),
and Wanninger. (Dkt. No. 1 at 7.) Plaintiff claims that he
was "kicked, stomped, sexually humiliated, and beat[en] with
sticks all over [his] body...." (Dkt. No. 1 at 7.) Plaintiff claims
that he was referred to as " ' Rodney King' and other racial and
sexual slurs" while the beating took place. (Dkt. No. 1 at 7.)
Specifically, Plaintiff makes the following claims: Colvin and
Goodrich held Plaintiff's legs open so Brockley could kick
him the groin; Wanninger struck Plaintiff multiple times with
her baton; and Mayo beat Plaintiff's knees, shins, and ribs with
a cudgel. (Dkt. No. 1 at 8.) Plaintiff claims that the beating
lasted approximately five minutes. (Dkt. No. 1 at 8.)

Plaintiff was taken to a facility hospital and was treated
by Defendant Registered Nurses Boyce ("Boyce") and
Clapper ("Clapper"). (Dkt. No. 1 at 8.) Clapper prepared
an injury report that indicated Plaintiff had only "superficial
abrasions." (Dkt. No. 1 at 30.) Plaintiff claims that Clapper
and Boyce "intentionally downplayed the severity of [his]
injuries while disregarding the more serious ones ..." since
they were not mentioned in the injury report. (Dkt. No. 1
at 8.) Plaintiff claims that Clapper only "questioned [him]
from afar" and that Boyce only "electronically check[ed]
[his] vital signs." (Dkt. No. 1 at 9.) Plaintiff claims that

Defendant Registered Nurse Hermance "utilized her time falsifying business records ..." to indicate that Colvin, Mayo, and Brockley suffered injuries rather than providing medical care. (Dkt. No. 1 at 8.) Photographs of Plaintiff were taken prior to leaving the hospital. (Dkt. No. 1 at 33–39.)

**\*2** Plaintiff claims that, in addition to what was indicated on the injury report, he suffered the following injuries: (1) swelling above his left eye; (2) three linear-shaped abrasions above left eye swelling; (3) bruise on the left side of his face; (4) swelling to the left side of his face; (5) swelling above his right eye; (6) swelling to his upper right forehead; (7) swelling near the center of his back; (8) linear-shaped laceration on his left shin; (9) left shin bone injury; (10) right knee injury; (11) left pinky bone injury; and (12) left rib injury. (Dkt. No. 1 at 10.)

On June 3, 2013, Plaintiff filed Inmate Grievance Complaint GM–55615–13, alleging "cruel and unusual punishment, excessive force, and inadequate medical care." (Dkt. No. 1 at 18–19.) After receiving no response from then GMCF superintendent Defendant S. Racette ("Racette"), within the allotted twenty-five day time period, Plaintiff appealed to the Central Office Review Committee ("CORC"). (Dkt. No. 1 at 4.) On July 22, 2013, S. Pelo ("Pelo"), the grievance supervisor, asked Plaintiff for an extension to the investigation period "to allow for a proper investigation." (Dkt. No. 1 at 22.) Pelo also informed Plaintiff that "CORC will still have to wait for the investigation [to be completed] before they can render a decision." (Dkt. No. 1 at 22.) Plaintiff denied Pelo's extension request citing his "statutory right to appeal." (Dkt. No. 1 at 4.) On August 7, 2013, Pelo confirmed that the appeal had been submitted to CORC and notified Plaintiff that a decision was forthcoming. (Dkt. No. 1 at 23.) On October 15, 2013, after not receiving a response from CORC within the allotted thirty day time period, Plaintiff commenced this action.[2] (Dkt. No. 1 at 4.)

## III. APPLICABLE LEGAL STANDARDS

### A. Rule 12(b)(6) motion

A defendant may move to dismiss a complaint "for failure to state a claim upon which relief can be granted" under Rule 12(b)(6). The motion tests the formal legal sufficiency of the complaint by determining whether it conforms to Federal Rule of Civil Procedure 8(a)(2), which requires that a complaint include "a short and plain statement of the claim showing that the pleader is entitled to relief." *Bush v. Masiello*, 55 F.R.D. 72, 74 (S.D.N.Y.1972). Satisfaction

of the requirement that a plaintiff "show" that he or she is entitled to relief requires that the complaint "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Determining whether a complaint states a plausible claim for relief ... requires the ... court to draw on its judicial experience and common sense.... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not shown – that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 (internal citation and punctuation omitted).

A complaint may be dismissed, pursuant to Rule 12(b)(6), only where it appears that there are not "enough facts to state a claim that is plausible on its face." *Twombly*. 550 U.S. at 570. While Rule 8(a)(2) "does not require detailed factual allegations, ... it demands more than an unadorned, the-defendant-harmed-me-accusation." *Iqbal*, 556 U.S. at 678 (citation and internal quotation marks omitted). A complaint which "tenders 'naked assertion [s]' devoid of 'further factual enhancement' " does not suffice. *Id.* (citation omitted).

**\*3** "In reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir.1994) (citation omitted). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

Where a party is proceeding pro se, the court is obliged to "read [the pro se party's] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *See Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir.1994) (citations omitted); *see also Harris v. Mills*, 572 F.3d 66, 72 (2d Cir.2009) (courts remain obligated to construe pro se complaints liberally even after *Twombly* ).

Where a pro se complaint fails to state a cause of action, the court generally "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir.2000) (citation and internal quotation marks omitted). An opportunity to amend is not required where "the problem

with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Id.* (citation omitted).

## B. The Prison Litigation Reform Act of 1996

As succinctly outlined by my colleague, Magistrate Judge David E. Peebles:

> The Prison Litigation Reform Act of 1996 ("PLRA," Pub.L. No. 104–134, 110 Stat. 1321 (1996), which imposes several restrictions on the ability of prisoners to maintain federal civil rights actions, expressly requires that no action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted. The PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong. An inmate plaintiff's complaint is subject to dismissal if the evidence establishes that he or she failed to properly exhaust available remedies prior to commencing the action.... Proper exhaustion requires a plaintiff to procedurally exhaust his or her claims by complying with the system's critical procedural rules. Complete exhaustion has not occurred, for purposes of the PLRA, until all of the steps of that available process have been taken.

*Bailey v. Fortier*, 09–CV–0742 (GLS/DEP), 2012 WL 6935254, at *4, 2012 U.S. Dist. LEXIS 185178, at *11–13 (N.D.N.Y. Oct. 4, 2012) (citations and punctuation omitted). [3] "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). In order to properly exhaust administrative remedies under the PLRA, inmates are required to complete the administrative review process in accordance with the rules applicable to the particular institution in which they are confined. *Jones v. Bock*, 549 U.S. 199, 218 (2007) (citing *Woodford v. Ngo*, 548 U.S. 81, 88 (2006)). If a prisoner has failed to properly follow each of the applicable steps prior to commencing litigation, he has failed to exhaust his administrative remedies. [4] *Woodford*, 548 U.S. at 93.

## C. Inmate Grievance Program

**\*4** Exhaustion for a prison inmate in DOCCS custody is normally achieved through the Inmate Grievance Program ("IGP"). 7 N.Y. COMP. CODES. R. & REGS. tit. 7, § 701.1 (2012). The IGP involves a three-step process. *Id.* at § 701.5. First, the prison inmate must submit a grievance to the clerk within twenty-one days of the alleged action. *Id.* at § 701.5(a)(1). The Inmate Grievance Program Committee ("IGPC") must hold a hearing within sixteen days and issue a written decision within two days of the hearing. *Id.* at §§ 701.5(b)(2)(i), (ii). Second, the prison inmate may appeal the IGPC's decision, within seven days of receipt, to the facility superintendent. *Id.* at § 701.5(c)(1). Third and finally, the prison inmate may appeal the facility superintendent's decision to CORC, within seven days of receipt. *Id.* at §§ 701.5(d)(i), (ii). CORC has thirty days to review the appeal and issue a decision. *Id.* at § 701.5(d)(2)(ii).

## D. *Hemphill v. State of New York*

Because failure to exhaust is an affirmative defense, defendants bear the burden of showing by a preponderance of the evidence that a plaintiff has failed to exhaust his available administrative remedies. *See Murray v. Palmer*, No. 9:03–CV–1010 (GTS/GHL), 2010 WL 1235591, at *4, 2010 U.S. Dist. LEXIS 32014, at *16 (N.D.N.Y. Mar. 31, 2010); *Bailey*, 2012 WL 6935254, at *6 (the party asserting failure to exhaust bears the burden of proving its elements by a preponderance of the evidence); *see also Andrews v. Whitman*, No. 06–2447–LAB (NLS), 2009 WL 857604, at *6, 2009 U.S. Dist. LEXIS 30017, at *16 (S.D.Cal. Mar. 27, 2009) (defendant must prove non-exhaustion of administrative remedies by a preponderance of the evidence).

If a defendant meets that burden, however, a plaintiff's failure to exhaust does not end the review. "[O]nce a defendant has adduced reliable evidence that administrative remedies were available to Plaintiff and that Plaintiff nevertheless failed to exhaust those administrative remedies, Plaintiff must then 'counter' Defendants' assertion by showing exhaustion

unavailability, estoppel, or 'special circumstances' [under *Hemphill v. State of New York*, 380 F.3d 680, 686 (2d Cir.2004) ]." *Murray*, 2010 WL 1235591, at *4. *Hemphill* sets forth a three-part inquiry for district courts. First, courts must determine if administrative remedies were in fact available to plaintiff. In *Hemphill*, the Second Circuit stated that "[t]he test for deciding whether the ordinary grievance procedures were available must be an objective one: that is, would 'a similarly situated individual of ordinary firmness' have deemed them available." *Hemphill*, 380 F.3d at 688. Courts have found administrative grievance procedures unavailable where an inmate was prevented from filing a grievance. *See, e.g., Sandlin v. Poole*, 575 F.Supp.2d 484, 488 (W.D.N.Y.2008) (The facility's "failure to provide grievance deposit boxes, denial of forms and writing materials, and a refusal to accept or forward plaintiff's appeals ... effectively rendered the grievance appeal process unavailable to him.").

Second, courts must determine if the defendants are estopped from presenting non-exhaustion as an affirmative defense because they prevented the plaintiff inmate from exhausting his administrative remedies by " 'beating him, threatening him, denying him grievance forms and writing implements, and transferring him to another correctional facility.' " *Hemphill*, 380 F.3d at 688 (citing *Ziemba v. Wezner*, 366 F.3d 161, 162 (2d Cir.2004)). Generally, defendants cannot be estopped from asserting a non-exhaustion affirmative defense based upon the actions or inaction of other individuals. *Murray*, 2010 WL 1235591, at *5 & n.26 (collecting cases); *McCloud v. Tureglio*, No. 07–CV–0650, 2008 WL 1772305, at *12, 2008 U.S. Dist. LEXIS 124388, at *44 (N.D.N.Y. Apr. 15, 2008) (Lowe, M.J.) ("None of those documents allege facts plausibly suggesting that Defendant's own actions inhibited Plaintiff's exhaustion of remedies during the time in question.").

**\*5** Third, the Second Circuit explained in *Hemphill* that there are certain "special circumstances" in which even though administrative remedies may have been available and the defendants may not be estopped from asserting a non-exhaustion defense, the inmate's failure to exhaust may be justified. [5] *Hemphill*, 380 F.3d at 686. "Special circumstances" have been found to include an incorrect but reasonable interpretation of the applicable grievance procedure or failing to file a grievance in the precise manner prescribed by the process as a result of threats. *See, e.g., Giano v. Goord*, 380 F.3d 670, 675–76 (2d Cir.2004) (failure to exhaust was justified where plaintiff inmate's interpretation of regulations was reasonable and prison official threatened inmate).

## IV. ANALYSIS

### A. Plaintiff Failed to Properly Exhaust Administrative Remedies

If a prison inmate fails to follow each of the applicable steps prior to commencing litigation, he has failed to properly exhaust his administrative remedies. *Woodford*, 548 U.S. at 90 (the PLRA requires "proper exhaustion"—"using all steps that the agency holds out, and doing so properly so that the agency addressed the issues on the merits"). Receiving a decision from CORC *after* commencing litigation does not satisfy PLRA's requirement that administrative remedies be exhausted *before* filing suit, and any claim not exhausted prior to commencement of the suit must be dismissed without prejudice. *Neal v. Goord*, 267 F.3d 116, 122–23 (2d Cir.2001), *overruled on other grounds*, *Porter v. Nussle*, 534 U.S. 516 (2002). Because Plaintiff commenced this action before CORC issued a decision on his appeal, the Court finds that he failed to exhaust his administrative remedies.

### B. *Hemphill* Analysis

As noted above, an exhaustion review does not end when, as in this case, defendants are found to have met the burden of establishing a plaintiff's failure to exhaust because the Court must still undertake an analysis of the *Hemphill* factors. *See Hemphill*, 380 F.3d at 686

Here, there is no dispute that at all relevant times, DOCCS had the IGP available for Plaintiff and other prison inmates. *See* 7 N.Y. COMP. CODES. R. & REGS. tit. 7, § 701.1 (2012); *Taylor v. Chalom*, No. 9:10–CV–1494 (NAM/ DEP), 2011 WL 6942891, at *4, 2011 U.S. Dist. LEXIS 150512, at *12 (N.D.N.Y. Dec. 13, 2011) (The IGP is "recognized as an 'available' remedy for purposes of the PLRA."). Plaintiff undoubtedly had administrative remedies available to him since, on June 3, 2013, he filed Inmate Grievance Complaint GM–55615–13 alleging "cruel and unusual punishment, excessive force, and inadequate medical care." (Dkt. No. 1 at 18–19.) Plaintiff does not allege that his failure to properly exhaust available administrative remedies was due to administrative remedies being unavailable to him. (Dkt. No. 39.) Plaintiff also does not allege that the named Defendants prevented him from properly exhausting available administrative remedies and should thus be estopped from asserting the defense. (Dkt. No. 39.)

**\*6** Finally, there are no special circumstances that would justify Plaintiff's failure to properly exhaust available administrative remedies. (Dkt. No. 39.) Plaintiff argued that his administrative remedies were sufficiently exhausted because his CORC appeal was not decided in a timely manner. Justification "must be determined by looking at the circumstances which might understandably lead ... uncounseled prisoners to fail to grieve in the normally required way." *Giano*, 380 F.3d at 678. As noted above, generally, the "special circumstances" doctrine is applied where a prisoner has been threatened with physical retaliation for exhausting administrative remedies or where the prisoner reasonably misinterprets the statutory requirements of the appeals process. *Id.* at 676. CORC's failure to act within the time frame set out in the regulations does not constitute a special circumstance justifying the failure to exhaust. *See Ford v. Smith*, No. 9:12–CV–1109 (TJM/TWD), 2014 WL 652933, at \*3, 2014 U.S. Dist. LEXIS 20581, at \*8–9 (N.D.N.Y. Jan. 16, 2014) (citations omitted). *Rodriguez v. Rosner*, No. 9:12–CV–958, 2012 WL 7160117, 2012 U.S. Dist. LEXIS 186228 (N.D.N.Y. Dec. 5, 2012) (dismissing complaint for failure to exhaust where prisoner filed appeal with CORC on May 4, filed federal civil rights complaint on June 10, and received CORC response dated September 26).

## V. CONCLUSION

The Second Circuit "has recognized that failure to exhaust administrative remedies is usually a 'curable procedural flaw' that can be fixed by exhausting those remedies and then reinstituting suit." *Neal*, 267 F.3d at 123 (citing *Snider v. Melindez*, 199 F3d 108, 11–12 (2d Cir.1999)). The Court finds dismissal without prejudice for failure to exhaust to be proper in this case.

The parties have not provided information to the Court regarding if and when CORC issued a decision on Plaintiff's appeal. If CORC issued a response to Plaintiff's grievance subsequent to the commencement of this action on October 15, 2013, the Court recommends that the complaint be dismissed without prejudice for failure to exhaust and that Plaintiff be granted leave to refile his complaint upon the filing of a Decision and Order by the District Court on this Court's Report and Recommendation. If CORC has not as yet issued a response, the Court recommends that the complaint be dismissed without prejudice, that CORC be directed to render a decision on Plaintiff's pending grievance appeal within thirty days of the filing of the District Court's Decision

and Order on this Report–Recommendation, and that upon CORC's failure to do so, Plaintiff's administrative remedies be deemed unavailable to him and he be allowed to refile this suit indicating such.

**ACCORDINGLY**, it is hereby

**RECOMMENDED** that Defendants' motion to dismiss Plaintiff's complaint (Dkt. No. 37) in this action be **GRANTED**, and that the complaint (Dkt. No. 1) be **DISMISSED WITHOUT PREJUDICE**, based upon Plaintiff's failure to fully exhaust his administrative remedies; and it is further

**RECOMMENDED** that: (1) in the event CORC has rendered a decision on Plaintiff's appeal on Inmate Grievance Complaint GM–55615–13, Plaintiff be granted leave to refile this suit upon the filing of a Decision and Order by the District court on this Court's Report–Recommendation; and (2) in the event CORC has not rendered a decision on Plaintiff's appeal, that CORC be directed to render a decision on Plaintiff's pending grievance within thirty days of the filing of the District Court's Decision and Order on this Report–Recommendation; and (3) if Plaintiff does not receive a decision from CORC within that time, administrative remedies may be deemed unavailable to him and he may therefore be excused from exhausting his administrative remedies and may refile this suit indicating such; and it is

**ORDERED** that the Clerk provide Plaintiff with a copy of this Order and Report–Recommendation, along with copies of the unpublished decisions cited herein in accordance with the Second Circuit decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir.2009) (*per curiam* ).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW*. *Roldan v. Racette*, 984 F.2d 85 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72.

**All Citations**

Slip Copy, 2015 WL 8008728

Footnotes

1     Page numbers in citations to the amended complaint refer to the page numbers assigned by the Court's electronic filing
      system rather than to page numbers in the original document.

2     The Court is unaware whether CORC has issued a response to Plaintiff's grievance.

3     The Court will provide Plaintiff with copies of all unpublished decisions cited in this Order in accordance with the Second
      Circuit's decision in *Lebron v. Sanders,* 557 F.3d 76 (2d Cir.2009) (*per curiam* ).

4     "[A]n inmate would be well advised to take advantage of internal prison procedures for resolving inmate grievances. When
      those procedures produce results, they will typically do so faster than judicial processes can. And even when they do
      not ..., the inmate's task in court will obviously be much easier." *Farmer v. Brennan,* 511 U.S. 825, 847 (1994).

5     Subsequent to *Hemphill*, the Supreme Court decided *Woodford v. Ngo,* 548 U.S. 81 (2006). The question addressed in
      *Woodford* was whether "a prisoner can satisfy the [PLRA's] exhaustion requirement by filing an untimely or otherwise
      procedurally defective administrative grievance or appeal." *Id.* at 83–84. The Supreme Court resolved the question in the
      negative, explaining that the PLRA requires "proper exhaustion" – "using all steps that the agency holds out, and doing
      so properly (so that the agency addressed the issues on the merits)." *Id.* at 90 (citation omitted). Although the Second
      Circuit has acknowledged that there is some question as to whether the estoppel and special circumstances inquiries
      in *Hemphill* survived *Woodford*, the Court has as yet found it unnecessary to decide the issue and appears to still be
      considering all three *Hemphill* inquiries in exhaustion cases. *See, e.g., Amador v. Andrews,* 655 F.3d 89, 102–03 (2d
      Cir.2011) (finding it unnecessary to decide whether *Hemphill* is still good law because plaintiff had failed to establish that
      defendants were estopped from raising non-exhaustion as an affirmative defense).

                                                          © 2016 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW**   © 2016 Thomson Reuters. No claim to original U.S. Government Works.                                                          6

2015 WL 7864161
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Eric Casey, Plaintiff,

v.

M. Brockley, Correctional Officer, Great Meadow
Correctional Facility; H. Colvin, Correctional
Officer, Great Meadow Correctional Facility;
A. Mayo, Correctional Officer, Great
Meadow Correctional Facility; C. Goodrich, Correctional
Officer, Great Meadow Correctional Facility;
Wanninger, Correctional Officer, Great
Meadow Correctional Facility; H. Clapper,
Registered Nurse, Great Meadow Correctional
Facility; T. Hermance, Registered Nurse,
Great Meadow Correctional Facility; Boyce,
Registered Nurse, Great Meadow Correctional
Facility; and S. Racette, Superintendent, Great
Meadow Correctional Facility, Defendants.

9:13-CV-01271 (DNH/TWD)
|
Signed December 2, 2015
|
Filed 12/03/2015

**Attorneys and Law Firms**

Eric Casey, Plaintiff pro se, Brooklyn, NY.

Hon. Eric T. Schneiderman, Attorney General for the State of
New York, Attorneys for Defendants, The Capitol, Ryan E.
Manley, Esq., Ass't Attorney General, Albany, NY.

## **DECISION and ORDER**

DAVID N. HURD, United States District Judge

**\*1** Pro se plaintiff Eric Casey brought this action pursuant
to 42 U.S.C. § 1983. On November 9, 2015, the Honorable
Thérèse Wiley Dancks, United States Magistrate Judge,
advised by Report-Recommendation that defendants' motion

pursuant to Federal Rule of Civil Procedure 12(b)(6) be
granted and that plaintiff's complaint be dismissed without
prejudice. The Report-Recommendation was predicated upon
the fact that neither party provided information regarding if
and when Central Office Review Committee ("CORC") had
issued a decision on plaintiff's appeal. No objections to the
Report-Recommendation were filed.

Based upon a careful review of the entire file and the
recommendations of the Magistrate Judge, the Report-
Recommendation is accepted in whole. See 28 U.S.C. §
636(b)(1).

Therefore it is

ORDERED that

1. Defendants' motion is GRANTED;

2. Plaintiff's complaint is DISMISSED without prejudice in
its entirety;

3. In the event CORC has rendered a decision on plaintiff's
appeal, plaintiff is granted thirty (30) days from the filing
of this Decision and Order to refile this suit indicating the
outcome of the appeal;

4. However, if within thirty (30) days of the filing
of this Decision and Order CORC has not issued a
decision, plaintiff's administrative remedies will be deemed
unavailable to him and he will be allowed to refile this suit.
Plaintiff will have sixty (60) days from the filing of this
Decision and Order to file an amended complaint indicating
such; and

5. The Clerk of the Court is directed to serve a copy of this
Decision and Order on the parties in accordance with the
Local Rules. The Clerk is further directed to enter judgment
accordingly and close the file.

IT IS SO ORDERED.

**All Citations**

Slip Copy, 2015 WL 7864161

**End of Document** © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 1080145
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Richard N. QUINN, Plaintiff,
v.
Daniel L. STEWART, Dominick Orsino,
Thomas Roome, Lorraine Levitas, Maria
Karimi, MD, Correctional Medical Care
Inc., and County of Orange, Defendants.

No. 10 Civ. 8692(PAE)(JCF).
|
April 2, 2012.

*OPINION & ORDER ADOPTING
REPORTS & RECOMMENDATIONS*

PAUL A. ENGELMAYER, District Judge.

**\*1** Richard Quinn, formerly incarcerated at the Orange
County Correctional Facility ("OCCF"), [1] brings this action
*pro se* pursuant to 42 U.S.C. § 1983 against Daniel L. Stewart,
Dominick Orsino, Thomas Roome, Lorraine Levitas, Maria
Karimi, Correctional Medical Care, Inc. ("CMC"), and the
County of Orange, New York ("Orange County"), alleging
violations of his Eighth Amendment right to adequate medical
care and his First Amendment right to delivery of mail. For
the reasons set forth below, the Court (1) adopts in full both
Reports and Recommendations of the Magistrate Judge, Hon.
James C. Francis; (2) makes an additional ruling that supplies
an alternative ground for dismissal of Quinn's claim with
respect to alleged tampering with his mail; and (3) grants
defendants' motions to dismiss the Amended Complaint,
except with respect to Quinn's Eighth Amendment claim of
inadequate medical care for his cyst, anemia, gunshot wound,
and back problems, to the extent brought against defendants
Karimi and Levitas, as to which the Court denies the motion
to dismiss.

**I. Background**

**A. Procedural History**
On November 29, 2010, Judge Paul A. Crotty, to whom this
case was then assigned, referred this case to Magistrate Judge

James C. Francis for general pretrial matters and dispositive
motions.

On April 7, 2011, defendant Stewart moved to dismiss
all claims against him pursuant to Federal Rules of
Civil Procedure 12(b)(1) and 12(b)(6). On July 26, 2011,
Judge Francis issued a Report and Recommendation ("First
Report") recommending that the Court dismiss Quinn's
Amended Complaint as to Stewart (Dkt.42). On August 16,
2011, Quinn timely filed a two-page letter, which was deemed
by the Court to be his objections to the First Report. On
August 26, 2011, Stewart submitted a response to Quinn's
objections.

On October 31, 2011, defendants Orsino, Roome, Levitas,
Karimi, CMC, and Orange County (collectively, "OCCF
defendants") moved to dismiss all claims against them
pursuant to Rules 12(b)(1) and 12(b)(6). On January 18,
2012, Judge Francis issued a Report and Recommendation
("Second Report") that the Court dismiss Quinn's Amended
Complaint as to Orsino, Roome, CMC, and Orange County,
but not as to Karimi and Levitas (Dkt.67). On January 31,
2012, Quinn timely submitted his objections to the Second
Report. On February 1, 2012, Quinn submitted a letter styled
as an addendum to his objections to the Second Report. [2]

**B. Facts**
Quinn was a pre-trial detainee at OCCF at all times relevant
to this claim. He claims to have received inadequate medical
care while incarcerated, and that OCCF officials deliberately
interfered with the delivery of his legal mail. The Court adopts
all relevant facts as stated in the First Report (Dkt.42) and the
Second Report (Dkt.67).

**C. Judge Francis's First Report**
Commissioner Stewart moved to dismiss the Amended
Complaint on the grounds that: (1) Quinn failed to
adequately plead his claims; (2) Quinn failed to exhaust
his administrative remedies; (3) Quinn failed to state a
claim; (4) Stewart lacked personal involvement in the alleged
constitutional deprivation; (5) Stewart is entitled to qualified
immunity; and (6) claims against state officials, like Stewart,
are barred by the Eleventh Amendment.

*1. Administrative Exhaustion*
**\*2** Judge Francis first addressed Stewart's claim that Quinn
had failed to exhaust all available administrative remedies.

Quinn made five separate grievances while in custody at OCCF: He alleged (1) inadequate medical care for a colloid cyst and brain tumor, anemia, a gunshot wound, and back problems; (2) inadequate treatment for Hepatitis C; (3) an erroneous prescription for nasal spray; (4) mail tampering; and (5) improper denial of permission to wear "thermals." As to the first grievance, Judge Francis found that Quinn had exhausted all administrative remedies for that claim. However, as to the second, relating to his treatment for Hepatitis C, Judge Francis found that because Quinn had not received a final decision with respect to that grievance at the time he filed his original Complaint, he had not exhausted his administrative remedies. As to the three remaining claims—relating to the nasal spray prescription, the alleged mail tampering, and authorization to wear thermals—Judge Francis found that because Quinn had filed his initial grievances with respect to those claims after the date on which he filed his original Complaint, he had not exhausted his administrative remedies as to those claims.

*2. Eighth Amendment*

Judge Francis next addressed Stewart's argument that Quinn had failed to state an Eighth Amendment claim. To establish an Eighth Amendment claim arising out of allegedly inadequate medical care, a prisoner must demonstrate first an objective "medical need," and second, a subjective finding that the prison official acted with "deliberate indifference," or a "sufficiently culpable state of mind." *Smith v. Carpenter,* 316 F.3d 178, 183–84 (2d Cir.2003). Judge Francis found that in light of the relaxed pleading standards for *pro se* complaints, Quinn's general and conclusory statements supporting the allegation that he suffered substantial pain sufficiently alleged facts to satisfy the objective prong of an Eighth Amendment claim. However, as to the subjective prong, Judge Francis found that based on the facts pled in the Amended Complaint, Stewart was not, as alleged, personally involved in the inadequate medical care, and thus, that Quinn had failed to allege a sufficiently culpable state of mind to satisfy the subjective prong of that claim.

Accordingly, as to Stewart, Judge Francis recommended dismissal of Quinn's claim for inadequate medical care on the basis of a failure to plead sufficient personal involvement, and dismissal of all remaining claims based on a failure to exhaust all administrative remedies.

**D. Judge Francis's Second Report**

The OCCF defendants moved to dismiss the Amended Complaint on the grounds that: (1) Quinn failed to exhaust his administrative remedies; (2) Orsino, Roome, and Karimi lacked personal involvement in the alleged constitutional deprivation; (3) Quinn failed to state a claim for deliberate indifference; and (4) Quinn's pendant state claims for medical malpractice must be dismissed.

*1. Administrative Exhaustion*

 **\*3** Magistrate Judge Francis recommended that the OCCF defendants' motion to dismiss Quinn's claims regarding treatment of Hepatitis C, nasal spray, mail tempering, and permission to wear thermals should be granted for the same reasons given in his First Report: Quinn had failed to exhaust all administrative remedies as to those claims before filing his original Complaint. Judge Francis again found, however, that Quinn had properly exhausted his administrative remedies as to his claims for inadequate medical treatment for a cyst and brain tumor, anemia, gunshot wound, and back problems, and thus recommended that the motion to dismiss Quinn's Eighth Amendment claim based on treatment for those ailments, to the extent based on failure to exhaust such remedies, be denied.

*2. Municipal Liability*

Judge Francis addressed *sua sponte* whether Quinn had sufficiently stated a claim under § 1983 against defendants Orange County and CMC. To state a § 1983 claim against a municipality, the plaintiff must allege that an officially adopted policy or custom caused his injury. *See Bd. of Cnty. Commis of Bryan Cnty., Oklahoma v. Brown,* 520 U.S. 397, 403, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997); *Monell v. Dep't of Soc. Servs. of the City of New York et al.,* 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Judge Francis found that, even taking all facts pleaded in the Amended Complaint as true, Quinn's single allegation that he was denied medical treatment because of "cost saving measures" was insufficient to raise an inference of the existence of a custom or policy under which OCCF would not provide constitutionally-mandated medical treatment to prisoners on account of cost. Accordingly, Judge Francis found that Quinn had failed to state a claim for municipal liability, and thus recommended that all claims against Orange County and CMC be dismissed.

*3. Eighth Amendment*

Magistrate Judge Francis next addressed the OCCF defendants' argument that Quinn failed to state an Eighth Amendment claim because he failed to sufficiently allege that defendants acted with deliberate indifference to his health. Judge Francis incorporated his findings from the First Report, given the more flexible standard applied to *pro se* complaints, Quinn had satisfied the objective prong of an Eighth Amendment claim. However, Judge Francis also found that Quinn failed to allege sufficient facts to support an inference that defendants Orsino or Roome knew of and disregarded an excessive risk to his health and safety. Therefore, Quinn's claims as to those two defendants failed to satisfy the subjective prong of such a claim. Accordingly, Quinn failed to state a claim under the Eighth Amendment against those defendants.

On the other hand, as to defendants Karimi and Levitas, Judge Francis found that Quinn had alleged sufficient facts to support an inference that they knew of and disregarded an excessive risk to his health and safety. As Judge Francis noted, in the Amended Complaint, Quinn alleged that Karimi, a doctor, was "not prescribing proper medications for other illnesses." Am. Compl. ¶ 27 (Dkt.12). Judge Francis interpreted this statement to allege that Karimi had denied Quinn's request for treatment for his cyst, anemia, gunshot wound, and back problems. Further, Judge Francis inferred from Quinn's alleged repeated requests for pain medication that Karimi and Levitas, a nurse, should have known that whatever treatment Quinn had been receiving was ineffective or insufficient. At the motion to dismiss stage, Judge Francis stated, a court would be unable to evaluate whether the treatment provided by Karimi and Levitas in fact met professional norms. Accordingly, Judge Francis concluded, Quinn had alleged sufficient facts to support an inference that defendants Karimi and Levitas disregarded an excessive risk to his health and safety. Judge Francis therefore recommended that the Eighth Amendment claim as to those claims should survive the motion to dismiss.

## II. Discussion

### A. Standard for Review

 **\*4**  A district court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1). When no timely objection has been made to the recommendations of a magistrate judge, "a district court need only satisfy itself that there is no clear error on the face of the record." *Carlson v. Dep't of Justice,* No. 10–cv–5149, 2012 WL 928124, at * 1 (S.D.N.Y. Mar.19, 2012) (slip op .) (internal quotation marks omitted). When a timely objection has been made, the court is obligated to review the contested issues *de novo. See Hynes v. Squillace,* 143 F.3d 653, 656 (2d Cir.1998).

Objections of *pro se* litigants are "generally accorded leniency" and construed "to raise the strongest arguments that they suggest." *Snyder v. Graham,* No. 09–cv–10307, 2012 WL 983526, at \*2 (S.D.N.Y. Mar. 22, 2012) (slip op.) (internal quotation marks omitted). "Nonetheless, even a *pro se* party's objections to a Report and Recommendation must be specific and clearly aimed at particular findings in the magistrate's proposal, such that no party be allowed a 'second bite at the apple' by simply relitigating a prior argument." *Pinkney v. Progressive Home Health Servs.,* No. 06–cv–5023, 2008 WL 2811816, at \*1 (S.D.N.Y. July 21, 2008) (quoting *Camardo v. Gen. Motors Hourly–Rate Emps. Pension Plan,* 806 F.Supp. 380, 382 (W.D.N.Y.1992)).

### B. Objections to Judge Francis's First Report

Quinn's sole objection to the First Report relates to the issue of administrative exhaustion. He argues that, contrary to Judge Francis's findings, although the grievance policy at the OCCF is "based on New York State's policy," it is "somewhat different." Pl.'s Objections to First Report (Dkt.45) at 1. Plaintiff attached to his two-page submission a copy of the OCCF grievance policy.

Where a party makes only general objections, the Court reviews the report and recommendation only for clear error. *See Pinkney,* 2008 WL 2811816, at * 1. Here, Quinn highlights the section of the grievance policy which states that, in the event a prisoner is released or transferred prior to the final resolution of his grievance, the grievance will continue absent the prisoner's participation. However, neither the objections themselves, nor the grievance policy he attaches, demonstrate that Quinn exhausted all available administrative remedies before filing the Complaint. Because his objections are general and at best restate the original arguments, the Report is reviewed for clear error as to the administrative exhaustion finding. The Court finds no such error.

Quinn did not object to Judge Francis's findings as to the Eighth Amendment claim or defendant Stewart's personal involvement. As such, the Court understands those findings to be without objection.

After reviewing the record, the Court finds that Judge Francis's well-reasoned and careful First Report is not facially erroneous, and it is therefore adopted in its entirety.

## C. Objections to Magistrate Judge Francis's Second Report

**\*5** Courts are obliged to construe *pro se* pleadings to raise "the strongest arguments they suggest." *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 474–75 (2d Cir.2006). Accordingly, the Court construes Quinn's objection to the Second Report to assert the following arguments: (1) his § 1983 claims against Orange County and CMC should not be dismissed, because questions of fact remain that bear on whether denial of adequate care resulted from an official policy or custom in violation of the Eighth Amendment; (2) he exhausted all administrative remedies because the letters he sent were not "informal"; and (3) he exhausted all administrative remedies as to the Hepatitis C claim because, in the case of prisoner release or transfer, the formal grievance process in OCCF continues in the plaintiff's absence, and the grievance related to the Hepatitis C medical care has now been exhausted.

As to the first objection, Quinn fails to allege specific facts supporting his claim that questions of fact remain which bear on whether municipal liability exists under § 1983. *See Monell,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611. Accordingly, Judge Francis's findings as to municipal liability are reviewed for clear error. *See Pinkney,* 2008 WL 2811816, at \* 1. The Court finds no such error.

As to Quinn's second objection, Quinn has merely restated the original arguments in his pleadings. Accordingly, Judge Francis's finding that his letters to defendant Orsino were correspondence that did not satisfy the formal OCCF grievance procedures is reviewed for clear error. *See id.; see also Day v. Chaplin,* 354 F. App'x 472, 474 (holding that informal written complaints sent to prison officials that did not conform to administrative procedures failed to satisfy exhaustion standard). The Court again finds no such error.

As to Quinn's third objection, the Court reviews the claim *de novo.* Here, as in his objection to the First Report, Quinn attaches to his objections a copy of the OCCF grievance policy; however, in the Second Report, Quinn provides somewhat more of an explanation for his having cited the section governing procedures applicable in the event of prisoner release or transfer. *See* Pl .'s Objections to Second Report at 4 ("The magistrate judge himself states that

plaintiff can file new actions. (Why?) The grievance(s) are completed, concerning refusal to treat 'Hepatitis C'."). The Court understands Quinn, in effect, to assert that grievances initiated before the filing of the present action will satisfy the exhaustion requirement as long as the grievance reaches a final conclusion at some time during the litigation. However, as a matter of law, that claim is incorrect.

All grievances must be "fully pursued *prior* to filing a complaint in federal court." *Neal v. Goord,* 267 F.3d 116, 122 (2d Cir.2001) (emphasis added); 42 U.S.C. § 1997e(a) ("No action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal Law, by a prisoner confined in any jail, prison or other correctional facility *until such administrative remedies as are available are exhausted.*" (emphasis added)). In order to properly exhaust administrative remedies, a plaintiff's grievance must be appealed to and, decided by, the highest body provided by the administrative process. *See Booth v. Churner,* 532 U.S. 731, 735, 121 S.Ct. 1819, 149 L.Ed.2d 958 (2001). According to the OCCF grievance procedures, the grievance process in a county jail in New York State is fully exhausted after the following steps are completed: (1) a grievance is filed with and denied by the Grievance Coordinator; (2) the denial of the grievance in appealed to and denied by the Chief Administrative Officer; and (3) the Citizens Policy and Complaint Review Council denies a final appeal of the grievance.

**\*6** The fact that Quinn's grievance with respect to his medical treatment for Hepatitis C may today be exhausted, or the fact that his remaining grievances may become exhausted sometime in the future despite the fact that he is no longer incarcerated, does not assist Quinn here. The administrative exhaustion requirement directs courts to evaluate solely whether grievance procedures were satisfied *at the time that an action was initially filed.* Such was not the case here. The Court therefore agrees with Judge Francis that Quinn failed to exhaust his administrative remedies as to the Hepatitis C claim.

Quinn again did not object to Judge Francis's findings as to the Eighth Amendment claims. As such, the Court understands those findings to be without objection.

After reviewing the record, the Court finds that Judge Francis's well-reasoned and careful Second Report is not facially erroneous, and it is therefore adopted by the Court.

## D. The First Amendment Claim

Because both of Judge Francis's Reports recommend dismissal of the mail tampering claim due to Quinn's failure to exhaust all available administrative remedies, the Reports do not address his mail tampering claim on the merits. In the interests of judicial economy, the Court finds occasion to address the mail tampering claim here.

Courts in this Circuit have an obligation to construe *pro se* complaints to raise "the strongest arguments they suggest." *See Triestman,* 470 F.3d at 474–75. Both legal and nonlegal mail are protected by the First Amendment's "right to the free flow of incoming and outgoing mail." *Davis v. Goord,* 320 F.3d 346, 351 (2d Cir.2003). "[A] prison official's interference with an inmate's mail may violate his First Amendment right to free speech, which includes the right to be free from unjustified governmental interference with communication." *Cancel v. Goord,* No. 00–cv–2042, 2001 WL 303713, at *5 (S.D.N.Y. Mar.29, 2001) (internal quotation marks omitted).

To survive a motion to dismiss, "a plaintiff must allege that correction officers 'regularly and unjustifiably' interfered with his mail, depriving him of his constitutional rights." *Edwards v. Horn,* No. 10–cv–6194, 2012 WL 760172, at *7 (S.D.N.Y. Mar.8 2012) (slip op.) (quoting *Shepherd v. Fisher,* No. 08–cv–9297, 2011 WL 3278966, at *2 (S.D.N.Y. July 27, 2011)). To assert such a claim, a prisoner must allege that the defendant's actions in tampering with plaintiff's mail (1) "resulted in actual injury" to the plaintiff, and (2) were "deliberate and malicious." *Cancel,* 2001 WL 303713, at *4 (quoted in *Davis,* 320 F.3d at 351). The first prong is objective, and courts must find that actual injury exists where interference with legal mail results in "the dismissal of an otherwise meritorious legal claim." *Davis,* 320 F.3d at 351. However, "[m]ere delay in being able to work on one's legal action or communicate with the courts does not rise to the level of a constitutional violation." *Id.* at 352 (citations and quotation marks omitted). The second prong is a subjective one, requiring "specific allegations of invidious intent ." *Id.* at 351.

**\*7** Quinn's allegations fail to satisfy either prong. First, Quinn fails to allege that any tampering with his legal mail caused him actual injury or in any way obstructed his ability to litigate his claims. He merely makes conclusory allegations, asserting that defendants "tamper[ed], interfered, and obstructed ... legal ... confidential correspondence," with no assertions as to the motivation behind the alleged

tampering, or as to any actual injury caused by it. Am. Compl. ¶ 33. On the contrary, Quinn has litigated his case capably and without any evident impediment. He submitted timely objections to both Reports, and did not seek nor require extensions to deadlines based on any inability to receive court documents. Second, Quinn does not state any facts that support the inference that corrections officers tampered with his mail in a deliberate or malicious way. Because Quinn failed to allege invidious intent, or that defendants' alleged interference with his mail affected his ability to litigate this case, his First Amendment mail tampering claim must be dismissed with prejudice.

## CONCLUSION

For the foregoing reasons, the Court accepts and adopts Magistrate Judge Francis's July 26, 2011 Report and Recommendation (Dkt.42) and his January 18, 2012 Report and Recommendation (Dkt.67), and supplements these Reports with the analysis of the First Amendment claim herein.

It is hereby ordered that: (1) plaintiff's claims against defendants Orange County and CMC are DISMISSED with prejudice; (2) plaintiff's Eighth Amendment claims against defendants Stewart, Orsino, and Roome are DISMISSED with prejudice; and (3) plaintiff's First Amendment mail tampering claim against defendants, generally, is DISMISSED with prejudice.

It is further ordered that plaintiff's Eighth Amendment claims of inadequate treatment for Hepatitis C and an erroneous prescription for nasal spray, as to defendants Karimi and Levitas, are DISMISSED without prejudice to re-filing upon exhaustion of all available administrative remedies.

It is further ordered that the OCCF defendants' motion to dismiss plaintiff's Eighth Amendment claim alleging inadequate medical care for a cyst, anemia, a gunshot wound, and back problems is DENIED as to defendants Karimi and Levitas. Accordingly, plaintiff's Eighth Amendment claim as to defendants Karimi and Levitas remains in the case. Defense counsel is directed to submit a proposed case management plan, including proposed deadlines for completion of all remaining discovery, to the Court by April 20, 2012.

The Court certifies, pursuant to 28 U.S.C. § 1915(a), that any appeal from this order would not be taken in good faith. The

Clerk of Court is directed to terminate the motions at docket items 32 and 53, and to terminate defendants Stewart, Roome, Orsino, Correctional Medical Care, and County of Orange, from this case.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 1080145

Footnotes

1   Commissioner Stewart represents that Quinn is no longer incarcerated. *See* Mem. of Law in Supp. of Def. Stewart's Mot. to Dismiss at 1 n.2 (Dkt.33).

2   Quinn's objections to the Second Report, as well as the subsequent addendum to his objections, were sent directly to Chambers, and thus are not docketed. The Court has directed that these submissions be docketed, retroactive to the dates they were received: January 31, 2012, and February 1, 2012, respectively.

**End of Document**                    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

**Called into Doubt by** Ajala v. West, W.D.Wis., May 4, 2015

2011 WL 1641885
Only the Westlaw citation is currently available.
United States District Court,
D. Minnesota.

Hanifi Marlow JIHAD, Plaintiff,

v.

Commissioner Joan FABIAN; Assistant
Commissioner David Crist; Warden John King;
Assoc. Warden Eddie Miles; Program Director Bruce
Julson; Program Director David Reishus; Religious
Cord. Gregory Skrypek; Chaplain Norris Blackmon;
and Assoc. Warden Michelle Smith, Defendants.

Civ. No. 09–1604 (SRN/LIB).
|
Feb. 17, 2011.

**Attorneys and Law Firms**

Hanifi Marlow Jihad, pro se.

Angela Behrens, Assistant Minnesota Attorney General, for
Defendants.

REPORT AND RECOMMENDATION

LEO I. BRISBOIS, United States Magistrate Judge.

**\*1** This matter is before the court on the parties' cross-
motions for Summary Judgment (Dkts. 131 and 162); the
Motion to Dismiss of Defendants Norris Blackmon and
Gregory Skrypek (Dkt.144); and Plaintiff's Motion to Strike
(Dkt.152). The motions have been referred to the undersigned
for a report and recommendation pursuant to 28 U.S.C. § 636
and Local Rule 72.1. For the reasons stated below, the Court
finds that Plaintiff's motion for summary judgment should
be denied; that Defendants' motion for summary judgment
should be granted in part and denied in part; that the motion to
dismiss should be granted as to Defendant Skrypek; and that
Plaintiff's Motion to Strike should be denied.

**I. FACTUAL BACKGROUND**

Plaintiff Hanifi Marlow Jihad is currently serving a life
sentence following a conviction for first degree murder. *See,
State v. Jones,* 556 N.W.2d 903, 905 (Minn.1996)(affirming
conviction). [1]

Jihad is currently incarcerated at the Minnesota Correctional
Facility at Stillwater, Minnesota (MCF–Stillwater). (Final
Am. Compl., Dkt. 120, ¶ 3).

Jihad identifies as a practicing Muslim, and in this lawsuit,
he alleges that prison officials have unlawfully burdened
and infringed upon his right to freely practice his religion.
Jihad brings his claims under the Religious Land Use and
Institutionalized Persons Act of 2000 (RLUIPA), 42 U.S.C.
§ 2000cc–1 *et seq.;* under Section 1983 for violations of
the free exercise clause of the First Amendment and the
Equal Protection clause of the Fourteenth Amendment; and
under the Minnesota Constitution. Construing Jihad's pro
se submissions liberally, the Court understands Jihad to
challenge the following policies and decisions: (1) a policy
prohibiting him from wearing a prayer cap, or kufi, when he
is not in his cell or the chapel; (2) a policy preventing him
from performing his five daily prayers outside of his cell,
which contains a toilet; (3) the denial of his request for halal-
certified meals; (4) a policy limiting celebrations for religious
holidays to one special meal per year; (5) a policy requiring
that a volunteer be present for all group religious services; and
(6) the cancellation of religious services on state holidays.

Defendants are current and former employees of the
Minnesota Department of Corrections (DOC). Jihad alleges
Defendants were involved in or were responsible for the
decisions and policies he is currently challenging. Defendant
Joan Fabian is the Commissioner of the DOC, and she is
sued in her individual and official capacity for permitting
or approving certain policies that allegedly violate Jihad's
religious rights. The remaining Defendants appear to be sued
primarily for their involvement in the facility's decisions to
deny Jihad's various requests for religious accommodations.
Defendant David Crist is the Assistant Commissioner of
Corrections; Defendant John King is the Warden at MCF–
Stillwater; Defendant Eddie Miles is identified as the
Associate Warden at MCF–Stillwater; Defendant Michelle
Smith is also identified as the Associate Warden at MCF–
Stillwater; Defendant Bruce Julson is a Program Director
and is responsible for overseeing religious programming at
MCF–Stillwater; Defendant David Reishus is the Program
Director for Administration and appears to be responsible
for overseeing the kitchen facilities at MCF–Stillwater;

Defendant Gregory Skrypek formerly served as the religious coordinator at MCF–Stillwater until he retired in May 2009; and Defendant Norris Blackmon works part-time at MCF–Stillwater as a religious coordinator.

**\*2** MCF–Stillwater houses approximately 1,400 inmates, and it is designated as a level four custody facility, with level five being the highest custody level. (First Blackmon Aff., Dkt. 32, at ¶ 6). The inmates at level four facilities generally have been convicted of serious and violent offenses, are serving longer sentences, or present a greater risk to security and public safety than the inmates at lower custody level facilities. (*Id.*)

The inmates at MCF–Stillwater "have a wide spectrum of religious beliefs," and "[n]early every known religious faith is held by someone in the facility." (*Id.* at ¶ 4). MCF–Stillwater has approximately 140 inmates who identify as Muslim. (First Julson Aff ., Dkt. 33, at ¶ 4).

Defendant Norris Blackmon, who works part-time as a religious coordinator at MCF–Stillwater, states that inmates are allowed a number of opportunities to practice their religious beliefs:

> "[I]nmates may participate in religious services with other inmates of the same faith; worship privately; designate up to five personal items as religious items; store community religious items with in [sic] a staff-designated location; purchase personal religious items at each facility; wear approved religious items; obtain religious material at the prison's library or through the mail; have an annual religious special meal; follow a religious diet; access spiritual and religious counseling services through the religious coordinator, chaplains, contract staff, and volunteers; and have individual community counseling visits by clergy or religious leaders in the visiting room or an alternative site."

(First Blackmon Aff., at ¶ 11). These policies apply to all inmates, regardless of religious affiliation.

The DOC has formalized its policies regarding inmate's religious practice through Policy No. 302.300 entitled "Religious Programming" which states:

> "Facilities will provide all offenders with reasonable opportunities to pursue individual religious beliefs and practices, within facility budgetary and security constraints. Attendance at or participation in religious activities may not be restricted on the basis of race, color, nationality, sex, sexual orientation, or creed. Offenders are not required to attend religious services."

(Dkt. 33–1, Exh. 2, at p. 3 of 9). The policy's provisions also deal with the purchase and possession of religious items, staffing of religious programming, religious services, religious counseling, and religious diets and meals.

The DOC requires inmates in custody level four and five facilities to have an outside volunteer present for religious services; this requirement applies to all religious groups at the affected facilities. (First Blackmon Aff., at ¶ 6). Generally, inmates are responsible for finding outside volunteers to supervise their religious services, but the prison chaplain may assist the inmates in finding volunteers. (Julson Aff., at ¶ 8). According to Norris Blackmon, the outside volunteer requirement for religious services promotes security within the correctional facility. (First Blackmon Aff., at ¶ 7). Blackmon states that permitting inmates to lead religious services "would risk creating hierarchies among inmates, which can lead to conflicts and jeopardize security." (*Id.*) In addition, Blackmon states that allowing inmates to conduct unsupervised religious services "could open the door for gang activity." (*Id.*) According to Blackmon, requiring an outside volunteer ensures that all inmates remain on equal footing during the service, and further ensures that inmates are actually using the time for religious services. (*Id.*); (Julson Aff., at ¶ 7). Joseph Hobson, who is employed as the religious coordinator at MCF–Stillwater, states that inmates may use religious services for illicit purposes if left unsupervised, and that he is aware of instances where known gang members have passed notes and conferred with each other during religious services, even with the presence of an outside volunteer. (Second Hobson Aff., Dkt. 166, at ¶ 9). Hobson states that such conduct would be further exacerbated if inmates were permitted to congregate without a volunteer. (*Id.*) According to Hobson, having an outside volunteer present ensures that inmates are following the traditions of

the faith during the services. (*Id.*) Because of this policy, religious services are sometimes cancelled when a volunteer is not present. (*Id.*)

**\*3** In addition, the DOC does not permit corrections officers (COs) to serve as religious volunteers for several reasons. (*Id.* at ¶ 11). First, COs are not qualified to determine standard religious practice or what constitutes a proper religious observance. (*Id.*) In addition, requiring COs to supervise religious services would create a dual role for COs to handle security concerns and to facilitate religious services. (*Id.*) Hobson states that COs should not be put in this position since it would inevitably lead to conflicts with inmates. (*Id.*) Hobson states that when COs are assigned to the chapel for security purposes, the CO is stationed at or near a desk that is located outside of the chapel. (*Id.*)

Muslims are afforded four opportunities to congregate for religious activities each week. (First Hobson Aff., at ¶ 4). This includes Jumu'ah, Tuesday and Thursday worship services, and a Sunday study group. (*Id.*) According to Joseph Hobson, the Qu'ran and Hadith, which are considered the holy Islamic texts, require attendance at one service, Jumu'ah, in order to be considered "in good standing as a Muslim." (*Id.* at ¶ 3). Jumu'ah is held on Fridays.

According to Defendant Bruce Julson, who currently oversees religious programming at MCF–Stillwater, the chapel has a capacity of 70 people. (Julson Aff., at ¶ 6). In April or May 2008, the Muslim population surpassed this number, and as such, the DOC added a second Jumu'ah service in October 2008 so as to accommodate all Muslims who wanted to attend Friday Jumu'ah services every week. (*Id.* at ¶ s 4, 6). In order to attend one of the services, an inmate must send a "kite" to DOC staffperson Theresa Dunn. (*Id.* at ¶ 6). Dunn then places the inmates into one of two groups, she issues movement passes, and the inmates are then able to attend the Jumu'ah service corresponding to their group assignment. (*Id.*). Because the chapel has a capacity of seventy, the first seventy inmates to sign up for services are permitted to attend, with the exception of Jumu'ah, which is now available to all inmates.

Defendants submit that religious programming may be cancelled for several reasons, and the reasons for cancellation "apply without regard to an inmate's particular religious beliefs." (First. Blackmon Aff., at ¶ 8). As the Court previously discussed, a religious service can be cancelled if a volunteer is not available. (*Id.*) In addition, religious programming is generally cancelled on state holidays. [2] (*Id.*) Lastly, religious programming may be cancelled if there is a security risk. (*Id.*) For instance, on one occasion services were cancelled when prison officials learned of threatened "hits" by members of a religious group. (*Id.*)

One of the tenets of the Islamic faith is that Muslims should pray five times every day. (*Id.* at ¶ 9). These five daily prayers are known as "salat." Blackmon indicates that other Muslims pray in their cells, and that nothing prohibits Muslims from praying within their cells. (*Id.*) Jihad claims that Muslims are prohibited from praying in the presence of toilets or graveyards, and as such, that it violates his religious beliefs to pray within his cell since it contains a toilet. As such, Jihad requests that he be permitted to utilize another location in the prison to perform salat.

**\*4** Defendant Bruce Julson states that it would be unworkable to permit Muslim inmates to leave their cells five times per day for prayer. (Julson Aff., at ¶ 10). First, Julson states that the prayers cannot be performed in the chapel space, which is used by all other religious groups at the prison. Julson indicates that allowing one religious group to use the chapel at the expense of others would be unfair and would likely cause conflict amongst inmates. (*Id.*) Second, Julson states that inmates' daily schedules are highly regulated, and that they generally have programming and assignments throughout the day. (*Id.*) Moreover, movements within the facility are highly regulated in order to ensure the safety of staff and inmates. (*Id.*) As such, permitting Muslim inmates to travel five times per day to a different location to pray would "create an enormous administrative burden by requiring numerous passes to be issued and tracked, and staff to keep track of many inmates coming and going from the chapel multiple times every day." (*Id.*) If each of the 140 Muslim inmates chose to congregate for the five daily prayers, there would be an additional 1,400 inmate movements per day for prison officials to monitor and coordinate. Prison records indicate that Jihad has a prayer rug on his list of personal property that he is permitted to keep in his cell. (Second Hobson Aff., at ¶ 13).

DOC policy permits each religious group at the facility to select one religious holiday per year to celebrate with a special meal. (*Id.* at ¶ 7). The policy states that the meal must be prepared by food services and that food and money cannot be donated by inmates. (Dkt. 33–1, at pp. 5–6 of 9). The DOC does not decide which holiday a religious group celebrates; rather, each religious group determines the holiday

it wants to celebrate with a special meal and then notifies the DOC of their choice. (Second Hobson Aff., at ¶ 7). MCF–Stillwater's Muslim group has selected Eid–al–Fitr as the holiday for which it will receive a special meal. (*Id.*) Jihad has participated in this special meal in the past. (*Id.*)

Eid–al–Fitr marks the end of Ramadan. (*Id.* at ¶ 3). Ramadan is a thirty-day period during which Muslims fast during daylight, from dawn until sunset. (*Id.* at ¶ 2). "Eid" means celebration, and "Fitr" means breaking the fast. (*Id.* at ¶ 3). Inmates are permitted to fast during Ramadan; fasting inmates receive the same meal as other inmates, but they receive their meals before dawn and after sundown in a bag rather than on a tray. (*Id.* at ¶ 2). Inmates are also permitted to fast at any time during the year so long as they have a religious reason for the fast. (*Id.*) The DOC requires that fasts have a religious component in order to avoid hunger strikes among the inmates. (*Id* .)

Jihad requests that Muslims also be permitted to celebrate Eid–al–Ahda with a special meal. Eid–al–Ahda is a celebration of sacrifice marking the end of Hajj, which refers to the annual pilgrimage to Mecca. (*Id.* at ¶ 4) Hajj is one of the five pillars of Islam, and Muslims are required to travel to Mecca at least once in their lifetime. Hajj may be recognized with a 10–day fast, with Eid–al–Ahda marking the end of Hajj and of the fast.

**\*5** The special meal is comprised of food items that are selected by the inmates so long as the cost does not exceed five dollars per person. (First Hobson Aff., at ¶ 8). In general, DOC meals are provided at a cost of approximately three dollars per person. (*Id* .) Inmates generally take advantage of the increased meal budget and request as much food as possible for their special meal. (*Id.*) "Given the benefits of extra food and control of the menu, most inmates would likely want special meals for all holidays." (*Id.* at ¶ 9). However, Defendants indicate that allowing more than one special meal per year would cause a hardship to the DOC in terms of its budget and staffing. (*Id.*) Defendants represent that by allowing each religious group to designate one holiday for a special meal all religious groups are treated uniformly. (*Id.*)

With respect to religious apparel, DOC policy permits inmates to wear designated religious items while they are in their cells or at the chapel during authorized religious services. (Julson Aff., at ¶ 11). Outside their cells, inmates are permitted to wear state-issued baseball caps or orange stocking caps. (*Id.*) During recreation, inmates may wear

state-issued headbands. (*Id.*) If an inmate's work assignment requires headwear, the inmate may only wear the headwear in assigned work areas and while moving to and from the assigned work area. (*Id.*) According to Hobson, a kufi is not a religious item, and Muslims are required only to cover their heads while they are in a mosque. (First Hobson Aff., at ¶ 5). Hobson states that some Muslims choose to wear a kufi as a head-covering, but any head-covering would be adequate for accomplishing this goal. (*Id.*)

Julson avers that the DOC's religious apparel policy promotes the safety and security of inmates and staff by promoting uniformity in appearance for all inmates while they are outside of their cells. (Julson Aff., at ¶ 12). This prevents inmates from wearing items that could signal a gang affiliation, which could cause conflicts with other inmates. (*Id.*) Julson avers that minimizing conflict and hostility among inmates provides a safer environment for both inmates and staff. (*Id.*)

## II. STANDARD OF REVIEW

Summary Judgment is appropriate only when the evidence demonstrates that there is no genuine issue of material fact such that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. Pro. 56(a); *Smutka v. City of Hutchinson,* 451 F.3d 522, 526 (8th Cir.2006). A disputed fact is "material" if it might affect the outcome of the case, and a factual dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The moving party bears the burden of bringing forward sufficient admissible evidence to establish that there are no genuine issues of material fact and that the movant is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The evidence must be viewed in the light most favorable to the nonmoving party, and the nonmoving party must be given the benefit of all reasonable inferences to be drawn from the underlying facts in the record. *Mirax Chemical Products Corp. v. First Interstate Commercial Corp.,* 950 F.2d 566, 569 (8th Cir.1991). However, the nonmoving party may not rest on mere allegations or denials in its pleadings, but must set forth specific admissible evidence-based facts showing the existence of a genuine issue. *Forrest v. Kraft Foods, Inc.,* 285 F.3d 688, 691 (8th Cir.2002). However, the movant is entitled to summary judgment where the nonmoving party has failed "to establish the existence of an element essential to

that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.,* 477 U.S. at 322. No genuine issue of fact exists in such a case because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323. [3]

## III. DISCUSSION

### A. *Sovereign Immunity*

**\*6** Defendants argue that Jihad's claims for damages against them in their official capacities are barred by the Eleventh Amendment. The Court agrees.

A suit against a public employee in that person's official capacity is merely a suit against the public employer. *Johnson v. Outboard Marine Corp.,* 172 F.3d 531, 535 (8th Cir.1999), citing *Kentucky v. Graham,* 473 U.S. 159, 165, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985). "The Eleventh Amendment immunizes an unconsenting State from damage actions brought in federal court, except when Congress has abrogated that immunity for a particular federal cause of action." *Hadley v. North Arkansas Community Technical College,* 76 F.3d 1437, 1438 (8th Cir.1996)[citations omitted], cert. denied, 519 U.S. 1148, 117 S.Ct. 1080, 137 L.Ed.2d 215 (1997). "To waive sovereign immunity, a state must make a clear, unequivocal statement that it wishes to do so." *Faibisch v. University of Minnesota,* 304 F.3d 797, 800 (8th Cir.2002), citing *Atascadero State Hospital v. Scanlon,* 473 U.S. 234, 238–40, 105 S.Ct. 3142, 87 L.Ed.2d 171 (1985).

Here, Jihad has not established that Minnesota has waived its immunity from damages for any of the laws at issue in this case, nor has he established that Congress abrogated Minnesota's immunity with respect to any of the claims at issue. *See, Van Wyhe v. Reisch,* 581 F.3d 639, 655 (8th Cir.2009)(official capacity claims for damages not available under RLUIPA), cert. denied, ––– U.S. ––––, 130 S.Ct. 3323, 176 L.Ed.2d 1220 (May 24, 2010); *Murphy v. State of Arkansas,* 127 F.3d 750, 754 (8th Cir.1997)(Section 1983 claims for damages against individual defendants in their official capacities are barred by Eleventh Amendment). As such, to the extent that Jihad seeks damages from Defendants in their official capacities, such claims should be dismissed.

### B. *Free Exercise Claims*

Jihad's free exercise claims arise under the free exercise clause of the First Amendment of the United States

Constitution, the Freedom of Conscience Clause of the Minnesota Constitution, and the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA), 42 U.S.C. § 2000cc–1 *et seq.*

With respect to free exercise claims under the United States Constitution, the Eighth Circuit has explained as follows:

> Although prisoners retain their constitutional rights, limitations may be placed on the exercise of those rights in light of the needs of the penal system. Constitutional claims that would otherwise receive strict scrutiny analysis if raised by a member of the general population are evaluated under a lesser standard of scrutiny in the context of a prison setting. *Turner v. Safley,* 482 U.S. 78, 81, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). A prison regulation or action is valid, therefore, even if it restricts a prisoner's constitutional rights if it is "reasonably related to legitimate penological interests." *Turner,* 482 U.S. at 89, 107 S.Ct. 2254, 96 L.Ed.2d 64. Turner sets forth four factors that courts should consider in making that determination. First, we ask whether there is a "valid rational connection" between the prison regulation and the government interest justifying it. *Id.* at 89–90, 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64. Second, we consider whether there is an alternative means available to the prison inmates to exercise the right. *Id.* at 90, 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64. Third, we examine whether an accommodation would have a "significant 'ripple effect' " on the guards, other inmates, and prison resources. *Id.* Fourth, we evaluate whether there is an alternative that fully accommodates the prisoner "at de minimus cost to valid penological interests." *Id.* at 90–91, 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64.

\* \* \*

**\*7** In analyzing [a free-exercise] claim, we consider the threshold issue of whether the challenged governmental action "infringes upon a sincerely held religious belief," *Hamilton v. Schriro,* 74 F.3d 1545, 1550 (8th Cir.1996), and then apply the Turner factors to determine if the regulation restricting the religious practice is "reasonably related to legitimate penological objectives." *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 353, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987). We accord great deference to the judgment and expertise of prison officials, "particularly with respect to decisions that implicate institutional security." *Goff v. Graves,* 362 F.3d 543, 549 (8th Cir.2004).

*Murphy v. Missouri Dep't. of Corrections,* 372 F.3d 979, 982–83 (8th Cir.), cert. denied, 543 U.S. 991, 125 S.Ct. 501, 160 L.Ed.2d 378 (2004).

While Jihad's First Amendment claims are actionable under 42 U. S .C. § 1983, he also raises a statutory free exercise claim under RLUIPA, as noted. "By enacting RLUIPA, Congress established a statutory free exercise claim encompassing a higher standard of review than that which applies to constitutional free exercise claims." *Murphy,* 372 F.3d at 986. A prison policy that satisfies RLUIPA's strict scrutiny standard necessarily satisfies the rational basis test applied for First Amendment purposes. *Gladson v. Iowa Department of Corrections,* 551 F.3d 825, 831 (8th Cir.2009). As such, where Jihad has raised both a Free Exercise and a RLUIPA claim, the Court has first addressed his claims under the framework of RLUIPA.

Section 3 of RLUIPA provides, in part:

"(a) General rule

No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution ... even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on the person—

(1) is in furtherance of a compelling governmental interest; and

(2) is the least restrictive means of furthering that compelling governmental interest."

RLUIPA defines religious exercise as "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc–5(7)(A)..

In order "to demonstrate a substantial burden on exercise of religion, a governmental policy or action must significantly inhibit or constrain religious conduct or religious expression; must meaningfully curtail a person's ability to express adherence to his or her faith; or must deny a person reasonable opportunities to engage in those activities that are fundamental to a person's religion." *Van Wyhe,* 581 F.3d at 656 [citations and quotations omitted].[4] "Only after the plaintiff first fulfills this duty must the government prove that its policy is the least restrictive means to further a compelling governmental interest." *Weir v. Nix,* 114 F.3d 817, 820 (8th Cir.1997)(RFRA case); *see also, Murphy,* 372 F.3d at 987

(noting that courts look to RFRA cases for guidance on applying RLUIPA).

**\*8** RLUIPA, which was enacted in 2000 after the United States Supreme Court found its predecessor statute unconstitutional as applied to the states in *City of Boerne v. Flores,* 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997), "is the latest of long-running congressional efforts to accord religious exercise heightened protection from government-imposed burdens." *Cutter,* 544 U.S. at 714. Congressional history indicates that RLUIPA was intended to eliminate frivolous or arbitrary barriers to an institutionalized individual's religious exercise, albeit with the expectation "that courts entertaining complaints under § 3 would accord due deference to the experience and expertise of prison and jail administrators." *Id.* at 716–17 [quotations and citations omitted]. As such, "[a]lthough we required the government to meet a higher burden than [under the First Amendment free exercise clause] ..., we nevertheless accord[ ] a significant degree of deference to the expertise of prison officials in evaluating whether they met that burden." *Murphy,* 372 F.3d at 987 [citing cases].[5]

Lastly, in a prior order, the Court determined that RLUIPA does not permit claims against prison officials in their individual capacities because individual prison personnel do not themselves receive Federal funding. (Dkt. 109, at pp. 40–42). The Court continues to rely on this analysis, and therefore concludes that to the extent that Jihad has asserted claims pursuant to RLUIPA, those claims are against the named Defendants **in their official capacities only.** As we have already concluded, Jihad cannot seek damages against Defendants in their official capacities, so his RLUIPA claims are for equitable relief only.

Jihad also claims that Defendants have violated his religious rights secured by Article 1, Section 16 of the Minnesota State Constitution.[6] Defendants argue that these claims must be dismissed because Minnesota has not recognized a private cause of action for violations of the Minnesota Constitution.

Minnesota has not enacted a statue that is equivalent to Section 1983, which provides a private cause of action for violations of the Federal Constitution. *Guite v. Wright,* 976 F.Supp. 866, 871 (D.Minn.1997), aff'd on other grounds, 147 F.3d 747 (8th Cir.1998); *Mlnarik v. City of Minnetrista,* 2010 WL 346402 at *1 (Minn.App. Feb.2, 2010)(finding that "no private cause of action for a violation of the Minnesota constitution has yet been recognized" and

therefore "appellant's complaint fails to state a claim"); *Danforth v. Eling,* 2010 WL 4068791 at *6 (Minn.App., Oct.19, 2010)* ("there is no private cause of action for violations of the Minnesota Constitution"). As such, to the extent that Jihad attempts to assert claims under the Minnesota Constitution, these claims should be dismissed. [7]

1. *Salat Claim Against Defendants Crist, King, Miles,, Skrypek, and Blackmon in their Official Capacities*

Jihad argues that the above Defendants impermissibly burdened the practice of his religion when they denied his request to perform his five daily prayers in a location outside of his cell. Jihad argues that his religion forbids him from praying in the presence of a toilet, and as such, that Defendants' failure to accommodate his request has forced him to violate his religious beliefs by requiring him to conduct his daily prayers in the presence of a toilet.

**\*9** For purposes of their summary judgment motions, Defendants have not challenged the sincerity of Jihad's religious beliefs with respect to salat, and they have assumed that the applicable restrictions impose a substantial burden on the practice of his religion. As such, the Court has assumed, without deciding, that Defendants have substantially burdened Jihad's sincerely held religious beliefs as they relate to where he should perform his daily prayers.

Instead, Defendants contend that the policy restricting Jihad to his cell for his daily prayers is narrowly tailored to furthering a compelling governmental interest. There can be no question that prison security and the safety of inmates and staff constitute compelling interests in the prison setting. *Goff v. Graves,* 362 F.3d 543, 549 (8th Cir.2004)("We must accord great deference to the judgment of prison officials, particularly with respect to decisions that implicate institutional security"); *Murphy,* 372 F.3d at 983 (8th Cir.2004)("Institutional security is 'the most compelling interest in a prison setting.' ") In the present case, Jihad's requested accommodation would significantly increase the number of daily movements for Muslim inmates that would have to be monitored and regulated by DOC staff. As Defendants have pointed out, this amounts to ten additional movements within the prison for every Muslim inmate involved. As Defendants have stated, the logistical problems with such a request would be significant for DOC staff. Moreover, allowing Muslim inmates to have substantially more opportunities to leave their cells and to utilize common areas would likely create the appearance of

favoritism, thereby leading to discord and conflict among inmates. All of these concerns plainly implicate the order and security of the prison. *See, Singson v. Norris,* 553 F.3d 660, 663 (8th Cir.2009)(finding that prison's security concerns were entitled to deference, and noting that "[a] prison is free to deny inmate religious requests predicated on RLUIPA if they jeopardize the effective functioning of an institution."), quoting *Cutter,* 544 U.S. at 726. As such, the Court finds that Defendants have clearly met their burden of establishing a compelling governmental interest in maintaining the order and security of the prison. [8]

Since the Court has determined that Defendants have established the existence of a compelling governmental interest, the Court must now determine whether there exists a less restrictive, suitable alternative that serves the government's compelling interests in maintaining prison security and order. The Court finds that there is no suitable alternative that would permit Jihad to perform salat outside of his cell five times daily without significantly undermining the security and order of the facility. There is simply no alternative that would not require extremely significant additional inmate movements in the facility. Moreover, there is no way to accommodate Jihad's request to significantly increase his movements and access to common areas without extending the same accommodation to all Muslim inmates who could request it, and thereby also creating a potential appearance of favoritism and increasing conflicts among non-Muslim inmates. In addition, this would require the allocation of significant resources to only one religion and only a limited number of inmates when compared to the whole inmate population.

**\*10** Defendants are not preventing Jihad from performing his salat altogether since he is clearly permitted to pray in his cell as frequently as he wishes. He has also been permitted to keep a prayer rug in his cell for this purpose. However sincere his belief, there is simply no reasonable way to accommodate Jihad's request without undermining the security and orderly administration of the prison. Simply put, prisons are not required to remove all barriers to an inmate's religions practice in the name of religious freedom. In the present case, the DOC's concerns are not arbitrary or irrational, but rather, they implicate one of the most fundamental aspects of the safety and security of a prison—namely, the strict regulation of inmate movements within the facility. *See, Williams v. Jabe,* 2008 WL 5427766 at *7–8 (W.D.Va., Dec.31, 2008)(security concerns justified denial of request to have evening congregational prayers during Ramadan

where the request would increase inmate movements during period of decreased staff availability), aff'd, 339 Fed.Appx. 317 (4th Cir.2009), cert. denied, ––– U.S. ––––, 130 S.Ct. 1061, 175 L.Ed.2d 895 (2010); *Vega v. Lantz,* 2009 WL 3157586 at *10 (D.Conn., Sept.25, 2009) ("RLUIPA does not require officials to make the burdensome alterations to prison scheduling and facility use that the plaintiff seeks, particularly in light of the security concerns that the defendants identify", where inmate requested permission to conduct five daily congregational prayers); *Fowler v. Crawford,* 534 F.3d 931 (8th Cir.2008)(prison was not required to provide sweat lodge for Native American inmate even though he believed it was necessary to the practice of his religion where such a request had clear implications for maintaining order and security even though the facility had permitted sweat lodges in the past), cert. denied, ––– U.S. ––––, 129 S.Ct. 1585, 173 L.Ed.2d 677 (2009); *Singson,* 553 F.3d at 662–63 (Wiccan inmate was denied request to keep tarot cards in cell for religious purposes where the court found "that the potential effect of in-cell use on the guards and allocation of prison resources outweighs the restrictions felt by any interested inmate-users."); *Ahmad v. Ehrmann,* 339 F.Supp.2d 1134, 1137–38 (D.Colo.2004)(weekly group prayer was sufficient substitute for request to have five daily prayers in a room without a toilet because such a request would drain prison resources and the request would undermine security), reversed on other grounds, 435 F.3d 1196 (10th Cir.2006) . [9]

In sum, the Court finds that Defendants have demonstrated that their policy regarding Jihad's five daily prayers is narrowly tailored to serving a compelling governmental interest. Because Jihad's prayer claim does not survive under RLUIPA, his First Amendment claim must also fail. Therefore, the Court recommends that Jihad's salat claim be dismissed with prejudice, and that summary judgment be entered in favor of Defendants Crist, King, Miles, Julson, Skrypek, and Blackmon as to this claim.

### 2. *Halal Meals Claim Against Defendants Fabian, Smith, and Reishus*

**\*11** Jihad argues that Defendants are violating his religious rights by failing to provide him with certified halal meals. This claim is asserted against Defendants Fabian, Smith, and Reishus. [10]

"Halal" refers to what is permissible or lawful under Islamic law, while "Haram" refers to what is forbidden or unlawful. (Dkt.39–4). The parties agree that the primary feature of

a halal diet is the absence of pork, which is forbidden. However, the parties do not agree on what is required of a halal diet. According to Defendants, a halal diet primarily requires the absence of pork and alcohol. (Packwood Aff., Dtk. 167, at ¶ 7). Based on this understanding, Defendants claim that Jihad is able to eat a halal diet with the food options that are available at MCF–Stillwater, since existing DOC meal options permit him to eat a diet entirely free of pork. Therefore, Defendants argue, Jihad has not established a substantial burden on the practice of his religion.

In support of their argument, Defendants have offered the affidavits of DOC staff who have consulted generally with the Muslim population in order to become familiar with the religion and what is required of a halal diet. In particular, Defendants have offered the Affidavit of Joseph Hobson, who serves as the religious coordinator at MCF–Stillwater. Hobson's own religious affiliation is with the Seventh-day Adventist Church. (First Hobson Aff., at ¶ 2). Hobson states that he become "particularly familiar with the Islamic faith through self-study and contacts with the Muslim population." (*Id.*) Hobson represents that "[e]verything that is not unlawful is halal, and only a few foods are haram", and that "[a]ll food is considered lawful unless explicitly forbidden." (*Id.* at ¶ 6). As such, Hobson avers that Muslims may eat any food item that is not haram, and that the main food that is considered haram is pork. (*Id.*) Because meal options at MCF–Stillwater always contain pork-free options, Hobson states that inmates may follow a halal diet based on the meal options that are already available. (*Id.* at ¶ 7).

Defendants have also offered the Affidavit of Sheila Packwood, who has worked as a dietitian for the DOC since 2004 and who is not Muslim. (Packwood Aff., at ¶ 1). According to Packwood, MCF–Stillwater provides two meal options, a standard meal and a lacto-ovo vegetarian meal. [11] (*Id.* at ¶4). Although not addressed by Defendants, it appears that DOC policy also provides for a "Kosher Vegetarian Meal," which are pre-packaged meals that are purchased through an approved vendor and which are available through a facility religious coordinator. [12] (Dkt. 31–1, at p. 3 of 7). DOC staff encourage inmates with a food allergy, religious preference, diabetes, hypertension, or other medical issues to choose the vegetarian meal, although the choice is ultimately left to the inmate. (Packwood Aff., at p. 4). In addition, about five inmates at MCF–Stillwater receive a special food tray that is not a standard or vegetarian meal because they have "a medically justified reason for receiving a special tray." (*Id.* at ¶ 5). For instance, some of these inmates are in renal failure,

require a low-protein diet, or have a gluten intolerance. (*Id.*) Packwood states that under these circumstances the five inmates who receive special trays would not be able to self-select a nutritionally safe meal from the regular meal options. (*Id.*)

**\*12** Packwood indicates that she has researched halal meals on several occasions by consulting with community resources volunteers, staff at halal markets, the executive director of the Islamic University of Minnesota, other Muslims, and other dietitians in the corrections field. (*Id.* at ¶ 6). Packwood states that, based on her research, Jihad's understanding of halal does not represent the "common understanding of the term." (*Id.* at ¶ 7). According to Packwood, the most important aspect of a halal diet is "not to consume any part of a pig or any alcohol." (*Id.*) Packwood states that inmates may eat a halal diet through the meals that are already offered. (*Id.* at ¶ 8). According to Packwood, nearly all of the individuals she consulted with were "surprised" by the definition of halal that Jihad was advancing. (*Id.* at ¶ 7). She also states "[t]hey explained to me that even a product certified as halal would not necessarily satisfy the definition advanced by Jihad." (*Id.*) Packwood stated that most Muslims are not concerned with the way that fruits and vegetables are grown, and that fruits and vegetables are generally acceptable regardless of the way they are grown so long as they are washed before eating. (*Id.*) Hobson also indicates that Jihad's definition of halal is "an extreme view" based on his consultation with other lifetime Muslims. (Second Hobson Aff., at ¶ 6). Hobson also states that if halal food is not available, "a Muslim may pray over and then eat it." (*Id.*)

Packwood discloses that she looked into the possibility of obtaining prepackaged halal meals, but that she found that it would not be feasible due to costs and nutritional requirements. (*Id.* at ¶ 8). Packwood priced prepackaged certified halal meals over the internet through Good Source Solutions, Inc., a California food vendor that services correctional facilities throughout the country. (*Id.*) According to Packwood, a certified halal meal is approximately $3.50 to $4.00 per meal, but the meal only provides 400 calories, as compared to the 1,000 calories for a standard DOC meal. (*Id.*) As such, in order to meet nutritional and caloric requirements, an inmate would likely need two or three pre-packaged meals for each meal. (*Id.*) Packwood states that a regular DOC meal costs approximately $1.10 to $3.29 per day for each inmate, and that it would be cost-prohibitive to spend $7.00 to $12.00 per meal to obtain sufficient halal-certified meals. (*Id.*) Packwood also stated that supplementing these meals

with fruits, vegetables and bread would also not be sufficient because these items would not meet Jihad's definition of halal. (*Id.*) According to Packwood, the prepackaged meals only offer ten options, so meal variety would be substantially reduced. (*Id.* at ¶ 9).

Jihad maintains that the DOC's understanding of what is considered halal is not accurate. As the Court understands Jihad's argument, in order to be considered halal, any food consumed must not come into contact with pork at any stage. In other words, a halal diet requires that he not only refrain from eating pork and pork by-products, but that he also refrain from eating any meat that derives from an animal that was fed with a pork by-product, or fruits and vegetables that were grown in a soil fertilized with manure. In addition, Jihad claims "Halal is achieved through Islamic rituals in accord with the Qur'an." (Pl.'s Memo. in Opp., Dkt. 175, at p. 6). The Court understands Jihad to argue that the current meal options, even though they do not contain pork, require him to consume foods that violate his religious beliefs, and that the only suitable option is the provision of halal-certified meals.

**\*13** As an initial matter, Defendants question the sincerity of Jihad's beliefs. (Pl.'s Memo. in Supp., Dkt. 163, at p. 19). To the extent that Jihad's understanding of halal is not necessarily the most common or orthodox understanding of the term, the Court notes that " 'the guarantee of free exercise is not limited to beliefs which are shared by all of the members of a religious sect.' " *Love v. Reed,* 216 F.3d 682, 688 (8th Cir.2000), quoting *Thomas v. Review Board of the Indian Employment Security Division,* 450 U.S. 707, 715–16, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981). Moreover, whether or not an asserted belief constitutes "a sincerely held religious belief is a factual determination, so we must not quickly dismiss such claims on summary judgment by concluding that those beliefs are not genuine." *Murphy,* 372 F.3d at 983, citing *Ochs v. Thalacker,* 90 F.3d 293 F.3d 293, 296 (8th Cir.1996). While there may be some cause to believe that Jihad's request may not be entirely sincere, this is a factual dispute that cannot be resolved on summary judgment. As such, the Court concludes that there are genuine issues of material fact, which preclude any conclusions as to the sincerity of Jihad's beliefs.

Next, the Court also concludes that there are genuine issues of material fact regarding whether the DOC's meal policy imposes a substantial burden on the practice of Jihad's religion. The case law makes clear that where a prison policy causes an inmate to violate some religious belief or tenet, that policy generally constitutes a substantial burden on religious

practice. *See, Waff v. Reisch,* 2010 WL 3730114 at *9 (D.S.D. July 30, 2010)(discussing definitions of substantial burden and noting that religious exercise will be substantially burdened if prison pressures or forces an inmate to engage in conduct that violates his religious beliefs). Here, Jihad has shown that he believes that eating a halal diet requires more than merely avoiding pork products. In particular, he has indicated that his religious beliefs compel him to eat food that has been grown, produced and processed in a particular manner, and that to ensure that food meets his religious needs, it must be certified as halal.

Defendants attempt to counter Jihad's claim of substantial burden by establishing that a halal diet is primarily achieved by the absence of pork in the diet. Jihad does not dispute that pork is a main concern with respect to halal diets. However, he disputes that this is an accurate representation of the true nature of a halal diet. The Court finds that Defendants have failed to offer competent evidence at this time in support of their understanding of halal, and therefore, they have failed to establish for purposes of the present summary judgment motion only that their existing meal plans are religiously adequate as a matter of law; a dispute of fact remains based on the present record. The individuals who have described the definition of halal do not identify as Muslim, and their description of the meaning of a halal diet is hearsay based on their discussions with unidentified Muslims in the community. Federal Rule of Civil Procedure 56(c) provides that affidavits offered in support of motions for summary judgment must be based on personal knowledge and must set forth facts as would be admissible in evidence. The affidavits attesting to what some unidentified Muslims say is the meaning of a halal diet are based on hearsay, which is not a proper basis for supporting Defendants' summary judgment motion. *Brewster v. United States,* 860 F.Supp. 1377, 1385 (S.D.Iowa 1994)(noting that hearsay evidence shouldn't be considered on a motion for summary judgment).

**\*14** Consequently, the Court is unable to conclude, in the absence of admissible and competent evidence, that the meal options available at MCF–Stillwater do not cause Jihad to consume food that is in violation of his religious beliefs. Therefore, the Court finds that fact issues still remain regarding whether the meal policy substantially burdens Jihad's religious beliefs. [13] *See, Thompson v. Williams,* 2007 WL 3244666 *17–20 (W.D.Wash., Oct.31, 2007)(finding summary judgment in favor of defendants was not warranted where plaintiff had shown eating a halal diet including meat is a fundamental tenant of his faith while prison officials failed

to show that meal options were religiously adequate or that providing them would be too burdensome); *Baranowski v. Hart,* 486 F.3d 112, 125 (5th Cir.2007)("Given the strong significance of keeping kosher in the Jewish faith, the [prison's] policy of not providing kosher food may be deemed to work a substantial burden upon Baranowski's practice of his faith").

Turning to the last steps, the Court also concludes that Defendants have failed to show that their meal policy is narrowly tailored to achieving a compelling governmental interest. Defendants argue that they explored the option of obtaining prepackaged halal meals, but found that the meals significantly exceed the DOC's budget for meals. The Court finds that Defendants have failed for purposes of the present motion to adequately support this argument with sufficient evidence. The burden of establishing that a policy is narrowly tailored to achieving compelling governmental interests rests with the prison officials. Prison officials "must demonstrate that they actually considered and rejected the efficacy of less restrictive measures before adopting the challenged practice." *See, Fegans,* 537 F.3d at 910, quoting *Alvarez v. Hill,* 518 F.3d 1152, 1156 (9th Cir.2008). In this instance, the only evidence that Defendants considered less restrictive alternatives is based on Packwood's review of pricing information available on only one website: the Good Source Company. There is no evidence that Defendants attempted to obtain pricing information from any other food service companies, and they have offered no evidence to suggest that the Good Source company is the only company that offers certified halal meals. The Court finds that Packwood's inquiry was arbitrary and self-serving, and consequently, the Court cannot conclude that Defendants reasonably considered less restrictive alternatives based on their review of only one website. *See, Thompson v. Williams,* 2007 WL 3244666 at *19 (summary judgment was not warranted where prison officials had failed to meet their burden of establishing that their meal policy was the least restrictive means of serving compelling governmental interests). However, the Court is also unable to conclude that Jihad is entitled to summary judgment on his claim, since there are genuine issues of material fact that remain.

**\*15** While the Court has determined that Jihad's RLUIPA claim should be permitted to move forward at this juncture, there is one final issue to be resolved as to Jihad's halal meal claim. The Court finds that even though Jihad's RLUIPA claim may move forward, Defendants are entitled to qualified immunity as to his First Amendment claim

for damages in their individual capacities. "Qualified immunity generally shields 'government officials performing discretionary functions from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Williams v. Jackson,* 600 F.3d 1007, 1012 (8th Cir.2010), quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Although the Court is unable to find at this time that the DOC's denial of the requested accommodation will ultimately be affirmed as valid, the Court finds that their actions did not violate clearly established constitutional law of which a reasonable person would have known. *See e.g., Thompson v. Williams,* 2007 WL 3244666 at *22 (W.D.Wash.2007)(genuine issues of material fact existed on First Amendment and RLUIPA claims, but finding defendants entitled to qualified immunity because "the majority of circuit and district courts that have looked at this specific issue have concluded there is no such clearly establish right to Halal meals, with or without Halal meat, under the First Amendment's Free Exercise of Religion Clause, RLUIPA or the Equal Protection Clause of the Fourteenth Amendment.") Although there is a clearly established right to religious dietary accommodations, the Court finds that, based upon a review of the cases, there is no clearly established right to pre-packaged halal meals. *See e.g., Patel v. United States Bureau of Prisons,* 515 F.3d 807 (8th Cir.2008)(BOP was not required to provide halal meals under the facts of that case); *Pratt v. Corr. Corp. of Am.,* 267 Fed.Appx. 482 (8th Cir.2008)(prison not required to provide diet with halal meat where other food that was halal was provided). In this case, the critical issue that remains to be resolved is whether the DOC did enough to consider other alternatives that would accommodate Jihad's religious beliefs. While, without deciding now, the DOC may ultimately have to consider providing prepackaged halal meals, once the disputes of material fact are resolved, this does not preclude the availability of qualified immunity. In this case, the Court cannot say that there is a clearly established right to prepackaged halal meals based on religious beliefs. As such, the Court finds that Jihad cannot proceed on his individual capacity claims against the Defendants, and all that remains are official capacity claims.

In sum, as to Jihad's halal meals claim, the Court recommends that Defendants' motion for summary judgment be denied in part and granted in part, and that Jihad's motion for summary judgment also be denied. Jihad should be permitted to further pursue his halal meals claim against Defendants Fabian, Smith, and Reishus in their official capacities only.

### 3. *Holiday Meals Claim*

**\*16** Jihad argues that Defendants have violated his free exercise rights by limiting him to one special holiday meal per year. The Court understands Jihad to request that he be allowed to celebrate Eid–al–Ahda at the conclusion of Hajj with a "religious feast." (Pl.'s Memo. in Opp., at p. 30). Defendants argue that the DOC's policy limiting Jihad to only one special feast per year does not impose a substantial burden on the practice of his religion. Defendants further argue that even if Jihad could establish a substantial burden on the practice of his religion, the DOC's policy is narrowly tailored to achieve a compelling state interest.

The Court finds that Jihad has not shown that the practice of his religion is substantially burdened by the one special meal policy. Significantly, the Eighth Circuit has stated that a "prison must permit reasonable opportunity for an inmate to engage in religious activities but **need not provide unlimited opportunities.**" *Van Wyhe,* 581 F.3d at 657 [emphasis supplied]. The DOC has produced competent evidence that Jihad may fast according to his religious beliefs at any time during the year, including during Hajj, and he is not prevented from pursuing individualized prayer and worship in the absence of the requested special meal. In other words, Jihad has not been prevented from celebrating Eid–al–Ahda altogether; rather, he has been prevented from recognizing the religious holiday in his preferred manner, with a special meal. As a consequence, the Court finds that Jihad cannot show that the practice of his religion has been substantially burdened by the rule limiting religious feasts to one per year. *See, Gladson,* 551 F.3d at 831 ("a prisoner need not be afforded his preferred means of practicing his religion as long as he is afforded sufficient means to do so"); *Johnson v. Harmon,* 2005 WL 1772752 at * 16 (E.D.Ark., July 1, 2005)(religious exercise was not substantially burdened simply because inmate was not able to participate in catered Eid Feast, and finding that inmate was able to break the fast of Ramadan by eating his regular meal tray "with the mind set and prayerfulness that is the essence of that religious holiday"); *Muhammad/Smith v. Freyder,* 2007 WL 1116045 at *3 (E.D.Ark. April 12, 2007)(finding that inmate's rights were not violated when he was not permitted to participate in the Eid feast, but was served regular meal tray, because he was in administrative segregation).

Moreover, even if the one special meal policy substantially burdened the practice of Jihad's religion, the Court would nevertheless find that the DOC's policy meets the strict

scrutiny standard applicable under RLUIPA. First, the Court finds that the policy furthers compelling governmental interests. The religious meal policy applies to all religious groups, and therefore, it promotes the equal treatment of all inmates and furthers the interest of preventing the perception of favoritism and thus minimizing the potential for inmate conflict. *Id.* at \*5 (policy prohibiting inmate from receiving catered Eid meal was justified because serving catered food to an inmate in segregation would create the impression of favoritism). Moreover, allowing more than one special meal would impose additional burdens financially and with respect to staffing, as Defendants have detailed.

**\*17** The Court recognizes that Jihad has submitted evidence showing that Muslim inmates are involved in the preparation of the Eid–al–Fitr meal, presumably to establish that Defendants' staffing concerns are overstated. However, even if Muslim inmates prepare the special meal, this does not address the staffing and financial burdens that would be imposed by allowing all religious groups to have more than one special meal per year. Defendants would have to consider permitting additional special meals for all religions and, as Defendants have established, many other religious groups would likely request such an accommodation given the benefits of the special meals. Most importantly, Defendants have established that the policy also provides for the equal treatment of all religious groups, which prevents instances of inmate conflict based on perceived favoritism. Accordingly, the Court finds that Defendants have demonstrated compelling governmental interests in uniformly limiting all religious groups to one special meal per year.

The Court also finds that there is no dispute that the policy is the least restrictive means of serving these interests. First, allowing Jihad personally, or Muslims in general, an exemption from this policy would likely result in perceptions of favoritism and, ultimately, could result in inmate conflict. Defendants cannot simply eliminate inmate conflict by permitting all religious groups to have two or more feasts per year, because this would result in significant burdens financially and administratively. Likewise, to the extent that Jihad offers to pay personally for the cost of the Eid–al–Ahda feast, this does not remedy the additional problems that would result with inmate conflict or DOC staffing, and therefore, it is not a suitable alternative. [14] As a result, there is no way to meet Jihad's request without risking security and without imposing significant financial and administrative burdens. In sum, Jihad has failed to establish a violation of his religious

rights, and therefore, Defendants are entitled to summary judgment on Jihad's special meal claim. [15]

### 4. *Religious Apparel Claim Against Defendant Fabian*
Here, Jihad challenges the portion of DOC Policy No. 302.30 that prevents him from wearing his kufi while he is outside of his cell or the chapel. Jihad alleges that this policy violates his free exercise rights by prohibiting him from wearing his kufi when he is in the public eye. According to Jihad, Muslims are required to guard their modesty by covering their head while in the public eye. (Pl.'s Memo. in Opp., at p. 33). Jihad further states that "[a] kufi is a common head covering cap that Muslims use to cover their heads." (*Id.*)

The Court finds that Jihad's kufi claim should be dismissed because he has failed to establish a substantial burden on the practice of his religion. Significantly, the DOC policy at issue does not entirely prohibit Jihad from covering his head while in the in public eye; rather, it only prohibits him from wearing his personally preferred headwear outside of the chapel or his cell. While Jihad claims that his religious beliefs require him to cover his head in public in the interests of modesty, he has not established that not being allowed to wear a kufi, as opposed to the readily available state-issued headwear, substantially burdens his religious exercise. *See, Junaid v. Kempker,* 2009 WL 881311 at \*8 (E.D.Mo., Mar.27, 2009)(policy restricting religious headwear to religious activities and outdoors did not impose substantial burden); *Rogers v. Scurr,* 676 F.2d 1211, 1216 (8th Cir.1982) ( "We find that no constitutional right of the prisoners was violated by the prohibition on wearing prayers caps and robes outside religious services"). According to Jihad's own representations, his primary concern is being able to cover his head in public, and the record is clear that he is not prevented from doing this. Further, and most importantly, he makes **no** claim that the state-issued headgear is not adequate for religious reasons. As such, the practice of his religion is not substantially burdened under these circumstances.

**\*18** Moreover, even if the policy prohibiting him from wearing his kufi outside of designated areas did constitute a substantial burden on the practice of his religion, the Court would nevertheless conclude that the policy is narrowly tailored to further a compelling governmental interest. The compelling interests of prison safety and security justify these narrowly-tailored regulations, which prohibit Jihad from wearing a kufi outside of his cell, but allow him to freely wear his kufi while in his cell or at the chapel. *Charles v. Frank,*

101 Fed.Appx. 634, 636 (7th Cir.)(regulation prohibiting prayer beads outside cell did not violate RLUIPA even though most Muslims would view the practice as essential to their faith), cert. denied, 543 U.S. 980, 125 S.Ct. 479, 160 L.Ed.2d 358 (2004); *Jonas v. Schriro,* 2006 WL 2772641 at *5 (D.Ariz., Sept.25, 2006)(compelling interest in security and discouraging gang affiliation justified policy restricting the locations where religious headwear could be worn); *Young v. Lane,* 922 F.2d 370, 375–76 (7th Cir.1991)(prison officials have a "strong interest in uniform dress regulations," "modern-day courts recognize that gangs pose a serious challenge to ... institutional security," and "gangs try to identify their members by means of such visual aids as hats"). Here, Defendants have clearly established that their policy is narrowly tailored to serving institutional safety and security, which is furthered by requiring that inmates have a uniform appearance. [16]

In sum, the Court finds that Jihad's religious beliefs and practices are not substantially burdened, and that the policy in question is narrowly tailored to serve a compelling governmental interest. As such, Defendants are entitled to summary judgment on this claim, and the Court recommends that Jihad's religious apparel claim be dismissed with prejudice.

5. *Volunteer Requirement Against Fabian and Smith*
Jihad also claims that Defendants Smith and Fabian violated his free exercise rights by requiring that a volunteer be present for religious services, and by cancelling services when no volunteer was available.

Significantly, in ruling on Jihad's earlier motion to amend, the Court denied as futile a motion to amend to assert RLUIPA and Free Exercise claims against certain Defendants, because Jihad had not sufficiently alleged a substantial burden on his religious practice as a result of the volunteer requirement. (Dkt. 109, at pp. 37–39.) Defendants argue that summary judgment should be granted in their favor for the same reasons.

Initially, the Court again finds that Jihad has not demonstrated that the volunteer requirement imposes a substantial burden on the practice of his religion. There is no dispute that Jumu'ah services have been cancelled due to the lack of an available volunteer, and that attendance of the Jumu'ah service is an important aspect of the practice of his religion. However, the evidence demonstrates that Jumu'ah

services are not prohibited, and that when the Muslim population increased, prison officials increased the number of services in order to accommodate weekly services for all Muslim inmates, albeit provided a volunteer was present. Defendants have also clearly demonstrated that Jihad is provided many other opportunities to personally practice his religion on a daily and weekly basis. As such, the Court finds that even if the volunteer requirement results in the occasional cancellation of religious services, the policy is not a substantial burden on Jihad's religious practice so long as there are other reasonable opportunities available for practicing his religion. *See, Anderson v. Harron,* 2009 WL 2058863 at *5 (D.N.J., July 7, 2009)(inmate could not establish that absence of religious services was a substantial burden on exercise of religion because religious services were not prevented because of an outright prohibition but due to a lack of volunteers, and he could pray alone or with members of his pod when services were cancelled); *Harris v. Moore,* 2007 WL 4380277 (E.D.Mo., Dec.13, 2007)(no substantial burden where inmate was limited to one group service per week lasting one and half hours), aff'd, 347 Fed.Appx. 271, 272 (8th Cir.2009); *Adkins v. Kaspar,* 393 F.3d 559, 571 (5th Cir.2004)(no substantial burden where worship services were cancelled on numerous occasions due to "a dearth of qualified outside volunteers available ... not from some rule or regulation that directly prohibits such gatherings"), cert. denied, 545 U.S. 1104, 125 S.Ct. 2549, 162 L.Ed.2d 275 (2005).

**\*19** Although Jihad has not shown a substantial burden on his religious exercise, his claim also fails because Defendants have adequately demonstrated that the volunteer requirement is the least restrictive means of furthering compelling governmental interests. Defendants have detailed that the volunteer requirement has been implemented in order to prevent inmates from serving in supervisory positions over other inmates, so as to prevent potential conflicts through the creation of hierarchies among inmates. Courts have recognized that prison officials have an interest in preventing unsupervised group activities and preventing inmates from holding leadership roles within a religious group, in order to maintain security and discipline within the prison. *Shabazz v. Arkansas Dept. of Corr.,* 157 Fed. Appx. 944, 945 (8th Cir.2005)(prison had security interest in avoiding inmates being elevated to position of leadership); *Cooper v. Tard,* 855 F.2d 125, 129 (8th Cir.1988)(recognizing that prison has interest in prohibiting Muslim group from conducting unsupervised religious services); *Tisdale v. Dobbs,* 807 F.2d 734, 738 (8th Cir.1986)(volunteer policy did not violate

rights where unsupervised group prayers posed danger of "becoming forums for dissension and unrest"); *Smith v. Kyler,* 295 Fed. Appx. 479, 483–84 (3rd Cir.2008)(volunteer requirement did not violate religious rights since inmate was able to practice his religion in other ways and where policy is meant to promote security and prevent authority structure among inmates), cert. denied, ––– U.S. ––––, 129 S.Ct. 2837, 174 L.Ed.2d 561 (2009). Defendants have established that the volunteer policy in this case is also the least restrictive means of furthering this compelling interest.

Jihad argues that the policy is not narrowly tailored because the religious services could be supervised by COs when a volunteer is not present. However, Defendants have offered evidence that requiring COs to supervise religious services is not a suitable alternative, because it would alter their fundamental relationship with inmates. Such an accommodation would create a dual role for COs, requiring them to handle security concerns and to facilitate religious services at the same time. In addition, COs are not suitably qualified religious advisors, and as such, this would not prevent the creation of hierarchies among inmates of the gathered religion. Therefore, the Court finds that the volunteer policy is narrowly tailored to further a compelling governmental interest.

For these reasons, the Court recommends that summary judgment be granted in favor of Defendants and that Jihad's volunteer claim be dismissed with prejudice.

### 6. *Equal Protection Claims Against Smith and Fabian*

Lastly, Jihad alleges that Fabian and Smith violated his right to equal protection by depriving him of the right to attend Jumu'ah when a volunteer was not present. In addition, Jihad claims that Defendants violated his equal protection claims when she cancelled Jumu'ah services on the July 4, 2009 holiday, and other State-recognized holidays even though volunteers were available, yet allowed non-religious programming to go forward. (Pl.'s Reply, Dkt. 190, at p. 11). The Court finds that Jihad's claims have no merit, and therefore, that Defendants are entitled to summary judgment on this claim. [17]

**\*20** In the prison context, "[t]he heart of an equal protection claim is that similarly situated classes of inmates are treated differently, and that this difference in treatment bears no rational relation to any legitimate penal interest." *Weiler v. Purkett,* 137 F.3d 1047, 1051 (8th Cir.1998), citing

*Timm v. Gunter,* 917 F.2d 1093, 1103 (8th Cir.1990), cert. denied, 501 U.S. 1209, 111 S.Ct. 2807, 115 L.Ed.2d 979 (1991). To assert an equal protection claim based on religion, inmates must show that he is "denied a reasonable opportunity to pursue their faith as compared to inmates of other religions." *Runningbird v. Weber,* 198 Fed.Appx. 576, 578 (8th Cir.2006). "[P]rison officials may restrict the religious practices of inmates only if such deprivation is necessary to further legitimate penological interests." *Rouse v. Benson,* 193 F.3d 936, 942 (8th Cir.1999)[citations omitted]. Nevertheless, "in prison cases, courts will ordinarily defer to the expert judgment of prison authorities, due to the difficulty of running a prison and the commitment of the task to the responsibility of the legislative and executive branches ." *Id.*

We begin our analysis by asking whether Jihad has shown that he has been treated differently than other similarly situated individuals when it comes to their respective religious practices. *See, Klinger v. Dep't of Corrections,* 31 F.3d 727, 731 (8th Cir.1994), cert. denied, 513 U.S. 1185, 115 S.Ct. 1177, 130 L.Ed.2d 1130 (1995). Religion constitutes a suspect classification. *Patel,* 515 F.3d at 816, citing *Weems v. Little Rock Police Dep't,* 453 F.3d 1010, 1016 (8th Cir.2006), cert. denied, 550 U.S. 917, 127 S.Ct. 2128, 167 L.Ed.2d 862 (2007). In this case, the Court finds that Jihad has not shown that he was treated differently than other similarly situated inmates, because the conduct and policies that he complains of apply equally to adherents of all religions within MCF–Stillwater. *See, Aziz v. Groose,* 74 F.3d 1243 (8th Cir.1996)("Everything about which Aziz complains applies to adherents of all other religions"; accordingly, "there was no equal protection violation"); *Rouse v. Benson,* 193 F.3d 939, 943 (8th Cir.1999)("[plaintiff] has not presented this court with any evidence showing that other inmates following other religions have not been similarly limited"). Significantly, the evidence plainly demonstrates that the cancellation of religious services on State holidays applies the same to **all affected** religious programming, and the policy requiring volunteers to be present for religious services also applies the same to all religious services, regardless of the religion. Therefore, Jihad has not presented any basis for establishing a violation of his right to equal protection.

The Court is mindful that Jihad argues that he has been treated differently than other similarly situated inmates because non-religious institutional programming, such as sports, was not cancelled when religious programming was cancelled, and because sports teams may be led by an inmate leader. (Pl.'s

Memo. in Opp., at p. 14). Even if we accept this as true, this is not sufficient to establish an equal protection violation because Jihad must show that he was treated differently than another religious group or sect .[18] *See e.g., Cooper v. Tard,* 855 F.2d 125, 130 (3rd Cir.1988)(finding no equal protection violation because the regulation made no distinction based on religious group or sect and concluding that sporting events are fundamentally different than religious activities); *Burks–Bey v. Stevenson,* 328 F.Supp.2d 928, 936 (N.D.Ind.2004)("The Fourteenth Amendment requires that the religious rights of inmates belonging to minority or nontraditional sects be respected to the same degree as the rights of those belonging to larger and more traditional denominations"); *Aziz,* 74 F.3d at 1243 (summary judgment properly granted on prisoner's equal protection claim because restrictions on religious practice applied to followers of all religions). Moreover, Jihad must show that the Defendants' differential treatment "was motivated by intentional or purposeful discrimination." *Patel,* 515 F.3d at 816, citing *Lewis v. Jacks,* 486 F.3d 1025, 1028 (8th Cir.2007), and *Phillips v. Norris,* 320 F.3d 844, 848 (8th Cir.2003). Here, there is no indication whatsoever that Defendants acted with the intent or purpose of discriminating based on religion.

**\*21** Accordingly, for the reasons stated above, Jihad's equal protection claim against Smith and Fabian fails, and the Court finds that summary judgment in their favor should be granted.

7. *Motion to Dismiss of Defendants Blackmon and Srkypek*
On August 12, 2010, Defendants Blackmon and Skrypek filed a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(2), which is now also before the Court. (Dkt.144). In their motion, Blackmon and Skrypek argue that the Court lacks personal jurisdiction over them because Jihad failed to properly serve them with a copy of his complaint.

As an initial matter, Blackmon has since made an appearance and filed a motion for summary judgment in this action. (Dkts.160, 162). Therefore, it will be recommended that as to Blackmon the motion be denied as moot.

Federal Rule of Civil Procedure 4 requires that a plaintiff serve a copy of the summons and complaint on defendant. Generally, this must be done within 120 days, although the Court may extend this deadline for good cause. Fed. R. Civ. Pro. 4(m). "If a defendant is improperly served, a federal court lacks jurisdiction over the defendant." *Printed Media Services, Inc. v. Solna Web, Inc.,* 11 F.3d 838, 843 (8th Cir.1993), citing *Dodco, Inc. v. American Bonding Co.,* 7 F.3d 1387, 1388 (8th Cir.1993), and *Sieg v. Karnes,* 693 F.2d 803, 807 (8th Cir.1982).

The Court finds that Jihad has failed to establish that he has properly serve Srkypek. Skrypek is a Catholic priest who formerly worked for the DOC. (Skrypek Aff., Dkt. 149, at ¶ 1). However, he retired from his position as religious coordinator at MCF–Stillwater in May of 2009.(*Id.*) Skrypek acknowledges that the Minnesota Attorney General's Office notified him that Jihad had named him as a defendant in the present action, but he has never been served with the summons or any complaint in this case, either in person or by mail. (*Id.* at ¶ 2).

Jihad claims that he has affected service by leaving the summons and complaint at Skrypek's former place of employment. In support, Jihad cites Rule 4(e)(2)(B), which states that service can be effected by leaving the summons and complaint "at the individual's dwelling or usual place of abode with someone of suitable age and discretion who resides there." This Rule is clearly inapplicable and does not establish that service has been properly effected on Skrypek. Nor is there any basis for finding that Jihad has established service of process under any other rule of service. *See, Redding v. Hanlon,* 2008 WL 762078 at *5–6 (D.Minn., Mar.19, 2008)(describing the ways that a plaintiff can serve an individual under the Federal Rules and Minnesota law).

While Skrypek is apparently aware of this lawsuit, actual notice of the lawsuit does not establish personal jurisdiction if the defendant was not lawfully served. *Sieg v. Karnes,* 693 F.2d at 807. To the extent that Jihad does not know Skyrpek's address, this does not relieve him of serving Skrypek, which is a requirement that is grounded in principles of due process. As such, the Court finds that Jihad has failed to carry his burden of establishing that he properly served Skrypek.[19]

**\*22** Moreover, this lawsuit has been pending since June 24, 2009, and as such, Jihad's deadline for serving Skrypek has long since expired. *See,* Fed. R. Civ. Pro. 4(m)("If a defendant is not served within 120 days after the complaint is filed, the court—on motion or on its own after notice to the plaintiff—must dismiss the action without prejudice against that defendant or order that service be made within a specified time.") While we might generally approach pro se cases somewhat indulgently, this does not excuse Jihad from complying with the Federal Rules of Civil Procedure, or other fundamental legal requirements, such as the duty

to effect proper service of process. *See, Redding,* 2008 WL 762078 at *7 ("While pro se pleadings are to be construed liberally, we cannot ignore the requirement that a plaintiff effect proper service of process on a defendant"); *Ackra Direct Marketing Corp. v. Fingerhut Corp.,* 86 F.3d 852, 856 (8th Cir.1996)("In general, pro se representation does not excuse a party from complying with a court's orders and with the Federal Rules of Civil Procedure."). In this case, the Court has been extremely indulgent, and Plaintiff has been afforded ample time to effect service of process. There is no basis for concluding that Jihad has established good cause for an additional extension of time to serve Skrypek at this late stage of the litigation, particularly in light of the fact that Jihad's salat prayer claim—the **only** claim asserted against Skrypek —is without merit, as the Court has detailed. Accordingly, the Court finds that Skrypek's Motion to Dismiss should be granted for the reasons stated above.

In response to the motion to dismiss, Jihad also filed a Motion to Strike Defendants' Motion to Dismiss. The Motion to Strike is essentially his opposition to the Motion to Dismiss. Consequently, the Court similarly finds that Jihad's Motion to Strike should be denied as moot. [20]

## IV. RECOMMENDATION

Based on the foregoing and all of the files, records and proceedings herein, IT IS HEREBY RECOMMENDED that:

1. That Defendants' Motion to Dismiss [Docket No. 144] as to Blackmon be DENIED as moot, and GRANTED as to Skrypek;

2. Plaintiff's Motion to Strike [Docket No. 152] be DENIED;

3. Plaintiff's Motion for Summary Judgment [Docket No. 131 ] be DENIED; and

4. Defendant's Motion for Summary Judgment [Docket No. 162] be GRANTED in part and denied in part:

a) That all of Plaintiff's claims be DISMISSED with prejudice, with the exception of Plaintiff's halal meals claim against Defendants Smith, Fabian, and Reishus;

b) That all other claims against Defendants Crist, King, Miles, Julson, Skrypek, and Blackmon be DISMISSED with prejudice.

## All Citations

Not Reported in F.Supp.2d, 2011 WL 1641885

Footnotes

1  Plaintiff was formerly known as Marlow Devette Jones. *See, Jihad v. State,* 594 N.W.2d 522, 523 (Minn.1999).

2  Jihad's own exhibits confirm that, where religious services were cancelled for a holiday, all religious services affected by the schedule were also cancelled. (Dkt. 1–4, Exh. 23, at p. 1 of 19)("no religious services" on Thursday, November 27, 2008, or Friday, November 28, 2008); (Dkt. 39–3, Exh. 2b, at p. 1 of 1)(all religious services cancelled on July 4, 2008).

3  Throughout his submissions, Jihad states that certain issues have already been ruled on by the Court, citing the Court's March 30, 2010 Order granting in part and denying in part his motion to amend. (Dkt.109). In that Order, the Court merely found that Jihad had stated a claim for relief; it did not express any opinion as to whether he would ultimately prevail on any particular issue.

4  In an earlier case, *see Murphy v. Missouri Dept. of Corrections,* 372 F.3d 979, 987 (8th Cir.2004), the Eighth Circuit stated that the religious conduct or expression must manifest a "central tenet" of the person's religious beliefs. Consistent with the Supreme Court's decision in *Cutter v. Wilkinson,* 544 U.S. 709, 125 S.Ct. 2113, 161 L.Ed.2d 1020 (2005), the Eighth Circuit has since clarified that " 'RLLUIPA bars inquiry into whether a particular belief or practice is 'central' to a prisoner's religion.' " *Gladson v. Iowa Department of Corrections,* 551 F.3d 825, 832 (8th Cir.2009), quoting *Cutter,* 544 U.S. at 725.

5  "Although we give prison officials 'wide latitude within which to make appropriate limitations,' they 'must do more than offer conclusory statements and post hoc rationalizations for their conduct.' " *Murphy,* 372 F.3d at 988–89, quoting *Hamilton v. Schriro,* 74 F.3d 1545, 1554 (8th Cir.), cert. denied, 519 U.S. 874, 117 S.Ct. 193, 136 L.Ed.2d 130 (1996).

6  Article 1, Section 16 of the Minnesota Constitution states in relevant part: "The right of every man to worship God according to the dictates of his own conscience shall never be infringed; nor shall any man be compelled to attend, erect or support any place of worship, or to maintain any religious or ecclesiastical ministry, against his consent; nor shall any control of or interference with the rights of conscience be permitted, or any preference be given by law to any religious establishment or mode of worship ..."

**7** In any event, Jihad represents that he is not seeking damages for any claimed violations of the Minnesota Constitution, and consequently, any such claims are essentially subsumed within his RLUIPA and First Amendment free exercise claims. *See, Hill–Murray Federation of Teachers, St. Paul, Minn. v. Hill–Murray High School, Maplewood, Minnesota,* 487 N.W.2d 857, (Minn.1992)(the test for a claim under the Minnesota freedom of conscience clause "has four prongs: whether the objector's belief is sincerely held; whether the state regulation burdens the exercise of religious beliefs; whether the state interest in the regulation is overriding or compelling; and whether the state regulation uses the least restrictive means").

**8** The Court finds that Jihad's attempts to dispute that Defendants have established a compelling interest do not adequately raise a genuine issue of material fact. Jihad argues that Defendants' security concerns are "exaggerated and irrational" because inmates are permitted to leave their cells at irregular hours for work activities, and because there are only 15 Muslims who attend regular Sunday Islamic studies class. (Pl.'s Memo. in Opp., Dkt. 175, at p. 5). First, even if some inmates leave their cells at irregular hours, this does not address the frequency of movements, which is a significant aspect of Defendants' security concerns. Also, this does not address concerns related to favoritism of Muslim inmates. Moreover, to the extent that Jihad is implying that many Muslims should not be permitted to take advantage of the requested accommodation, such a request is clearly without merit. The DOC would not be able to accommodate Jihad's request without accommodating similar requests from other Muslim inmates. As such, the Court finds that this evidence does not competently dispute and therefore does not crease a **genuine** dispute of material fact as to the existence of a compelling governmental interest.

**9** The Court understands Jihad to argue that because he cannot perform salat outside the presence of a toilet, he is not being offered suitable or reasonable alternatives to practice his faith because he cannot practice in the exact manner that he believes is required by his religion. Jihad appears to misconstrue the requirements of RLUIPA and the First Amendment. A sincere belief that an activity is necessary or central to the practice of a religion does not, by itself, establish that a prison must accommodate an inmate's request. *See Gladson,* 551 F.3d at 831 ("a prisoner need not be afforded his preferred means of practicing his religion as long as he is afforded sufficient means to do so"); *Cutter,* 544 U.S. at 722 (RLUIPA does not "elevate accommodation of religious observances over an institution's need to maintain order and safety.") In other words, the prison must afford a reasonable opportunity to Jihad to practice his religion, but that does not mean that a prison must accommodate every religious belief as to the manner, location, and frequency of religious practices. Prisoners must practice their religions within certain boundaries and rules that are necessary to the overall order and security of the facility. In this case, those interests must override Jihad's personal beliefs as to the manner and location he would prefer for the performance of his daily prayers.

**10** In their Reply, Defendants argue that Jihad has not exhausted his administrative remedies with respect to cross-contamination issues in the DOC's kitchen. Defendants raised this argument for the first time in their Reply Brief, and the Court generally does not consider arguments made for the first time in a reply. *Britton v. Astrue,* 622 F.Supp.2d 771, 790 (D.Minn.2008); *Bearden v. Lemon,* 475 F.3d 926, 930 (8th Cir.2007)( "This claim was not argued in Lemon's brief in chief and, therefore, we will not consider the argument as it is well settled that we do not consider arguments raised for the first time in a reply brief"). Accordingly, the Court finds that the issue has not been adequately briefed. In any event, the Court does not consider the cross-contamination issue to be dispositive of the halal meals issue, since Defendants have failed to carry their burden of establishing that their refusal to accommodate Jihad's request was narrowly tailored to serve a compelling governmental interest.

Moreover, to the extent that Defendants argue the Court's March 30, 2010 Order on his motion to amend (Dkt.109) has precluded any claims against Reishus, the Court disagrees. The Court understands Jihad to assert only a halal meals claim against Reishus, and Jihad was granted leave to assert his halal meals claim by a later Court Order. (Dkt.117).

**11** The lacto-ovo vegetarian meal is "a non-meat alternate meal using dairy products, eggs, and legumes to provide adequate protein and nutrition." (Dkt. 31–1, at p. 1 of 7).

**12** In response to one of Jihad's grievances, a DOC Staffperson named Nanette Larson states that kosher meals are only provided during the observance of Passover. (Dkt. 111–1, at p. 3 of 21). None of the Affidavits submitted by Defendants have addressed this issue directly, and consequently, it is unclear how often kosher meals are provided to Jewish inmates.

**13** Moreover, even if the Court were to credit Defendants' evidence describing the definition of a halal diet, this does not necessarily establish that Jihad's religious beliefs are not substantially burdened, since it is his beliefs that are at issue. As the Court has already stated, the inquiry is not framed in terms of whether the prison's policy or conduct imposes a substantial burden based on the common understanding of the religion.

**14** The policy itself expressly prohibits inmates from contributing to the cost of the religious feasts, and Defendants have not attempted to explain the basis for that rule. As such, the Court has not relied on it in making its decision.

15    To the extent that Jihad may also be attempting to assert a claim that he should be permitted to fast during Hajj, or celebrate Eid–al–Ahda in a particular manner, these claims clearly fail. First, Jihad has not brought forth any evidence to demonstrate that he requested and was denied the opportunity to fast during Hajj, and the evidence shows that he may fast for religious purposes at any time during the year. Moreover, there is no evidence that the DOC ever denied a request that Muslim inmates be permitted to participate in a group prayer, or some other religious activity in recognition of the holiday for the celebration of Eid–al–Ahda, except insofar as Jihad requested permission to celebrate with an additional special meal. Without any such evidence, Jihad would be unable to establish a substantial burden, and Defendants would clearly be entitled to summary judgment.

16    Jihad makes a few vague references to a religious medallion he wishes to wear. DOC regulations do not prohibit him from wearing the medallion, but require that the medallion be worn inside his shirt on a plastic cord while outside of his cell. To the extent that Jihad continues to assert a claim based on the ability to wear a religious medallion, such a claim should be dismissed for the same reasons that his kufi claim fails.

17    The Court recognizes that Jihad has cited to a provision of RLUIPA dealing with land use regulations: "No government shall impose or implement a land use regulation in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution." 42 U.S.C. § 2000cc(b)(1). This provision has no relevance to Jihad's equal protection claim. To the extent that Jihad has raised RLUIPA claims—which cannot be premised on this land use provision—those claims have already been addressed by the Court.

18    To the extent that Jihad continues to argue to his rights were violated because Jumu'ah services were cancelled in favor of a "religious" holiday, this argument has already been rejected by the Court. The holidays at issue are clearly recognized as secular holidays. *See, Jihad v. Fabian,* 680 F.Supp.2d 1021, 1042 (D.Minn.2010).

19    It appears that Jihad requested that Defendants provide Skrypek's address via discovery requests served in mid-September. Defendants objected on the grounds that the disclosure was prohibited by State law. Minn.Stat. § 13.43, subd. 5a (2008)(providing that the home address and telephone number of DOC employees "shall not be disclosed to facility patients, corrections inmates, or other individuals who facility or correction administrators reasonably believe will use the information to harass, intimidate, or assault any of these employees"). The Court need not address the validity of this objection, because, at this stage of the litigation, the Court finds that good cause does not justify an extension of time to serve Skrypek.

20    On a final note, Defendants assert that Jihad has not served several documents that were filed earlier in this case. Because these documents have not been dispositive to the Court's decision on the present motions, the Court will not address the issue any further.

---

**End of Document**                                         © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2009 WL 7042244
Only the Westlaw citation is currently available.
United States District Court,
D. Maryland.

Jeremiah Montgomery JONES
v.
Warden John A. ROWLEY.

Civil Action No. AMD–08–1094.
|
April 20, 2009.

**Attorneys and Law Firms**

Jeremiah Montgomery Jones, Cumberland, MD, pro se.

Phillip Michael Pickus, Office of the Attorney General, Baltimore, MD, for Defendants.

MEMORANDUM

ANDRE M. DAVIS, District Judge.

**\*1** Plaintiff filed this civil rights action alleging that on or about February 8, 2008, North Branch Correctional Institution ("NBCI") officers were ordered to confiscate all religious headgear or "crowns" from Rastafarian inmates. [1] Paper No. 1. He claims that he had been permitted to retain the crowns since 2005. *Id.* He seeks compensatory damages and the return of his religious crowns, as well as "other religious items" allegedly confiscated, which he claims are needed to engage in religious services and without which he is denied his right to practice his religion. *Id.; see also* Paper No. 4.

In amended complaints, plaintiff alleges that from the first day of his arrival at NBCI his constitutional right to retain his religious property has been violated. Paper Nos. 4, 6, 12 & 17. He mentions the denial of two religious crowns, and also the taking of a religious board game (Ouija), an unidentified religious book, and "divination cards." *Id.* Plaintiff also takes issue with the administrative remedy review process. *Id.*

On September 26, 2008, the court received plaintiff's second request for preliminary injunction. Paper No. 22. He claims that the NBCI warden issued a memorandum which states that all inmates who have confiscated property at NBCI will be charged with an infraction if they want their property

held pending a hearing. *Id.* Plaintiff alleges that this practice will pose a threat to him as his property is being held in the NBCI Property Department pending his administrative remedy hearing and civil action. *Id.* He further asserts that unless the aforementioned acts (as set out in the warden's memorandum) are enjoined, he will suffer irreparable harm by being placed on disciplinary segregation. *Id.*

On October 3, 2008, defendant was ordered to respond to this motion, so as to specifically address plaintiff's allegations regarding Warden Rowley's memorandum. A decision on the motion for preliminary injunction was stayed. On October 20, 2008, defendant filed a motion to dismiss or, in the alternative, motion for summary judgment, which has been construed as a motion for summary judgment. [2] Paper No. 27. Plaintiff has filed an opposition. Paper No. 29. No hearing is necessary to rule on the pending dispositive motion. *See* Local Rule 105.6. (D.Md.2008). For reasons to follow, defendant's motion for summary judgment shall be granted and plaintiff's motion for preliminary injunction shall be denied.

I.

Summary judgment is appropriate under Rule 56(c) of the Federal Rules of Civil Procedure when there is no genuine issue as to any material fact, and the moving party is plainly entitled to judgment in its favor as a matter of law. In *Anderson v. Liberty Lobby, Inc.,* the Supreme Court explained that in considering a motion for summary judgment, the "judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." 477 U.S. at 249 (1986). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. Thus, "the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Id* . at 252.

**\*2** In undertaking this inquiry, a court must view the facts and the reasonable inferences drawn therefrom "in a light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)* (quoting *United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962)); see also E.E .O. C. v. Navy Federal Credit Union, 424 F.3d 397, 405 (4th Cir.2005).* The mere

existence of a "scintilla" of evidence in support of the non-moving party's case is not sufficient to preclude an order granting summary judgment. *See Anderson,* 477 U.S. at 252.

## II.

Plaintiff complains about the confiscation of his religious and non-religious property. Defendant acknowledges that in February 2008, several items were confiscated: a black handkerchief, an extra extension cord, two hats, a 12″ by 18″ African Liberation Flag, two psychic circles with divination cards, a can opener, a nose hair trimmer, and a metal heart necklace. Paper No. 27, Ex. 1.

The Maryland Division of Correction Directive ("DCD") 140–200, sets out the allowable property for Rastafarian inmates.[3] Paper No. 27, Ex. 3. Rastafarian inmates are entitled to an African Liberation Flag, but the flag must be no larger than 6″ by 4″. *Id.* The directive does not permit blue, black, and red clothing. *Id.,* Ex. 4. Rastafarian inmates are also allowed headgear or "crowns" but only in sizes consistent with security and in permitted colors as dictated by DCD 220–004. *Id.,* Exs. 1 & 3.

Plaintiff's hats were retained because they were too large and capable of concealing contraband and were in non-allowable colors of green, yellow, and red. *Id.,* Ex. 2; Ex. 6 at Wilt Decl. Defendant also claims that the psychic circles confiscated from plaintiff contained glass, which is considered prohibited contraband at NBCI as it presents a significant security risk in that it can be used as a weapon. *Id.,* Exs. 6 & 7. In addition, while Rastafarian inmates are allowed pendants such as the Lion of the Tribe of Judah or the Star of David, *id.,* Ex. 3, plaintiff's pendant was a heart. Inmates are permitted to possess handkerchiefs, but they must be white. *Id.,* Ex. 4.

The NBCI Chief of Security explains that clothing containing the colors red, blue, black, and yellow are banned because these colors can represent gang membership or participation.[4] *Id.,* Ex. 8 at Northcraft Decl. He affirms that the display of "any indicia of gang membership can intimidate other inmates and staff," causing a security risk. Northcraft maintains that there is no way to prevent this risk other than to ban these colors. *Id.* Northcraft further asserts that plaintiff's African Liberation Flag was confiscated because it was larger than the allowable 4″ by 6″ flag. *Id.* He affirms that the rule is in place because officials must control the amount of material given to inmates or inmates will use the excess materials to

manufacture contraband, such as rope. Paper No. 27, Ex. 8 at Northcraft Decl. Northcraft states that such contraband would pose an institutional security risk. *Id.*

**\*3** Defendant alleges that on May 13, 2008, three months after plaintiff's property was confiscated, he was called to the property room. *Id.,* Ex. 9. Officer David Nave explained to plaintiff why he could not have his property and requested disposition information, such as a forwarding address, for disposal of the items. *Id.* Plaintiff refused to provide any kind of disposition for the property. Nave therefore recommended that the property be deemed "abandoned and destroyed." On May 19, 2008, the Warden approved the destruction of the property and on June 4, 2008, a designee of the Commissioner approved the destruction of the property and the property was destroyed. *Id.,* Ex. 10. Defendant states that the property confiscation, destruction, and infraction process complained of by plaintiff in his motion for preliminary injunction involves the issuance of a notice of infraction on the issue of property forfeiture so that the matter may be heard by a hearing examiner. *Id.,* Ex. 6. Defendant claims that the main purpose of the infractions is to provide a hearing for the confiscated property and inmates are generally not sanctioned during this process unless the seized property is contraband such as drugs or weapons. *Id.*

In his opposition plaintiff again claims that his tam/crown, books, divination cards, and message/ouiji board were improperly confiscated. Paper No. 31. He disputes defendants' proffered rationale for confiscation of the crown, claiming that a large size tam is necessary as it is Rastafarian belief that hair must be entirely covered at all times. *Id.* Plaintiff also discusses the confiscation of his "African Divination" book, the deck of tarot cards that accompanied the book, and his message/ouiji board. *Id.*

Plaintiff's allegations have been analyzed under the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. §§ 2000cc–1(a)[5] and the First Amendment. The court finds that neither a statutory nor constitutional violation has been demonstrated.

Section 3 of the RLUIPA provides as follows:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution, as defined in section 1997 of this title, even if the burden results from a rule of general applicability,

unless the government demonstrates that imposition of the burden on that person—

(1) is in furtherance of a compelling governmental interest; and is the least restrictive means of furthering that compelling governmental interest.

Under RLUIPA, plaintiff has the burden of persuasion as to whether the government action substantially burdens his exercise of religious freedom. *See Adkins v. Kaspar,* 393 F.3d 559. 567 n. 32 (5th Cir.2004); *Civil Liberties for Urban Believers v. Chicago,* 342 F.3d 752, 760 (7th Cir.2003). Once a substantial burden is established, the government bears the burden of persuasion that its practice is in furtherance of a compelling government interest and is the least restrictive means of furthering that interest. *See Adkins,* 393 F.3d at 567 n. 32.

**\*4** Before the RLUIPA, courts applied the First Amendment "deference" analysis found under *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987), and *Turner v. Safley,* 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). These cases held that incarceration leads to a limitation on many rights and privileges as may be warranted by valid penological considerations, *see O'Lone,* 482 U.S. at 348, and that a prisoner's right to free exercise of his religion must give way to regulations that are "reasonably related to legitimate penological interests." *Id.* at 349; *cf. Turner,* 482 U.S. at 89. The evaluation of what was an appropriate and reasonable penological objective was left to the discretion of the administrative officers operating the prison, who were to be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment were needed to maintain institutional security. *See O'Lone,* 482 U.S. at 349.

Defendant claims that while inmates do retain protections under the First Amendment, restrictions may be applied if they are reasonably related to legitimate penological interests. He asserts that under the reasonableness test, prison officials are to be accorded wide-ranging discretion in the adoption and execution of policies and practices to maintain internal order and security. Defendant argues that each of the religious items taken from plaintiff in February 2008 was confiscated for a compelling security policy.

As a matter of law, the court concludes this heightened security concern is well founded. The regulation restricting plaintiff's wearing of a tam or "crown" [6] does not comprise a violation under § 1983 or RLUIPA since crowns are large and may be used to conceal contraband, including weapons and drugs. *See Benjamin v. Coughlin,* 905 F.2d 571, 579 (2d Cir.1990). Furthermore, prison officials' security concerns regarding the "gang" colors of the headgear comprises a compelling security interest outweighing plaintiff's right to perform the particular religious practice. Plainly, the wearing of a crown is not banned in a blanket fashion; it is not unreasonable to restrict the size and color of the crowns in view of security concerns. Plaintiff is not prohibited from wearing a smaller crown, of a permissible color.

Similarly, the confiscation of plaintiff's glass psychic circles and over-sized flag violates neither the First Amendment nor RLUIPA as the security reasons offered by defendant are compelling and the restrictions as to size and material composition are reasonable. Again, plaintiff has alternatives to the practice his religion associated with these items. He may retain an African Liberation Flag of a smaller size and he can possess psychic circles without glass materials. These are reasonable alternatives which fully accommodate plaintiff's practices.

The confiscation of plaintiff's non-religious property, e.g., handkerchief, extension cord, can opener, nose hair trimmer, and metal heart necklace does not violate constitutional due process, because plaintiff is provided an adequate post-deprivation remedy. [7] *See Parratt v. Taylor,* 451 U.S. 527, 542–44, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981).

III.

**\*5** For the reasons set forth, defendant's motion to dismiss or for summary judgment, treated as a summary judgment motion shall be granted. The motion for preliminary injunction is denied. An Order follows.

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 7042244

Footnotes

1    In his amended complaint, plaintiff claims that the crown has Rastafarian religious colors or red, yellow, green, and black, with stripe and checkers and the Rastafarian religious symbol of the Lion of Judah. Paper No. 6.

2    A response to plaintiff's motion for preliminary injunction is incorporated into defendants' motion for summary judgment.

3    DCD 140–200 states that Rastafarian inmates may possess an African Liberation Flag, a tam or "crown" of a size and in colors permitted by regulation and security, a sized pendant with specific symbols, a picture of Haile Selassie, prayer beads, and reading and recorded materials. Paper No. 27, Ex. 3.

4    DCD–220–004 prohibits inmates from being issued, purchasing, or possessing clothing items that are dark blue/black/ red/or camouflage colored, with the exception of religious headgear. NBCI Institutional Directive 220–004 prohibits inmate clothing in black, red, dark blue, light blue, dark brown, khaki, yellow, fushia, camouflage, drab, orange, military or medical garb. Paper No. 27, Exs. 4 & 5.

5    In *Cutter v. Wilkinson,* 124 S.Ct. 2113, 2121–22 (2005), the Supreme Court found that the section of the RLUIPA which increased the level of protection for prisoners' religious rights did not violate the Establishment Clause of the First Amendment.

6    A tam or crown, also known as a Tsalot–Kob, is the approved religious headwear for members of the Rastafarian religious faith. It is described as a hemispheric head cap that can be made of cloth, knitted or crocheted, may have a peak at the top, and may be either multi-colored or single colored. *See www.docs.state.ny.* Under DCD 140–200, App. 29, a tam is allowable Rastafari property, but must be in colors permitted by prison direction and in size approved by the chaplain in conjunction with security. *See* Paper No. 27, Ex. 3.

7    Defendant does not directly respond to plaintiff's claims regarding the confiscation of his Divination book, tarot cards, and Ouija game board. Nevertheless, plaintiff has failed to show how these items are essential to his observance of the Rastafarian religion and they are not on the Rastafari property list under Division of Correction directives. Therefore, the court does not consider these items "religious" property.

---

**End of Document** © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2009 WL 3489376
Only the Westlaw citation is currently available.
United States District Court,
C.D. California,
Western Division.

Diallo E. UHURU, Plaintiff,
v.
P. HART, et al., Defendants.

No. CV 07-07361-JVS (VBK).
|
Oct. 27, 2009.

West KeySummary

1    **Constitutional Law**
      👉 Prisons and Pretrial Detention

     **Prisons**
      👉 Hair, Grooming, and Clothing

     A prisoner was unable to demonstrate prison
     officers burdened the practice of his religion
     by requiring him to remove his head covering
     prior to entering the mental health building.
     The prisoner admitted he was able to attend
     religious services and wear his head covering
     almost every day, but the prisoner brought the §
     1983 claim alleging prison officers violated his
     First Amendment rights. The requirement that
     no head coverings were to be worn in certain
     areas of the prison was based on the legitimate
     governmental interest of prisoner safety, and the
     prisoner failed to establish officers substantially
     interfered with his practice of religion. U.S.C.A.
     Const.Amend. 1; 42 U.S.C.A. § 1983.

     Cases that cite this headnote

**Attorneys and Law Firms**

Diallo E. Uhuru, San Luis Obispo, CA, pro se.

Tiffany R. Hixson, California Attorney Generals Office, San
Diego, CA, for Defendants.

ORDER (1) ACCEPTING AND ADOPTING THE
REPORT AND RECOMMENDATION OF THE
UNITED STATES MAGISTRATE JUDGE, AND (2)
GRANTING DEFENDANTS MOTION FOR JUDGMENT
ON THE PLEADINGS/ MOTION FOR SUMMARY
JUDGMENT AND DISMISSING THE COMPLAINT

JAMES V. SELNA, District Judge.

**\*1** Pursuant to 28 U.S.C. § 636, the Court has reviewed
the Complaint and all other papers along with the attached
Report and Recommendation of the United States Magistrate
Judge, and has made a *de novo* determination of the Report
and Recommendation.

**IT IS THEREFORE ORDERED** that a Judgment be
entered (1) approving and adopting the Report and
Recommendation, (2) granting Defendants' Motion for
Judgment on the Pleadings/Motion for Summary Judgment;
and (3) dismissing Plaintiff's Complaint and the action with
prejudice.

REPORT AND RECOMMENDATION OF
UNITED STATES MAGISTRATE JUDGE

VICTOR B. KENTON, United States Magistrate Judge.

This Report and Recommendation is submitted to the
Honorable James V. Selna, United States District Judge,
pursuant to 28 U.S.C. § 636 and General Order 05-07 of
the United States District Court for the Central District of
California.

*PROCEEDINGS*

On November 14, 2007, Plaintiff Diallo E. Uhuru (hereinafter
referred to as "Plaintiff"), a state prisoner proceeding *pro se,*
filed a civil rights action pursuant to 42 U.S.C. § 1983 after
being granted leave to proceed without prepayment of the
full filing fee. Plaintiff named as Defendants the following
persons: P. Hart, Licensed Vocational Nurse ("LVN"); J.
Joslyn, Senior Registered Nurse ("SRN II"); D. Engler,
Appeals Coordinator, Correctional Counselor ("CC") II
Specialist; A. Athie, Correctional Officer; M. Ortiz; Sergeant,
C. Haun,[1] Library Tech; and "John/Jane" Does in their

individual and official capacities. (*See* Complaint at pp. 3-5; Attachment to Complaint, Exhibit ["Ex."] A at pp. 8-11.)

On December 5, 2007, the Court issued an Order directing service by the United States Marshal on Defendants Hart, Joslyn, Athie, Ortiz, Engler and Haun.

On March 28, 2008, Defendants Ortiz, Athie, Haun, Joslyn and Engler filed an Answer to Plaintiff's Complaint.

On April 11, 2008, a "Notice of Errata" was filed by Defendants Athie, Ortiz, Joslyn, Engler and Haun. Defendants' counsel indicated that the PACER docket reflected that counsel represented Defendant P. Hart and that the Answer filed on March 28, 2008 was also made on behalf of Defendant P. Hart. Defendants' counsel noted that these items were in errata and the Answer was only made on behalf of Defendants Athie, Ortiz, Joslyn, Engler and Haun.

On April 17, 2008, the Court issued a Minute Order directing the Court Clerk to correct the PACER docket and delete Defendant P. Hart's name from the Answer filed on March 28, 2008.

On June 14, 2008, Defendants filed a "Request for Leave to Take Plaintiff's Deposition, a Person Confined in Prison." On June 30, 2008, the Court issued an Order granting Defendants' request for leave to take Plaintiff's deposition.

On July 7, 2008, Plaintiff filed a "Declaration for Entry of Default" against Defendant P. Hart. On July 11, 2008, the Court issued a Minute Order denying Plaintiff's request for entry of default as Defendant P. Hart was never properly served with a Summons and Complaint.

**\*2** On November 25, 2008, Defendants filed documents entitled "Defendants' Notice of Motion and Motion for Judgment on the Pleadings; Motion for Summary Judgment;" "Defendants' Request for Judicial Notice;" "Memorandum of Points and Authorities in Support of Defendants' Motion for Judgment on the Pleadings; Motion for Summary Judgment;" "Declaration of M. Vela in Support of Defendants' Motion for Summary Judgment;" "Declaration of N. Grannis in Support of Defendants' Motion to Dismiss and/or Motion for Summary Judgment;" "Declaration of G. Post in Support of Defendants' Motion for Summary Judgment;" "Declaration of M. Ortiz in Support of Defendants' Motion for Summary Judgment;" "Declaration of A. Athie in Support of Defendants' Motion for Summary Judgment;" "Declaration

of J. Joslyn in Support of Defendants' Motion for Summary Judgment;" "Declaration of L. Westphal in Support of Defendants' Motion for Summary Judgment;" "Declaration of A. Pitoniak in Support of Defendants' Motion for Summary Judgment;" "Declaration of Tiffany Hixson in Support of Defendants' Motion for Summary Judgment;" "Declaration of Rabbi Moskowitz in Support of Defendants' Motion for Summary Judgment;" and "Defendants' Separate Statement of Undisputed Facts."

On December 2, 2008, the Court issued an Order outlining the procedures to be used in opposing a Motion for Summary Judgment pursuant to *Rand v. Rowland,* 154 F.3d 952 (9th Cir.1998) and ordered Plaintiff to file an Opposition or Statement of Non-Opposition to Defendants' Motion.

On December 19, 2008, Plaintiff filed a document captioned "Opposition to Defendants' Motion for Summary Judgment" ("Opposition").

On January 9, 2009, Defendants filed a "Reply to Plaintiff's Opposition to Defendants' Motion for Judgment on the Pleadings and/or Summary Judgment" ("Reply").

Having reviewed the allegations in the Complaint, Defendants' Motion for Judgment on the Pleadings/Summary Judgment, Plaintiff's Opposition and Defendants' Reply, the Court hereby recommends that Defendants' Motion for Judgment on the Pleadings/Motion for Summary Judgment be granted and the action be dismissed.

### *BACKGROUND*

The Complaint charges Defendants with violating Plaintiff's rights under the First, Fourth, Fifth, Eighth, Thirteenth and Fourteenth Amendment rights, the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA") and the Religious Freedom Restoration Act. ("RFRA"). (Complaint at p. 5.) Plaintiff claims Defendants violated his rights to "freedom of religion, due process, access to the courts, freedom from cruel and unusual punishment and deliberate indifference." (*Id.*)

Specifically, Plaintiff claims that on January 1, 2007, Defendants Athie and Ortiz made him remove his religious head covering prior to entering the mental health building. (Attachment Ex. A at p. 9.) Additionally, Plaintiff claims that on September 23, 2007, Defendant Joslyn wore a baseball cap

in the mental health building while Plaintiff was not allowed to wear his religious head covering. (*Id.* at p. 8.) Plaintiff also claims that Defendants Haun and Engler violated his First, Fourth, Fifth, Eighth, Thirteenth Amendment rights. (*Id.* at p. 10.)

### STATEMENT OF FACTS

**\*3** Based on its review and consideration of the declarations and attached exhibits filed in support of and in opposition to the pending Motion for Judgment on the Pleadings/Motion for Summary Judgment, this Court finds the following material facts to be undisputed unless otherwise noted.

Plaintiff is a California prison inmate currently confined at the California Mens Colony ("CMC")-East. (Complaint at p. 1; Defendants' Separate Statement of Undisputed Material Facts ["SUF"] No. 1.) Defendants are employed by the California Department of Corrections and Rehabilitation at CMC-East. (Complaint at pp. 3-5; Declaration of J. Joslyn, ¶ 2, Declaration of A. Athie, ¶ 2, Declaration of M. Ortiz, ¶ 2; SUF No. 2.)

On November 14, 2007, Plaintiff filed his Complaint alleging Defendants violated his rights to freely practice his religion by forcing him to remove his religious head covering prior to entering the mental health building and library. (Complaint; SUF No. 3.) Plaintiff is unable to articulate his religious affiliation history. (SUF No. 4.) In 2003, Plaintiff claimed he was a member of the "Nation of Islam." (Defendant's Request for Judicial Notice, Exhibit ["Ex."] A; SUF No. 5.) In 2007, Plaintiff claimed he was Jewish. (Defendant's Request for Judicial Notice, "Ex." B; SUF No. 6.) Plaintiff claims his religion is "universal." (SUF No. 7.) Plaintiff claims he follows "the creator." (SUF No. 8.) On October 15, 2008, Plaintiff identified his religious affiliation as "Hebrew." (SUF No. 9.) Plaintiff currently attends both Jewish and Muslim activities at CMC. (Declaration of Rabbi Moskowitz, ¶ 4; SUF No. 10.)

While attending Jewish activities, Plaintiff wears a kippa/ yarmulke. (Declaration of Rabbi Moskowitz, ¶ 5; SUF No. 11.) While attending Muslim activities, Plaintiff wears a kufi. (Declaration of Rabbi Moskowitz, ¶ 5; SUF No. 12.) Plaintiff claims his gray beanie cap is a religious head covering. (Declaration of L. Westphal, ¶ 6; SUF No. 14.) Defendants dispute Plaintiff's contention and argue that the gray or blue beanie cap Plaintiff wears is not a religious head covering.

(Declaration of Rabbi Moskowitz, ¶ 5; SUF No. 15.) Plaintiff has also been seen wearing a baseball cap. (Declaration of M. Ortiz, ¶ 5; SUF No. 16.) On November 12, 2008, Plaintiff had five different head coverings in his possessions: two kippas, one kufi, one beanie, and one t-shirt skull cap. (Declaration of A. Pitoniak, ¶¶ 5-8, Exs. C-E; SUF No. 17.)

Sometime in January of 2007, Plaintiff was asked to remove his head covering by Defendants Athie and Ortiz prior to entering the mental health building. (SUF No. 18.) At this time, there was a sign outside the mental health building prohibiting hats of any kind. (Declaration of M. Ortiz, ¶ 4; SUF No. 19.) The reason for this policy was to maintain the safety and security of the institution. (Declaration of M. Ortiz, ¶ 4, Declaration of A. Athie, ¶¶ 5-6; SUF No. 20.) Additionally, when dealing with mentally ill inmates allowing some head coverings and not allowing others could result in chaos which can also compromise safety and security of the institution. (Declaration of A. Athie, ¶ 5; SUF No. 21.)

**\*4** Plaintiff filed an inmate appeal regarding the January incident in the mental health building whereby he was asked to remove his head covering. (Declaration of N. Vela, ¶ 8, Ex. A; SUF No. 22.) The Institution responded to Plaintiff's appeal at the Second Level in June of 2007, citing the Operations Manual as support for the decision requiring inmates to remove head coverings. During this time period, inmates were permitted to possess religious head coverings while in their cells and while attending religious services, but not inside the mental health building or dining rooms. (Declaration of M. Vela, Ex. A; SUF No. 23.)

In July of 2007, the Operations Manual was revised to permit inmates to possess religious head coverings at all times. (Declaration of A. Pitoniak, ¶ 4, Ex. A; SUF No. 24.) Additionally, in November of 2008, the Warden at California Mens Colony circulated a memorandum to all staff clarifying the policy with regard to religious head coverings. (Declaration of A. Pitoniak, ¶ 5, Ex. B; SUF No. 24.) Inmates are now permitted to wear religious head coverings in the mental health buildings at all times. (Declaration of A. Pitoniak, ¶¶ 4-5, Exs. A-B, Declaration of G. Post, ¶ 4; SUF No. 25.)

Plaintiff has absolutely no idea when or how many other times Defendants Athie and Ortiz requested he remove his head covering. (SUF No. 26.) Plaintiff cannot articulate what is required by his religion with regard to his religious head covering. (SUF No. 27.)

Plaintiff did not file an inmate appeal at the Institution level complaining about the actions of Defendants Haun, Joslyn or Engler as alleged in the Complaint. (Declaration of M. Vela, ¶¶ 6-7; SUF No. 28.) Nor did Plaintiff file an appeal at the Third Level mirroring the allegations against Defendants Haun, Joslyn and Engler. (Declaration of N. Grannis: ¶¶ 5-6; SUF No. 29.) The only interaction Defendant Joslyn had with Plaintiff was when he was assigned to interview Plaintiff in response to an inmate appeal. (Declaration of J. Joslyn, ¶ 5; SUF No. 30.) Defendant Joslyn has never worked in the mental health building and has never asked Plaintiff to remove any head covering anywhere. (Declaration of J. Joslyn, ¶¶ 4, 7; SUF No. 31.) Plaintiff participates in religious services nearly every day and he is permitted to wear his head covering. (SUF No. 32.)

### PARTIES' CONTENTIONS

Defendants move for judgment on the pleadings and/or summary judgment on the following grounds: (1) Plaintiff did not exhaust his claims against Defendants Haun, Joslyn and Engler; (2) Plaintiff does not state a claim with regard to the Fourth, Fifth, Eighth, Thirteenth and Fourteenth Amendments; (3) Defendants are entitled to summary judgment on Plaintiff's claims under RLUIPA and the First Amendment because Defendants did not place a "substantial burden" on Plaintiff's ability to practice his religion and because Plaintiff does not have a "sincerely held belief;" (4) Plaintiff's claim for injunctive relief is moot; and (5) Defendants are entitled to qualified immunity.

**\*5** Plaintiff in his Opposition contends that he has exhausted available administrative remedies; that he has stated a claim with regard to the Fourth, Fifth, Eighth, Thirteenth and Fourteenth Amendments; that he has stated a claim under RLUIPA and the First Amendment; and that Defendants are not entitled to qualified immunity.

Defendants in their Reply contend that Plaintiff's Opposition fails to contain any evidence in support of his case. Specifically, Plaintiff has failed to provide any evidence that he attempted to exhaust his administrative remedies with respect to Defendants Haun, Engler and Joslyn; failed to state a claim under the Fourth, Fifth, Eighth, Thirteenth and Fourteenth Amendments; failed to state a claim under RLUIPA and the First Amendment; and are entitled to qualified immunity.

### STANDARD OF REVIEW

**A.** *Judgment on the Pleadings.*

Federal Rule of Civil Procedure 8(a)(2) requires "a short and plain statement of the claim showing that the pleader is entitled to relief," in order to "give the defendant fair notice of what the ... claim is and the grounds upon which it rests." *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 1964, 167 L.Ed.2d 929 (2007); *Erickson v. Pardus,* 551 U.S. 89, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007). Judgment on the pleadings pursuant to Rule 12(c) is appropriate when, even if all material facts in the nonmoving party's pleadings are true, the moving party is entitled to judgment as a matter of law. *Torbet v. United Airlines, Inc.,* 298 F.3d 1087, 1089 (9th Cir.2002), overruled on other grounds by *United States v. Aukai,* 497 F.3d 955 (9th Cir.2007).

The standard applied on a Rule 12(c) motion for judgment on the pleadings is essentially the same as that applied on a Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted. *See Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc.,* 896 F.2d 1542, 1550 (9th Cir.1989). To survive a motion to dismiss for failure to state a claim upon which relief can be granted, "[f]actual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact) ." *Bell Atlantic Corp. v. Twombly,* 127 S.Ct. at 1965 (citations and quotations omitted). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* (citations omitted). "[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Id.* at 1969 (abrogating a literal reading of the oft-quoted statement in *Conley v. Gibson,* 355 U.S. at 45-46 ("a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief")).

**\*6** Dismissal is appropriate on a Rule 12(b)(6) motion if the facts alleged do not state a claim to relief that is "plausible

on its face." *Id.* at *1974*. Pro se pleadings are liberally construed. *Ortez v. Washington County,* 88 F.3d 804, 807 (9th Cir.1996). Generally, review is limited to the contents of the complaint. *Clegg v. Cult Awareness Network,* 18 F.3d 752, 754 (9th Cir.1994). However, material which is properly submitted as part of the complaint may be considered on a motion to dismiss. *Cooper v. Pickett,* 137 F.3d 616, 622 (9th Cir.1997). Also, a court may take judicial notice of "matters of public record" without converting a motion to dismiss into a motion for summary judgment. *Lee v. City of Los Angeles,* 250 F.3d 668, 689 (9th Cir.2001). Allegations of material fact in the complaint are taken as true and construed in the light most favorable to the nonmoving party. *Clegg v. Cult Awareness Network,* 18 F.3d at 754. "The court need not, however, accept as true allegations that contradict matters properly subject to judicial notice or by exhibit. Nor is the court required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Sprewell v. Golden State Warriors,* 266 F.3d 979, 988 (9th Cir.) (citations omitted), amended by 275 F.3d 1187 (2001). A plaintiff's civil rights claim can be "fatally undermined" by the attachments to his complaint. *Id.*

**B. *Motion for Summary Judgment.***

A motion for summary judgment should be granted if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party bears the initial burden of informing the court of the basis for the motion, and identifying the portions of the pleadings, depositions, answers to interrogatories, admissions, or affidavits which demonstrate the absence of a triable issue of material fact.[2] *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The burden then shifts to the non-moving party to present specific facts showing that there is a genuine issue of material fact warranting trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324. In resolving a motion for summary judgment, "[T]he inquiry performed is the threshold inquiry of determining whether there is the need for a trial-whether, in other words, there are any genuine factual issues that can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson,* 477 U.S. at 250.

Under this standard, the mere existence of an alleged factual dispute between the parties will not withstand summary judgment. *Scott v. Harris,* 550 U.S. 372, 127 S.Ct. 1769, 1776, 167 L.Ed.2d 686 (2007). A factual dispute qualifies as "material" only if it "might affect the outcome of the suit under the governing law[.]" *Anderson,* 477 U.S. at 248 (noting that "the substantive law will identify which facts are material" and that "[f]actual disputes that are irrelevant or unnecessary" in relation to the legal elements of the claims "will not be counted"); *S.E.C. v. Seaboard Corp.,* 677 F.2d 1301, 1306 (9th Cir.1982) ("A material issue of fact is one that affects the outcome of the litigation and requires a trial to resolve the parties' differing versions of the truth.") (citation omitted). A "dispute about a material fact is 'genuine' ... if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson,* 477 U.S. at 248; *see also Harris,* 127 S.Ct. at 1776 ("Where the record taken as a whole would not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial").

**\*7** In determining whether a triable issue of material fact exists, the evidence must be considered in the light most favorable to the non-moving party. *Barlow v. Ground,* 943 F.2d 1132, 1134 (9th Cir.1991). However, summary judgment cannot be avoided by relying solely on conclusory allegations unsupported by factual data. *Taylor v. List,* 880 F.2d 1040, 1045 (9th Cir.1989). More than a "metaphysical" doubt is required to establish a genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Mere reliance on the pleadings and conclusory allegations are insufficient to preclude summary judgment. *Celotex Corp.,* 477 U.S. at 324. A party opposing a properly supported motion for summary judgment "... must set forth specific facts showing that there is a genuine issue for trial." *Anderson,* 477 U.S. at 247, *citing First National Bank of Arizona v. Cities Services Co.,* 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968).

Finally, where the evidence conflicts, questions of credibility and motivation generally present an issue of material fact inappropriate for resolution on summary judgment. *See, Allen v. Scribner,* 812 F.2d 426, 435, 437 (9th Cir.1987), *amended on other grounds,* 828 F.2d 1445 (9th Cir.1987); *see also Valandingham v. Bojorquez,* 866 F.2d 1135, 1139, 1140 (9th Cir.1989) (genuine issue of material fact existed as to whether defendants committed the alleged retaliatory acts). Thus, when a plaintiff presents evidence on which the trier of fact could reasonably resolve a material factual issue in his favor, summary judgment for defendants is not appropriate. *See, Barlow v. Ground,* 943 F.2d 1132, 1136 (9th Cir.1991), *cert. denied,* 505 U.S. 1206, 112 S.Ct. 2995, 120 L.Ed.2d 872

(1992); *see also Neely v. Feinstein,* 50 F.3d 1502, 1509 (9th Cir.1995).

### DISCUSSION

For all of the following reasons, Defendants' Motion for Judgment on the Pleadings and/or Motion for Summary Judgment should be granted.

**A. *Section 1983* Requirements.**

In order to state a claim under *section 1983,* a plaintiff must allege that: (1) the defendants were acting under color of state law at the time the complained of acts were committed; and (2) the defendants' conduct deprived plaintiff of rights, privileges, or immunities secured by the Constitution or laws of the United States. *Karim-Panahi v. Los Angeles Police Dept.,* 839 F.2d 621, 624 (9th Cir.1988); *Haygood v. Younger,* 769 F.2d 1350, 1354 (9th Cir.1985) (en banc), *cert. denied,* 478 U.S. 1020, 106 S.Ct. 3333, 92 L.Ed.2d 739 (1986). Liability under *section 1983* is predicated upon an affirmative link or connection between the defendants' actions and the claimed deprivations. *See Rizzo v. Goode,* 423 U.S. 362, 372-73, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976); *May v. Enomoto,* 633 F.2d 164, 167 (9th Cir.1980); *Johnson v. Duffy,* 588 F.2d 740, 743 (9th Cir.1978).

A person deprives another of a constitutional right, where that person "does an affirmative act, participates in another's affirmative acts, or omits to perform an act which [that person] is legally required to do that causes the deprivation of which complaint is made." [citation] Indeed, the "requisite causal connection can be established not only by some kind of direct personal participation in the deprivation, but also by setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury." [citation]

**\*8** *Hydrick v. Hunter,* 500 F.3d 978, 988 (9th Cir.2007) (quoting *Johnson v. Duffy,* 588 F.2d at 743-44).

**B. *Plaintiff Has Failed To Fully Exhaust His Administrative Remedies Regarding His Claims.***

Since this action was filed after the enactment of the Prison Litigation Reform Act of 1995 ("PLRA"), it is governed by the provisions of the PLRA. The PLRA amended 42 U.S.C. § 1997e(a) to provide as follows:

"No action shall be brought with respect to prison conditions under Section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."

The PLRA defined the phrase "civil action brought with respect to prison conditions" as meaning "any civil proceeding arising under federal law with respect to the conditions of confinement or the effects of actions by government officials on the lives of persons confined in prison," other than "habeas proceedings challenging the fact or duration of confinement in prison." *See,* 18 U.S.C. § 3626(g)(2).

Under the PLRA, a prison inmate may not bring a 42 U.S.C. § 1983 action unless and until he has exhausted all available administrative remedies. 42 U.S.C. § 1997e(a); *Woodford v. Ngo,* 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006). Exhaustion is mandatory and not discretionary. *Booth v. Churner,* 532 U.S. 731, 739, 121 S.Ct. 1819, 1824, 149 L.Ed.2d 958 (2001); *Porter v. Nussle,* 534 U.S. 516, 524, 122 S.Ct. 983, 988, 152 L.Ed.2d 12 (2002).

Failure to exhaust administrative remedies under § 1997e(a) of the PLRA is an affirmative defense that does not impose a pleading requirement on the Plaintiff. *Jones v. Bock,* 549 U.S. 199, 127 S.Ct. 910, 921, 166 L.Ed.2d 798 (2007); *Wyatt v. Terhune,* 315 F.3d 1108, 1119 (9th Cir.2003). When moving to dismiss for failure to exhaust administrative remedies, defendants have the burden to raise and prove the absence of exhaustion. *Wyatt v. Terhune,* 315 F.3d at 1119. In deciding a motion to dismiss for failure to exhaust non-judicial remedies, the Court may look beyond the pleadings and decide disputed issues of fact. *Id.* at 1119-20. The failure to exhaust the administrative remedies under the PLRA does not deprive the federal court of its subject matter jurisdiction. *Id.* at 1117 n. 9.

Exhaustion of administrative remedies is a prerequisite to bringing suit under PLRA. 42 U.S.C. § 1997(e)(a). The PLRA exhaustion requirement requires "proper exhaustion," that is, if administrative remedies are not available because a prisoner failed to comply with a deadline or appeal, then the prisoner has not exhausted his administrative remedies for purposes of § 1997(e)(a). *Woodford v. Ngo,* 548 U.S.

81, 126 S.Ct. 2378, 2387, 165 L.Ed.2d 368 (2006); *see also Ngo v. Woodford,* 539 F.3d 1108 (9th Cir.2008). The PLRA requires administrative exhaustion even where the grievance process does not permit an award of money damages where a prisoner seeks only money damages, as long as the grievance tribunal has authority to take some responsive action. *Booth v. Churner,* 532 U.S. 731, 733, 121 S.Ct. 1819, 149 L.Ed.2d 958 (2001).

**\*9** The State of California provides its prisoners the right to appeal administratively "any departmental decision, action, condition or policy perceived by those individuals as adversely affecting their welfare." (California Code of Regulations Title 15, section 3084.1(a).) They may also file appeals alleging misconduct by correctional officials. *Id., § 3084.1(c).* To exhaust available administrative remedies within this system, a prisoner must proceed through several levels of appeal: (1) informal resolution, (2) formal written appeal on a CDC Form 602, (3) second-level appeal to the institution head or designee, and (4) third-level appeal to the Director of CDC or the Director's designate. *Barry v. Ratelle,* 985 F.Supp. 1235, 1237 (S.D.Cal.1997) (citing Cal.Code. Reg. Title 15, section 3084.5). A final decision from the Director's level of review satisfies the exhaustion requirement in § 1997(e)(a). *Id.* at 1237-38. A California prisoner is required to submit an inmate appeal at the appropriate level and proceed to the highest level of review available before filing suit. *Butler v. Adams,* 397 F.3d 1181, 1183 (9th Cir.2005); *see Griffin v. Arpaio,* 557 F.3d 1117, 1120-21 (9th Cir.2009) (concluding that prisoner did not exhaust claim where his grievance failed to notify prison of the problem.)

Plaintiff has not exhausted his administrative remedies as to all of his claims against Defendants Haun, Joslyn or Engler's actions. Specifically, Plaintiff did not file an inmate appeal complaining about the actions of Defendants Haun, Engler and Joslyn. (SUF No. 28.) Nor did Plaintiff file an appeal at the Director's Level complaining about the actions of Defendants Haun, Engler and Joslyn. (SUF No. 29.; *see* Declaration of N. Grannis in Support of Defendants' Motion for Judgment on the Pleadings/Motion for Summary Judgment. ["Grannis Decl."], ¶¶ 5-6; Declaration of M. Vela in Support of Defendants' Motion for Judgment on the Pleadings/Motion for Summary Judgment ["Vela Decl."], ¶¶ 6-7.)

Plaintiff in his Opposition alleges that he has exhausted "all available remedies" and requests the Court to conclude that he has exhausted his administrative remedies. (*See* Plaintiff's

Opposition at pp. 3, 5-7.) However, Plaintiff has provided no evidence in support of his contention that the claims against Defendants Joslyn and Engler are exhausted. Plaintiff also alleges that Defendant Haun violated Plaintiff's right to practice his religion. Plaintiff in his Opposition argues that he has exhausted his claim against Defendant Haun and refers to "Exhibit B." (Opposition at 7.) In the appeal cited in Ex. B., Plaintiff complains that the law library lacks requisite supplies. Plaintiff fails to allege that Defendant Haun violated his right to practice his religion. Thus, Ex. B does not exhaust Plaintiff's constitutional claims related to his religious head covering against Defendant Haun. As such, Defendants Haun, Engler and Joslyn should be dismissed from the action.

### C. *Plaintiff Does Not State a Claim Under the Fourth, Fifth, Eighth, Thirteenth and Fourteenth Amendments Against Defendants.*

**\*10** Plaintiff alleges Defendants violated his rights under the "Fourth, Fifth, Eighth, Thirteenth and Fourteenth," Amendments. (Complaint at 5.) Plaintiff, however, fails to state any facts in support of his conclusory allegations. Vague and conclusory allegations of official participation in civil rights violations are not sufficient to withstand a motion to dismiss. *Ivey v. Board of Regents,* 673 F.2d 266, 268 (9th Cir.1982); *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 1969, 167 L.Ed.2d 929 (2007). Since Plaintiff has failed to state any facts in support of these allegations, Defendants are entitled to summary judgment on these claims.

Plaintiff alleges that his constitutional rights were violated by Defendants Joslyn and Engler with regard to their involvement in processing Inmate Appeals. (Attachment Ex. A at p. 10.) Interests protected by the Due Process Clause may arise from two sources: the Due Process Clause itself and the laws of the State. *Meachum v. Fano,* 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976). Here, Plaintiff's claims fail because the lack of an adequate prison administrative appeal or grievance system does not implicate the due process clause itself because there is no constitutional right to such a system. *Mann v. Adams,* 855 F.2d 639 (9th Cir.1988). Secondly, Defendants' involvement in the administrative appeals process cannot serve as a basis for liability in a 42 U.S.C. § 1983 action. *Buckley v. Barlow,* 997 F.2d 494, 495 (9th Cir.1993); *see also Ramirez v. Galaza,* 334 F.3d 850, 860 (9th Cir.2003) (no liberty interest in processing of appeals because no entitlement to a specific grievance procedure).

The State of California has not created a protected liberty interest in an administrative appeal or grievance system. Cal.Code. Regs. Title 15 § 3084, *et seq.,* grants prisoners the right to a grievance procedure but there is no protected liberty interest in that process. Lack of a grievance process does not present "atypical" circumstances or those which cause "substantial hardship." *Sandin v. Connor,* 515 U.S. 472, 485, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). Accordingly, Plaintiff's claim against Defendants Engler and Joslyn must be dismissed.

Moreover, liability may be imposed on an individual defendant under § 1983 only if the plaintiff can show that the defendant proximately caused the deprivations of his federally protected rights of which he complains. *Leer v. Murphy,* 844 F.2d 628, 634 (9th Cir.1988); *Harris v. City of Roseburg,* 664 F.2d 1121, 1125 (9th Cir.1981). Respondeat superior is not a sufficient basis for imposing liability under § 1983. *Monell v. New York City Dept. of Social Services,* 436 U.S. 658, 663-64 n. 7, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). State officials are not subject to suit under § 1983 unless they play an affirmative part in the alleged deprivation. *King v. Atiyeh,* 814 F.2d 565, 568 (9th Cir.1987).

Supervisory personnel generally are not liable under 42 U.S.C. § 1983 on any theory of respondeat superior or vicarious liability in the absence of a state law imposing such liability. *See Redman v. County of San Diego,* 942 F.2d 1435, 1443-44 (9th Cir.1991), *cert. denied,* 502 U.S. 1074, 112 S.Ct. 972, 117 L.Ed.2d 137 (1992). A supervisory official may be liable under § 1983 only if he or she was personally involved in the constitutional deprivation, or if there was a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation. *See Id.* at 1446-1447. To premise a supervisor's alleged liability on a policy promulgated by the supervisor, the plaintiff must identify a specific policy and establish a "direct causal link" between that policy and the alleged constitutional deprivation. *See, e.g., City of Canton, Ohio v. Harris,* 489 U.S. 378, 385, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989); *Oviatt v. Pearce,* 954 F.2d 1470, 1474 (9th Cir.1992). A "failure to train" theory can be the basis for a supervisor's liability under § 1983 in only limited circumstances. *See City of Canton,* 489 U.S. at 387-90 (liability only where failure to train amounts to deliberate indifference).

**\*11** Plaintiff has failed to identify any particular policy or policies promulgated by Defendants which allegedly had a direct causal link to the alleged civil rights violations about which Plaintiff is complaining. Additionally, Plaintiff has failed to allege sufficient facts to support a "failure to train" theory. Thus, the allegations of the Complaint are insufficient to state a federal civil rights claim against Defendants.

**D.** *Defendants Did Not Prevent Plaintiff From Exercising His Right To Practice His Religion.*

**1.** *Defendants' Actions Did Not Impede Plaintiff's Ability To Practice His Religion.*

Plaintiff has alleged that Defendants' actions have prevented him from freely practicing his religion in violation of the Religious Freedom Restoration Act of 1993, 42 U.S.C. § 2000bb ("RFRA"). (*See* Complaint at 5.) However, Plaintiff's RFRA claim has no merit because the RFRA was declared by the United States Supreme Court to be unconstitutional as applied to the states in *City of Boerne v. Flores,* 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997); *see also Freeman v. Arpaio,* 125 F.3d 732, 736 (9th Cir.1997) (RFRA has been invalidated).

Plaintiff also asserts violations of the Religious Land Use & Institutionalized Persons Act ("RLUIPA") (42 U.S.C. § 2000cc et seq .). The RLUIPA prohibits the government from imposing " 'a substantial burden on the religious exercise of a person residing in or confined to an institution,' unless the burden furthers 'a compelling governmental interest,' and does so by 'the least restrictive means.' " *Cutter v. Wilkinson,* 544 U.S. 709, 712, 125 S.Ct. 2113, 161 L.Ed.2d 1020 (2005) (quoting 42 U.S.C. § 2000cc-1 (a)). The RLUIPA is designed to "protect[ ] institutionalized persons who are unable freely to attend to their religious needs and are therefore dependent on the government's permission and accommodation for exercise of their religion." *Id.* at 721. The text of the RLUIPA provides, in relevant part, as follows:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution, as defined in [42 U.S.C. § 1997], even if the burden results from a rule of general applicability, unless the government demonstrates that the imposition of the burden on that person

> (1) is in furtherance of a compelling governmental interest; and

> (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a).

The RLUIPA defines "religious exercise" as "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A). The Supreme Court has noted that "the 'exercise of religion' often involves not only belief and profession but the performance of ... physical acts [such as] assembling with others for a worship service [or] participating in sacramental use of bread and wine." Cutter v. Wilkinson, 544 U.S. at 720 (citation omitted). The Ninth Circuit has explained that a "substantial burden" on "religious exercise" must " 'impose a significantly great restriction or onus upon such exercise.' " Warsoldier v. Woodford, 418 F.3d 989, 995 (9th Cir.2005) (citation omitted). Also, a "substantial burden" occurs " 'where the state ... denies [an important benefit] because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs.' " Id. (quoting Thomas v. Review Bd. of Indiana Employment Sec. Div., 450 U.S. 707, 717-18, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981)).

**\*12** Under the RLUIPA, a plaintiff bears the responsibility of making a prima facie showing that the challenged policy constitutes a substantial burden on the exercise of his religious beliefs. Warsoldier v. Woodford, 418 F.3d at 994. The defendant then bears the burden of showing that any substantial burden on the plaintiff's exercise of his religious beliefs is both "in furtherance of a compelling governmental interest" and the "least restrictive means of furthering that compelling governmental interest." Id. at 995. "Prison security is a compelling governmental interest." Greene v. Solano County Jail, 513 F.3d 982, 988 (9th Cir.2008). While prison administrators are entitled to deference with regard to prison security, to meet their burden to show "least restrictive means" they must demonstrate that they have " 'considered and rejected the efficacy of less restrictive measures before adopting the challenged practice.' " Id. at 889-90 (quoting Warsoldier v. Woodford, 418 F.3d at 999).

Plaintiff alleges that Defendants' actions have prevented him from freely practicing his religion. Specifically, Plaintiff alleges that Defendants Athie and Ortiz made him remove his religious head covering on one occasion-January 1, 2007. (Attachment Ex. A at pp. 8-9.) Plaintiff also claims without specifying when or how often Defendant Haun made him remove his head covering before entering the library. (Id. at 10.) Finally, Plaintiff claims that Defendant Joslyn, on September 23, 2007 requested he remove his head covering. (Id. at 8.)

Plaintiff admits that he was able to attend religious services and wear his head covering almost every day. (SUF No. 32.) Thus, Plaintiff has not established a "substantial burden" on his ability to practice religion. RLUIPA broadly defines "religious exercise" to include "any exercise of religion, whether or not compelled by or central to, a system of religious belief." 42 U.S.C. § 2000 cc-5(7)(A). See San Jose Christian College v. Morgan Hill, 360 F.3d 1024, 1034 (9th Cir.2004). Under RLUIPA, to substantially burden means to impose a significantly great restriction or onus upon such exercise; Resnick v. Adams, 348 F.3d 763 (9th Cir.2003) (application of RLUIPA could only be triggered by demonstration of the burden imposed on Plaintiff's free exercise of religion was substantial).

Defendants contend that Plaintiff does not have a sincerely held religious belief that requires him to wear a specific head covering at all times. "[P]rison officials may appropriately question whether a prisoner's religiosity, asserted as the basis for a requested accommodation, is authentic." Cutter v. Wilkinson, 544 U.S. 209, 725 n. 13, 125 S.Ct. 2113, 161 L.Ed.2d 1020, ---- n. 13125 (2005). Here, Plaintiff has not articulated his religious affiliation history, nor his current religion. (SUF Nos. 4-9.) At Plaintiff's deposition, when asked what religion he identifies himself with, Plaintiff first stated, "universal," then stated that he follows the "creator," and finally indicated he is "Hebrew." (SUF Nos. 7-9.) Further, Plaintiff was unable to articulate what is required of his religion with respect to a head covering. (SUF No. 27.) Plaintiff wears five different types of caps, including a baseball cap, a state-issued beanie cap and a cap made out of a t-shirt. (SUF Nos. 11-13, 16-17.) Thus, Plaintiff cannot prove he has a sincerely held religious belief requiring him to wear a religious head covering at all times. Defendants are therefore entitled to summary judgment on Plaintiff's RLUIPA claims.

**\*13** Additionally, Defendants contend that Plaintiff was never prevented from practicing his religion. Defendants contend that these isolated events did not substantially burden Plaintiff's ability to practice his religion, especially in light of all the other religious activities that he was still able to observe.

Plaintiff also contends his First Amendment right to free exercise of religion was violated by Defendants. To implicate the Free Exercise Clause of the First Amendment, a challenged prison regulation must burden an inmate's belief that is both sincerely held and rooted in religious belief.

*Shakur v. Schriro,* 514 F.3d 878, 884-85 (9th Cir.2008). It is established that prison regulations that impinge on an inmate's constitutional rights will be upheld as valid if they are reasonably related to legitimate penological interests. *Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987); *Bradley v. Hall,* 64 F.3d 1276, 1279 (9th Cir.1995). In evaluating the reasonableness of a challenged prison regulation a court will consider the following factors: whether the governmental objective underlying the regulation is legitimate and neutral, and whether the regulation is rationally related to that objective; whether alternative means of exercising the right remain available; the impact that an accommodation of the asserted right would have on guards, other inmates, and the allocation of prison resources; and the availability of ready alternatives. *Turner v. Safley,* 482 U.S. at 89-90; *Shakur v. Schriro,* 514 F.3d at 884; *Bradley v. Hall,* 64 F.3d at 1279-80.

In order to demonstrate a free exercise violation, a prisoner must show the defendant "burdened the practice of his religion, by preventing him from engaging in conduct mandated by his faith, without any justification reasonably related to legitimate penological interests." *See Freeman v. Arpaio,* 125 F.3d 732, 736 (9th Cir.1997). To reach the level of a constitutional violation, "the interference with one's practice of religion must be more than an inconvenience; the burden must be substantial and an interference with the tenet or belief that is central to religious doctrine." *Id.* at 737 (quoting *Graham v. C.I.R.,* 822 F.2d 844, 851 (9th Cir.1987)). A prisoner may be inconvenienced in the practice of his faith so long as such practices do not prohibit the prisoner from "participating in the mandates of his religion." *See Freeman,* 125 F.3d at 737. The Free Exercise Right is "necessarily limited by the fact of incarceration, and may be curtailed in order to achieve legitimate correctional goals or to maintain prison security." *McElyea v. Babbitt,* 833 F.2d 196, 197 (9th Cir.1987), citing *O'Lone v. Shabazz,* 982 U.S. 342, 107 S.Ct. 2400, 2304, 96 L.Ed.2d 282 (1987).

Here, Plaintiff cannot establish that any of the Defendants substantially interfered with his ability to freely practice his religion in violation of the First Amendment. Since Plaintiff's ability to practice his religion was not substantially interfered with in that the request to remove his head covering was based on legitimate governmental interests, Plaintiff cannot establish a violation of his First Amendment rights. As such, Defendants are entitled to summary judgment.

## PLAINTIFF IS NOT ENTITLED TO INJUNCTIVE/ DECLARATORY RELIEF AS HIS CLAIMS ARE MOOT

**\*14** To the extent Plaintiff demands injunctive relief permitting him to wear a kippa or a kufi, his request is moot. "The exercise of judicial power under Article III of the Constitution depends on the existence of a case or controversy." *Preiser v. Newkirk,* 422 U.S. 395, 401-02, 95 S.Ct. 2330, 45 L.Ed.2d 272 (1975). "[A] federal court has neither the power to render advisory opinions nor to decide questions that cannot affect the rights of the litigants in the case before them." *Id.* When an inmate seeks injunctive relief concerning the prison where he is incarcerated, his claims for such relief become moot when he is no longer subjected to those conditions. *Weinstein v. Bradford,* 423 U.S. 147, 96 S.Ct. 347, 46 L.Ed.2d 350 (1975).

In July of 2007, California Men's Colony changed its previous rule regarding possession of religious head coverings. (SUF No. 24.) Specifically, inmates are now permitted to wear religious head coverings at all times. (SUF No. 24.) Therefore, Plaintiff's claims for injunctive relief are moot.

## ALTERNATIVELY, DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY

Defendants contend that they are protected by qualified immunity. Qualified immunity shields a defendant from a suit for damages if a reasonable officer in the defendant's position could have believed his or her conduct was lawful in light of clearly established law and the information the officer possessed at the time the conduct occurred. *Hunter v. Bryant,* 502 U.S. 224, 227, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) (*per curiam* ); *Anderson v. Creighton,* 483 U.S. 635, 641, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). The qualified immunity standard gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law. *Hunter v. Bryant,* 502 U.S. 224, 229, 112 S.Ct. 534, 116 L.Ed.2d 589, citing *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986).

In *Saucier v. Katz,* 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), the United States Supreme Court set forth a two-step qualified immunity inquiry. In determining whether a defendant is entitled to qualified immunity, the trial court must first determine whether, "[T]aken in the light most favorable to the party asserting the injury, do the facts

alleged show the officer's conduct violated a constitutional right?" *Saucier,* 533 U.S. at 201. If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity. *Id.* If the Plaintiff's factual allegations do add up to a violation of the Plaintiff's federal rights, then the court must proceed to determine whether the right "was clearly established," whether the contours of the right were delineated with sufficient clarity to make a reasonable officer in the defendant's circumstances aware that what he was doing violated the right. In essence, the first step is whether the facts alleged constitute a violation of a constitutional right. If they do, then at the second step, the question is whether the defendant could nonetheless have reasonably but erroneously believed that his or her conduct did not violate the plaintiff's right. *Id.* at 2158.

 **\*15** Whether an official protected by qualified immunity may be held personally liable for an alleged unlawful official action generally turns on the objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken. Government officials performing discretionary functions generally are granted qualified immunity and are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald,* 457 U.S. at 818; *Butler v. Elle,* 281 F.3d 1014, 1020 (9th Cir.2002).

Even assuming *arguendo* Plaintiff was able to establish that a constitutional violation occurred regarding his claims, Defendants are still entitled to qualified immunity because a reasonable person similarly situated to Defendants could have believed their conduct in this case was lawful. The contours of the clearly established right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. *Id.* at 202 (citing *Anderson,* 483 U.S. at 640). "The second prong of the *Saucier* inquiry operates at a high level of specificity. It is insufficient that the broad principle underlying a right is well established." *Walker v. Gomez,* 370 F.3d 969, 978 (9th Cir.2003). Instead, the relevant dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable

officer that his conduct was unlawful in the specific factual situation he confronted. The salient question is whether the state at the time provided fair warning that the Defendants' conduct was unconstitutional. *Davis v. Scherer,* 468 U.S. 183, 197, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984).

Therefore, even if Plaintiff had sufficiently stated a RLUIPA or First Amendment claim, Defendants are entitled to qualified immunity. Plaintiff must establish that a prison inmate faced with analogous case factors had a clearly established right to wear his religious head covering in the mental health building and in the library. Plaintiff cannot establish this right as there is no clearly established law requiring prisons to permit inmates to wear religious head coverings at all times. (*See Khatib v. County of Orange,* 2008 WL 822562 *10 (C.D.Cal.2008) (holding that the right to wear religious headgear while in custody was not clearly established), citing *Standing Deer v. Carlson,* 831 F.2d 1525, 1528 (9th Cir.1987) ("Court upheld a 'no headwear' policy in a dining area of a prison, finding it was reasonably related to cleanliness, security and safety"); *Young v. Lane,* 922 F.2d 370, 375-77 (7th Cir.1991) ("Prohibition on yarmulkes outside of cell justified by security concerns"); *Benjamin v. Coughlin,* 905 F.2d 571, 578-79 (2nd Cir.1990) ( "Prohibition on wearing Rastafarian crowns while allowing yarmulkes and kufis justified by 'security concerns over concealing' weapons and contraband"). Defendants are therefore entitled to qualified immunity.

### *RECOMMENDATION*

 **\*16** For all of the foregoing reasons, **IT IS RECOMMENDED** that the District Court issue an Order: (1) approving and adopting this Report and Recommendation; (2) granting Defendants' Motion for Judgment on the Pleadings/Motion for Summary Judgment; and (3) directing that Judgment be entered dismissing this action with prejudice.

### All Citations

Not Reported in F.Supp.2d, 2009 WL 3489376

Footnotes

1    Erroneously sued as "C. Hann."

2    Affidavits supporting (and opposing) summary judgment must be made on personal knowledge, must set forth admissible statements of fact, and must show affirmatively that the affiant is competent to testify to the matters stated therein. Fed.R.Civ.P. 56(e). A verified complaint, to the extent it is based on a plaintiff's personal knowledge, meets the affidavit requirement. *McElyea v. Babbitt,* 833 F.2d 196, 198 n. 1 (9th Cir.1987).

---

**End of Document**                                   © 2016 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Red Flag - Severe Negative Treatment

**Reversed and Remanded by** Khatib v. County of Orange, 9th Cir. (Cal.), March 15, 2011

2008 WL 822562
Only the Westlaw citation is currently available.
United States District Court,
C.D. California.

Souhair KHATIB, Plaintiff(s),
v.
COUNTY OF ORANGE, a political subdivision;
Michael S. Carona, an individual; Brian Cossairt, an
individual; and Does 1 through 10, Defendant(s).

No. SACV 07-1012 DOC (MLGx).
|
March 26, 2008.

**Attorneys and Law Firms**

Becki F. Kieffer, Jennifer Mathis, Ross Dixon & Bell, Irvine, CA, Ellen Radovic, Owais Mohammad Qazi, Owais Qazi Law Office, Corona, CA, Hector O. Villagra, Ranjana Natarajan, ACLU Foundation of Southern California, Orange, CA, for Plaintiff.

Christina M. Sprenger, Franscell Strickland Roberts & Lawrence, Orange, CA, David D. Lawrence, Franscell Strickland Roberts and Lawrence, Glendale, CA, Michelle L. Palmer, Orange County Counsels Office, Santa Ana, CA, for Defendants.

*ORDER* GRANTING IN PART AND DENYING
IN PART DEFENDANTS' MOTION TO DISMISS

DAVID O. CARTER, District Judge.

**\*1** Before the Court is Defendants County of Orange (the "County"), Michael S. Carona ("Carona"), and Brian Cossairt's ("Cossairt") (collectively "Defendants") Motion to Dismiss Plaintiff's First Amended Complaint Pursuant to Federal Rule of Civil Procedure 12(b)(6) (the "Motion"). The Court finds the matter appropriate for decision without oral argument. Fed.R.Civ.P. 78; Local Rule 7-15. Accordingly, the hearing set for January 14, 2008 was removed from the Court's calendar. After considering the moving, opposing, and replying papers, the Court hereby GRANTS IN PART and DENIES IN PART Defendants' Motion.

**I. BACKGROUND**

Plaintiff, Souhair Khatib ("Plaintiff"), has practiced the Islamic faith since birth. Her religious beliefs compel her to wear a hijab (a traditional headscarf) whenever she is in the company of men who are not members of her immediate family. Whenever Plaintiff is in public, she covers her hair and neck with a hijab. Appearing in the presence of male non-family members without a hijab "is a serious breach of faith and a deeply humiliating and defiling experience."

In 2006 Plaintiff and her husband pled guilty to a misdemeanor in the Orange County Superior Court. They were then placed on three years probation and ordered to complete thirty-days of community service by November 3, 2006. On November 1, 2006 Plaintiff appeared in the Orange County Superior Court to seek an extension of time to complete her community service. Instead, the court revoked Plaintiff's and her husband's probation and had them taken into custody. A male officer then handcuffed and led Plaintiff to a courthouse holding facility.

When Plaintiff arrived at the holding facility's booking counter, a male officer ordered Plaintiff to hand over her belongings and remove her hijab. Plaintiff refused. The officer repeated the order. Plaintiff again refused. Another male officer also told Plaintiff to remove her hijab. Plaintiff again refused. A female officer then told Plaintiff to remove the hijab. Plaintiff again refused. The female officer then told Plaintiff that the headscarf, which could be used as a choking weapon against Plaintiff, had to be removed for Plaintiff's own security. The female officer also stated that, if Plaintiff did not remove the headscarf voluntarily, the male officers would remove it. To avoid being touched by the male officers, Plaintiff assented and removed her hijab, revealing a long elastic band which held her hair back. She was not required to remove this elastic band.

After she removed the hijab, officers placed Plaintiff in a women's holding cell. This cell shared an open hallway with the male holding cell and was directly across from the booking counter. Guards and inmates at the booking counter and those using the hallway saw Plaintiff while she waited in the holding cell. This prompted Plaintiff to attempt to use a vest she was wearing to cover her head and neck.

While inside the holding cell, Plaintiff saw another inmate, apparently in a Halloween costume, wearing fishnet stockings. She also saw a female inmate wearing a "waist-length jacket over her clothing despite its potential use as a (choking) weapon."

**\*2** That afternoon, Plaintiff was directed to return to the courtroom. Upon exiting the cell, an officer ordered her to remove the vest from her head and neck, which Plaintiff did. Prior to entering the courtroom, Plaintiff asked an officer if she could cover her head and neck with the vest. The officer declined. Additionally, Plaintiff's husband asked an officer if Plaintiff could cover her head and neck with his jacket. The officer also declined this request. When Plaintiff entered the courtroom, she observed male members of her mosque, who were present to offer assistance to Plaintiff and her husband. Seeing these men from her mosque caused Plaintiff to "feel[ ] humiliated and ashamed to be seen without her hijab."

During this appearance, the court ordered Plaintiff and her husband to complete thirty days of community service by January 30, 2007. Plaintiff then returned to the holding cell and again used the vest to cover her head and neck. At 4:00 or 4:30 that afternoon Plaintiff was released from the holding cell. She retrieved her belongings and asked if she could "step into an adjoining room" to put on her headscarf. Officers told her to wait until she left the holding area to open the bag containing her belongings.

## II. LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a complaint must be dismissed when a plaintiff's allegations fail to state a claim upon which relief can be granted. Once it has adequately stated a claim, a plaintiff may support the allegations in its complaint with any set of facts consistent with those allegations. *Bell Atlantic Corp. v. Twombly,* --- U.S. ----, ----, 127 S.Ct. 1955, 1969, 167 L.Ed.2d 929 (2007); *see Balistreri v. Pacifica Police Dep't,* 901 F.2d 696, 699 (9th Cir.1990) (stating that a complaint should be dismissed only when it lacks a "cognizable legal theory" or sufficient facts to support a cognizable legal theory). Dismissal for failure to state a claim does not require the appearance, beyond a doubt, that the plaintiff can prove "no set of facts" in support of its claim that would entitle it to relief. *Bell Atlantic,* 127 S.Ct. at 1968 (abrogating *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)).

The Court must accept as true all factual allegations in the complaint and must draw all reasonable inferences from those allegations, construing the complaint in the light most favorable to the plaintiff. *Guerrero v. Gates,* 442 F.3d 697, 703 (9th Cir.2006); *Balistreri,* 901 F.2d at 699. Dismissal without leave to amend is appropriate only when the Court is satisfied that the deficiencies in the complaint could not possibly be cured by amendment. *Jackson v. Carey,* 353 F.3d 750, 758 (9th Cir.2003) (citing *Chang v. Chen,* 80 F.3d 1293, 1296 (9th Cir.1996)); *Lopez v. Smith,* 203 F.3d 1122, 1127 (9th Cir.2000).

## III. DISCUSSION

### A. Standing to Seek Equitable Relief

A plaintiff seeking equitable relief against government action must show that "she has sustained or is immediately in danger of sustaining some direct injury" as a result of the official conduct. *City of Los Angeles v. Lyons,* 461 U.S. 95, 102, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1968). The injury or threat of injury must be "real and immediate" rather than "conjectural." *Id.* Moreover, "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief ... if unaccompanied by any continuing, present adverse effects." *O'Shea v. Littleton,* 414 U.S. 488, 495-96, 94 S.Ct. 669, 676, 38 L.Ed.2d 674 (1974). Instead, Plaintiff has standing to seek equitable relief only if she is likely to be subjected to wrongful state action for completely innocent conduct. *Hodgers-Dugin v. de la Vina,* 199 F.3d 1037, 1041-44 (9th Cir.1999).

**\*3** Here, Plaintiff has not established that she is in real and immediate danger of being compelled to remove her headscarf in the future. Nor has she alleged that she may be subjected to similar misconduct as a result of completely innocent conduct. Her argument that she may be taken into custody for such innocent conduct as failing to carry a her Driver's License or Identification Card is unavailing. The terms of Plaintiff's probation require her to carry identification; her failure to abide by these terms is not "completely innocent." While failure to carry identification is typically not considered wrongful conduct, violation of the conditions of one's probation is certainly wrongful. Plaintiff's claim that she may again experience injury rests on the purely conjectural possibility that she will again violate her probation and be taken into custody.

Finally, although Plaintiff may suffer an ongoing emotional impact from the incident at issue, this is inadequate to grant standing absent a "real and immediate threat of future injury...." *Lyons,* 461 U.S. at 107 n. 8 (1968). Plaintiff has

not sufficiently alleged any such threat. Accordingly, Plaintiff lacks standing to pursue equitable relief, and Defendants' Motion to Dismiss on this ground is GRANTED with prejudice.

## B. The Religious Land Use and Institutionalized Persons Act of 2000

The Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), provides that:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution, as defined in [the Prison Litigaton Reform Act of 1995 ("PLRA"), 42 U.S.C. § 1997], even if the burden results from a rule of general applicability, unless the government demonstrates that the imposition of the burden on that person [meets strict judicial scrutiny].

42 U.S.C. § 2000cc-1(a). The PLRA defines an "institution" as "any facility or institution owned, operated, or managed by, or [that] provides services on behalf of any State or political subdivision of a State," and which is, *inter alia,* "a jail, prison, or other correctional facility," or a "pretrial detention facility. 42 U.S.C. § 1997(1)(B)(ii) & (iii).

The central question in the instant case, apparently one of first impression, is whether a courthouse holding facility is an institution for purposes of RLUIPA. For the reasons that follow, the Court finds such a holding facility cannot constitute an "institution."

Traditionally, RLUIPA has been applied to assure religious freedom within jails and prisons. These facilities hold inmates for substantial periods of time. The relatively lengthy period of confinement allows a sort of homeostasis to develop among the inmate population. This modicum of stability allows for the increased religious freedoms contemplated by RLUIPA. However, this same stability and relative safety is not present in courthouse holding facilities. Accordingly, applying RLUIPA to such facilities seems misguided.

**\*4** The relative safety and stability of longer-term facilities arise for a number of reasons. First, the longer period of confinement permits staff and inmates to become familiar with one another. Guards that know inmates well are better attuned to warning signs of potential disruption and can typically use this knowledge to avoid significant problems. Additionally, inmates and staff develop a sort of rapport, albeit less-than-friendly, through which neither group frequently tests the boundaries of acceptable conduct. A similar detente arises among prisoners who, often grudgingly, avoid confrontation despite significant periods of unsupervised exposure to one another.

This environment also requires staff members to identify and isolate dangerous or vulnerable inmates, to ascertain which inmates or groups need additional supervision and which can be trusted with less, and to separate groups of inmates that have the highest potential for conflict. Within these facilities inmates are separated to keep tensions and violence to a minimum. Additionally, inmates are segregated according to the severity and/or violence of their offenses-e.g., inmates convicted of fraud-based crimes are housed separately from inmates convicted of armed robbery. The ability to separate inmates helps maintain the overall safety of the facility.

The proper functioning of jail or prison facilities also depends on the establishment and strict adherence to a routine. Inmates and guards develop a daily pattern, including counting inmates, dining, work within the jail or prison, exercise, etc. When both guards and inmates know what is expected on a daily basis, the risk of disruption or violence decreases. For the most part, guards and inmates follow their daily routine without serious problems.

Finally, inmates within longer-term facilities are searched on entry and subsequently searched with some regularity. Accordingly, although not perfect, guards have the ability to drastically reduce the number of dangerous items that inmates have in their possession. The assurance that inmates are largely unarmed aids in creating a relatively safe atmosphere within jails and prisons.

The safety and stability inside longer-term facilities created by the factors discussed above allows staff to pursue rehabilitative or corrective goals and also permits a fair amount of expressive and religious freedom. These are the sorts of facilities that Congress plainly had in mind when it enacted RLUIPA, to allow "institutionalized persons to exercise their religion to the extent that it does not undermine the security, discipline, and order of their institutions." 146 Cong. Rec. S6678-02 (daily ed. July 13, 2000) (Statement of Sen. Hatch).

However, Courthouse holding facilities are entirely different than longer-term facilities such as jails and prisons. The factors needed to create the atmosphere of stability inside jails and prisons that allows for exercise of religious freedoms without "undermin[ing] ... security, discipline, and order ..." are utterly absent from courthouse holding facilities. Instead, in order to assure that inmates and staff remain safe, guards must assure that all inmates are strictly supervised and treated uniformly. In dramatic contrast to the stability and routine of jails or prisons, these facilities are in constant motion. Indeed, the very purpose of courthouse holding facilities is to process inmates and hold them for a period of hours to assure that they make court appearances. Within this period of hours, large numbers of inmates are taken into custody, released from custody and taken to and from hearings within the courthouse.

 *5  In the early hours of the morning, long before judges take the bench to begin the days' criminal calendar, inmates start to arrive at courthouse holding facilities. These facilities, generally beneath the portions of the courthouse open to the public, are forced to accept all inmates from various jails and prisons throughout the county that are scheduled for hearings. Naturally, this includes some of the most dangerous inmates.

Upon entering the courthouse facility, these inmates are taken to a labyrinthine series of underground hallways beneath the courthouse. Under the watchful eye of a severely limited number of guards, they form lines for brief-often insufficient-searches. After being searched, they are taken to a processing counter and then placed in one of a number of holding cells, which hold approximately 10 to 150 inmates at a time. Despite numerous cameras monitoring these holdings cells and the presence of guards nearby, killings (self-inflicted or otherwise) are not infrequent. Such incidents have made the physical safety of inmates a top priority of these facilities. Indeed, these short-term facilities are, for reasons identified below, some of the most dangerous in the penal system.

At some point, inmates are removed from these holding facilities and taken to court in shifts: black male inmates, Hispanic male inmates, Asian male inmates, white male inmates, female inmates, transsexual inmates, and finally, inmates with communicable diseases. This unfortunate parade of inmates has developed as one of a limited number of practical ways to reduce violence between groups. Inmates are then placed in smaller cells within each courtroom while they await their hearings.

During the day's proceedings, courts often take individuals into immediate custody. These individuals, essentially taken directly off the street, are placed in the courtroom cells along with inmates that were transferred from other penal facilities. Aside from the metal detectors at the entrance to the courthouse, individuals taken into custody in court have not been searched for weapons or contraband. However, at the close of the morning session, all of the inmates, including these new additions, are returned to the underground holding facilities. The inmates are again searched, those taken into custody in court are processed and required to turn over personal belongings, and all are placed back into the temporary holding cells.

After a brief lunch, the process begins again for the afternoon calendar. At the end of the day, those inmates ordered released will be given back their personal belongings and released from custody.

This regular movement of inmates throughout the morning is made more difficult by issues that require immediate attention. Even during the relative "down time," where the majority of inmates are in the appropriate places, judges may require specific defendants to appear immediately, guards may have to transfer one or a small number of inmates between holding cells, inmates may arrive from other facilities, etc. Even in the brief periods of relative calm throughout the day, there is always some action within these facilities.

 *6  The dissimilarity of "institutions" such as jails and prisons, and courthouse holding facilities is apparent when the factors above, which lead to the relative stability in long-term facilities, are considered.

Far from having daily interaction with inmates, guards have only a few minutes while inmates are being processed or moved to gain whatever familiarity they can. Once inmates are in the holding cells, their interaction with guards is minimal. Additionally, they are only in these cells, under the supervision of courthouse personnel, for the few hours between hearings. Rather than seeing the same inmates every day, the courthouse holding facilities process a new group of inmates every day. There is no period in which inmates and staff can develop the sort of rapport that exists in longer-term facilities. Guards have no way of identifying warning signs for dangerous conduct.

Likewise, there is little opportunity for staff to segregate inmates according to their dangerousness or vulnerability. Guards in courthouse holding facilities place inmates haphazardly into holding cells largely dependent on their race or their preference to be held with a particular racial group. They are required to make snap judgements of where to place each individual. Due to their inability to separate predatory inmates from the weak or vulnerable, or to separate violent offenders from other, less dangerous inmates, it is not unusual for a probation violator to be housed in the same cell as a violent criminal.

As one might imagine from the constant movement within the holding facilities, there is also no opportunity for inmates to develop a routine. They are in and out of the facilities before any such routine could develop. Instead, safety in courthouse holding facilities relies on strict control by guards.

Finally, because a number of individuals are taken into custody from court, the opportunity for a full search is limited. Accordingly, the assumption that prisoners are unarmed does not hold true in the courthouse holding facilities. Additionally, due to limited space, individuals taken into custody in court are placed in the same cells as those who came from jails and prisons. Accordingly, there is a heightened risk that dangerous objects will be used by individuals who would not otherwise have access to them. For this reason, guards are particularly sensitive to allowing inmates to keep personal items which may be used as weapons.

In order to assure the safety of inmates as well as staff, guards in courthouse holding facilities, who are unable to develop a routine with inmates, must exercise strict control. The level of supervision and control at a courthouse holding facility is necessarily greater than at a longer-term facility because guards do not have the luxury of being familiar with inmates or getting inmates into a pattern of behavior. The cost of this strict control, needed to assure that inmates and staff are safe, is a uniformity of treatment that may not always be consistent with the exercise of individual religious and expressive freedoms. Indeed, in order to maintain this strict control, guards must make split-second decisions about how to handle situations as they arise, and must assure that inmates fully comply with their directives. These decisions include where to place certain inmates or groups, how to order movements of inmates from the cells, which inmates need to be searched more carefully, and how to deal with inmates taken into custody in court. This multitude of micro-level

decisions, made within a matter of seconds, is not amenable to *post hoc* judicial review as contemplated by RLUIPA.

**\*7** Courthouse holding facilities are not "places of correction or detention." *See Witzke v. Femal,* 376 F.3d 744, 753 (7th Cir.2004) (quoting *Alexander S. v. Boyd,* 113 F.3d 1373, 1383 (4th Cir.1997)). They serve no correctional or rehabilitative purpose, and individuals are not detained in them for material periods. Instead, they serve only to assure that inmates are taken to and from court as scheduled. Individuals temporarily placed in these facilities are simply not the sort of "institutionalized persons who are ... dependent on the government's permission or accommodation for exercise of their religion." *See Cutter v. Wilkinson,* 544 U.S. 709, 721, 125 S.Ct. 2113, 161 L.Ed.2d 1020 (2005). Instead, if these individuals are "institutionalized," it is by the longer-term facilities that typically house them, not by the short term processing facilities that comprise courthouse holding areas.

Instructive is the fact that courthouse holding facilities lack the administrative grievance procedure dictated by PLRA. Although Congress clearly intended "a wide variety of institutions to be afforded the opportunity to address the problems presented in inmate complaints before the initiation of a federal lawsuit," *Witzke, supra* (citing *Porter v. Nussle,* 534 U.S. 516, 524-25, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002)), case law has not extended the PLRA's protections to courthouse holding facilities.

The fact that PLRA's requirements have not been applied to such facilities deprives them of the protection afforded to jails and prisons. These protections were plainly relevant in the choice to define the scope of RLUIPA by reference to the PLRA. In discussing RLUIPA, Senator Kennedy discounted fears of frivolous prisoner suits as follows:

> Congress also passed the [PLRA], which includes a number of procedural rules to limit frivolous prisoner litigation. Those procedural rules will apply in cases brought under the bill we are introducing today. Based upon these protections and the data on prison litigation, it is clear that this provision in our bill will not lead to a flood of frivolous lawsuits or threaten the safety, order, or discipline in correctional facilities.

146 Cong. Rec. S6678-02 (daily ed. July 13, 2000) (statement of Sen. Kennedy). To apply RLUIPA to courthouse holding facilities, where the requirements of PLRA are not clearly applicable, would make frivolous religious litigation a real possibility. It would give rise to the exact harm contemplated and discounted by Senator Kennedy and disregard Congress' express choice to define the scope of RLUIPA as it has.

Indeed, courthouse holding facilities are distinct from the types of institutions Congress could have had in mind when it laid out the requirements of the PLRA. As the Supreme Court noted in *Porter v. Nussle,* 534 U.S. 516, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002), Congress, in enacting the PLRA, intended to "afford[ ] corrections officials *time and opportunity* to address complaints internally before allowing the initiation of a federal case." *Id.* at 524-25 (emphasis added). No such opportunity is afforded to officials operating courthouse holding facilities. No such opportunity *could* be afforded. In the time needed to consider an administrative grievance, the inmate's stay in the holding facility (generally for no more than a few hours) would have long ended. The procedures outlined by Congress in the PLRA would be entirely ineffective in this setting. The impracticality of applying the PLRA in courthouse holding facilities demonstrates that the broad reach of the PLRA, and thus RLUIPA, does not stretch to such facilities.

**\*8** By way of comparison, courthouse holding facilities are more akin to the temporary holding facilities at police stations held not to be governed by the PLRA, *see Linares v. Jones,* 04-0247, 2007 WL 1601725 at \*4 (D.D.C. June 4, 2007) (police station detention); *Berishaj v. City of Warren,* 04-70998, 05-71476, 2006 WL 2069440 at \*12 (E.D.Mich.2006) (holding that PLRA requirements do not apply to temporary detention at police facility because Plaintiffs were no longer incarcerated at time of suit), than they are to halfway houses or drug treatment facilities, where PLRA has been found to apply, *see Witzke, supra* (drug treatment facility); *Ruggiero v. County of Orange,* 467 F.3d 170 (2d Cir.2006) (halfway house). Halfway houses and drug treatment facilities epitomize the ability of longer-term facilities to use familiarity and routine to assure safety. At these institutions, which have minimal security in place, inmates are reintegrated into everyday life and routine activities and given treatment rather than punishment. The opposite is true of holding facilities: because they house inmates temporarily, they must rely on extensive security and constant supervision to assure the safety of inmates and staff. The same temporary and transitory nature that makes holding facilities poor candidates for the PLRA's administrative procedures, necessarily makes it unlikely that Congress intended them to be covered by RLUIPA.

Simply put, an inmate's stay in a courthouse holding facility is generally temporary and transitory. For a number of reasons, constant movement within holding facilities makes unlimited exercise of religious and expressive freedoms impractical. Staff at such facilities do not have the luxuries that make such freedoms feasible in longer-term institutions, to which RLUIPA plainly applies. As a result, the Court cannot conclude that Congress intended the PLRA or RLUIPA to apply to courthouse facilities.

This holding does not imply that religious freedoms have no place in courthouse holding facilities. Indeed, as discussed *infra* at Section C, Plaintiff can certainly maintain a First Amendment challenge to the practices of such facilities. Instead, the Court merely finds that Congress could not have intended for such facilities to be subject to strict judicial review under RLUIPA where the robust exercise of religious freedoms in these facilities could, for the reasons discussed above, place the safety of inmates and staff at serious risk.

Therefore, Defendants' Motion to Dismiss Plaintiff's RLUIPA claims is hereby GRANTED.

## C. Free Exercise

Plaintiff alleges that the removal of her headscarf and refusal to allow her to wear it during her court appearance or in the holding facility violated her First Amendment rights. The Civil Rights Act of 1871, 42 U.S.C. § 1983, provides a cause of action for violations of constitutional guarantees. To make out a claim under § 1983, a plaintiff must allege that a person "acting under the color of state law," "deprived the plaintiff of a federal constitutional or statutory right." *Wood v. Ostrander,* 879 F.2d 583, 587 (9th Cir.1989) (citing *Rinker v. County of Napa,* 831 F.3d 829, 831 (9th Cir.1987)).

**\*9** Plaintiff has clearly satisfied her burden of pleading state action. She claims that officers employed by the OCSD, following a County custom, practice or official policy, caused her to remove the headscarf and refused to permit her to put it back on. She alleges that this custom, policy or practice was implemented by the OCSD, Defendant Carona and Defendant Cossairt and/or ratified or not redressed by the County.

Plaintiff alleges that her First Amendment right to free exercise of her religion was violated. To prevail on such

a claim, Plaintiff must establish that officials burdened a belief that was sincerely held and rooted in religious beliefs. *See Malik v. Brown,* 16 F.3d 330, 333 (9th Cir.1994) (citing *Callahan v. Woods,* 658 F.2d 679, 683 (9th Cir.1981) (two criteria are sincerity and basis in religion). Secular or philosophical beliefs do not merit protection under the Free Exercise clause. *Id.* Additionally, the Court need not consider whether religious beliefs are "central" to a persons faith, but merely whether they are sincerely held. *See Employment Div. v. Smith,* 494 U.S. 872, 886-887, 110 S.Ct. 1595, 108 L.Ed.2d 876 ("[in]appropriate for judges to determine the 'centrality' of religious beliefs...."); *Shakur v. Schriro,* 514 F.3d 878, 884-85 (9th Cir.2008) (discussing sincerity and centrality test).

Plaintiff has satisfied this "sincerity test" by alleging that having her head uncovered in the presence of male non-family members "is a serious breach of faith and a deeply humiliating and defiling experience." Additionally, the allegation that male officers forced plaintiff to remove the headscarf and refused to permit her to replace it either in the holding facility or in court is sufficient to plead that the officers burdened or infringed Plaintiff's right.

Finally, to state a constitutional claim under § 1983, the plaintiff must allege harm and causation-i.e. a specific injury as a result of the conduct of a particular defendant and an affirmative link between injury and conduct. *See Rizzo v. Goode,* 423 U.S. 362, 371-72, 77, 96 S.Ct. 598 (1976). The allegations that individual OCSD employees were responsible for this purported infringement, and that they acted pursuant to an official policy or custom, satisfies this "affirmative link" requirement.

Because Plaintiff's allegations are sufficient to plead a § 1983 claim for a violation of the Free Exercise Clause, Defendants' Motion to Dismiss this claim is DENIED.

### D. Qualified Immunity

Qualified Immunity applies to shield a state actor from liability where "she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted." *Brosseau v. Hagan,* 543 U.S. 194, 198, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004). A qualified immunity determination requires a two-tiered analysis. The court must first determine whether the plaintiff has alleged a constitutional deprivation. *See Conn v. Gabbert,* 526 U.S. 286, 290 119 S.Ct. 1292 (1999) (citing *Siegert v. Gilley,* 500 U.S. 226, 232-233, 111 S.Ct. 1789, 114

L.Ed.2d 277 (1991); *County of Sacramento v. Lewis,* 523 U.S. 833, 841 n. 5, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998)). As discussed *supra* at section C, Plaintiff has adequately alleged a violation of her First Amendment rights.

**\*10** Thus, the Court must consider the second stage of analysis: whether the right was clearly established at the time of the alleged violation. *See id.* A right is "clearly established" if, "in light of the specific context of the case," it would be "clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz,* 533 U.S. 194, 201-02, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001).

"Rule 12(b) (6) dismissal is not appropriate unless [the Court] can determine, based on the complaint itself, that qualified immunity applies." *Groten v. California,* 251 F.3d 844, 851 (9th Cir.2001) (citing *Jensen v. City of Oxnard,* 145 F.3d 1078, 1085 (9th Cir.1998)). However, whether the constitutional right at issue was "clearly established ... presents a question of law." *Elder v. Holloway,* 510 U.S. 510, 516, 144 S.Ct. 1019, 127 L.Ed.2d 344, ---- (1994). Accordingly, in cases where the complaint itself discloses the basis for a valid qualified immunity defense, the Court may consider that defense on a Motion to Dismiss.

The right at issue was Plaintiffs' purported right to wear a headscarf while in the courthouse holding facility and in court during her afternoon hearing. On considering the state of the law in the Ninth Circuit and others on this issue, it is evident that Plaintiff's right was not "clearly established" when she was compelled to remove the scarf. In *Standing Deer v. Carlson,* 831 F.2d 1525, 1528 (9th Cir.1987), the Court upheld a "no-headwear" policy in a dining area of a prison, finding it reasonably related to cleanliness, security and safety. Other circuits have also upheld decisions to prohibit inmates from wearing religious headgear. *See e.g. Young v. Lane,* 922 F.2d 370, 375-77 (7th Cir.1991) (prohibition on yarmulkes outside of cell justified by security concerns); *Benjamin v. Coughlin,* 905 F.2d 571, 578-79 (2d Cir.1990) (prohibition on wearing Rastifarian crowns while allowing yarmulkes and kufis justified by "security concerns over concealing" weapons and contraband); *Rogers v. Scurr,* 676 F.2d 1211, 1216 (8th Cir.1983) (upholding prohibition on wearing prayer caps and robes outside of religious services). These decisions demonstrate that, at the time of Plaintiff's interaction with OCSD personnel, the right to wear religious headgear while in custody was not "clearly established."

Consequently, defendants Carona and Cossairt are entitled to qualified immunity on Plaintiff's First Amendment claim and Defendants' Motion to Dismiss Plaintiff's First Amendment claim must be GRANTED as to these defendants.

### E. California Constitution Article 1, Section 4

Article 1, Section 4 of the California Constitution provides that, "[f]ree exercise and enjoyment of religion without discrimination or preference are guaranteed." Defendants do not challenge the sufficiency of Plaintiff's allegations in stating a claim under this provision. Instead, they claim that the provision is not "self executing" as to monetary damages in the absence of an effectuating statute. In other words, Defendants argue that a private plaintiff cannot maintain a suit for damages under this section of the California Constitution.

 **\*11** The California Supreme Court has previously stated that many provisions of the California Constitution are self executing to the extent that they "support[ ] an action, brought by a private plaintiff against a proper defendant, for declaratory relief or for injunction." *Katzberg v. Regents of the University of California,* 29 Cal.4th 300, 307, 127 Cal.Rptr.2d 482, 58 P.3d 339 (2002). Concerning monetary relief, the California Supreme Court also laid out a framework for determining whether an action for money damages would lie:

First, [the Court] shall inquire whether there is evidence from which we may find or infer, within the constitutional provision at issue, an affirmative intent either to authorize or to withhold a damages action to remedy a violation. In undertaking this inquiry we shall consider the language and history of the constitutional provision at issue, including whether it contains guidelines, mechanisms, or procedures implying a monetary remedy, as well as any pertinent common law history. If we find any such intent, we shall give it effect.

Second, if no affirmative intent either to authorize or to withhold a damages remedy is found, we shall undertake the "constitutional tort" analysis adopted by *Bivens* and its progeny. Among the relevant factors in this analysis are whether an adequate remedy exists, the extent to which a constitutional tort action would change established tort law, and the nature and significance of the constitutional provision. If we find that these factors militate against recognizing the constitutional tort, our inquiry ends. If, however, we find that these factors favor recognizing a constitutional tort, we also shall consider the existence of

any special factors counseling hesitation in recognizing a damages action, including deference to legislative judgment, avoidance of adverse policy consequences, considerations of government fiscal policy, practical issues of proof, and the competence of courts to assess particular types of damages.

*Id.* at 317, 127 Cal.Rptr.2d 482, 58 P.3d 339. The California Courts have not yet addressed whether such a private suit for monetary damages is available under Article I, Section 4 of the California Constitution. Thus, the Court is presented with a matter of first impression under California law.

However, 28 U.S.C. § 1367 gives this Court discretion to decline to exercise supplemental jurisdiction over a claim where that claim involves "novel or complex issues of state law." 28 U.S.C. § 1367(c)(1). In addition to being a matter of first impression, and therefore novel, the determination of whether a private action for money damages exists also appears complex. It would involve careful consideration of the intention of the state legislature, a delicate balancing of existing state law remedies, and consideration of the broader impact of such a constitutional tort. The Court finds it prudent to abstain from considering this important issue of California law in favor of California courts.

Accordingly, the Court hereby GRANTS Defendants' Motion to Dismiss Plaintiff's claim under Article I, Section 4 of the California constitution without prejudice to allow Plaintiff to file suit in state court if she so desires.

### F. Intentional Infliction of Emotional Distress

 **\*12** In order to plead a claim for intentional infliction of emotional distress under California law, the plaintiff must allege: "1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing emotional distress; 2) the plaintiff's suffering severe or extreme emotional distress; and 3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct." *Christensen v. Superior Court,* 54 Cal.3d 868, 903, 2 Cal.Rptr.2d 79, 820 P.2d 181 (1991) (citations omitted). Because Plaintiff has pleaded facts sufficient to establish such a claim, dismissal is unwarranted.

Outrageous conduct is that which is, "so extreme as to exceed all bounds of that usually tolerated in a civilized community." *Id.* Whether conduct could reasonably be deemed outrageous is a question of law for the court. *Berkley v. Dowds,* 152 Cal.App.4th 518, 534, 61 Cal.Rptr.3d 304 (2007). However,

"if reasonable persons may differ, it is for the jury to determine whether the conduct was, in fact, outrageous." *Id.* In addition to being outrageous, the conduct must be "intended to inflict injury or engaged in with the realization that injury will occur." *Davidson v. City of Westminster,* 32 Cal.3d 197, 210, 185 Cal.Rptr. 252, 649 P.2d 894 (1982) (citing *Spackman v. Good,* 245 Cal.App.2d 518, 54 Cal.Rptr. 78 (1966)). Plaintiff alleges that Defendant's conduct was "extreme, outrageous and unprivileged...." Specifically, she states that Defendants prohibited her from wearing her headscarf despite knowledge that the headscarf was mandated by her religious beliefs. She also claims that, pursuant to an official custom, practice, or policy, OCSD officers, "intended to cause or recklessly disregarded the probability of causing Plaintiff to suffer" harm. Finally, she alleges that Defendants should have known that prohibiting Plaintiff from using her hijab would cause her extreme mental and emotional distress. Reasonable people could certainly differ on the question of whether this conduct was "extreme and outrageous." Additionally, Plaintiff has properly pleaded Defendants' intent to the extent possible.

Plaintiff's complaint also plainly indicates that Plaintiff suffered extreme mental and emotional distress and that such distress was caused by Defendants' acts or omissions. These allegations are sufficient to establish the elements of harm and causation under the minimal pleading requirements of Rule 8.

Accordingly, Defendant's Motion to Dismiss Plaintiff's Intentional Infliction of Emotional Distress claim is hereby DENIED.

### G. Statutory Immunity

Defendants Carona and Cossairt claim that they are entitled to statutory immunity on two bases: discretionary immunity under California Government Code § 820.2 and immunity from vicarious liability under § 820.8. The County asserts derivative immunity under § 815.2. California Government Code § 820.2 provides that, "a public employee is not liable for an injury resulting from his act or omission where the act or omission was the result of the exercise of the discretion vested in him, whether or not such discretion be abused." In determining whether discretionary immunity is applicable, the Court "must consider whether the acts or omissions of the particular employee resulted from the exercise of discretion within the meaning of section 820.2." *Barner v. Leeds,* 24 Cal.4th 676, 684, 102 Cal.Rptr.2d 97, 13 P.3d 704 (2000). This immunity is narrowly circumscribed, and "is reserved for those basic policy decisions which

have been expressly committed to coordinate branches of government, and as to which judicial interference would thus be unseemly." *Caldwell v. Montoya,* 10 Cal.4th 972, 981, 42 Cal.Rptr.2d 842, 897 P.2d 1320 (1995) (citations omitted). A determination of whether the alleged acts fall within this realm of basic policy decisions would require the Court to inquire into the policy itself and the scope of the power vested in Defendants. This would entail a venture far outside the confines of Plaintiff's complaint, which cannot be undertaken on a Motion to Dismiss

**\*13** Pursuant to Government Code § 820.8, "[e]xcept as otherwise provided by statute, a public employee is not liable for an injury caused by the act or omission of another person." However, the statute goes on to indicate that, "[n]othing in this section exonerates a public employee for liability for injury proximately caused by his own negligent or wrongful act or omission." Cal. Gov't Code § 820.8. Plaintiff alleges that Carona and Cossairt "directed" the conduct in question. She also bases a claim on Carona and Cossairt's negligence in failing to train, exercise control, or adequately supervise the officers who removed Plaintiff's head covering. Because Plaintiff has sufficiently alleged that her injury was proximately caused by the negligent or wrongful conduct of Carona and Cossairt, it is not evident that they are entitled to § 820.8 immunity.

Finally, Government Code § 815.2 provides immunity to public entities for injuries, "resulting from an act or omission of an employee ... where the employee is immune from liability." Because the Court is unable to conclude that Carona or Cossairt are entitled to statutory immunity, the derivative immunity defense of § 815.2 is inapplicable at present. Accordingly, Defendants' Motion to Dismiss on the basis of statutory immunity under California law is hereby DENIED.

### IV. DISPOSITION

For the reasons above, the Court hereby GRANTS Defendants' Motion to Dismiss Plaintiff's equitable claims with prejudice. The Court also hereby GRANTS Defendants' Motion to Dismiss Plaintiff's RLUIPA claim with prejudice. However, the Court hereby DENIES Defendants' Motion to Dismiss Plaintiff's First Amendment claim against the County, but GRANTS it with prejudice against Defendants Carona and Cossairt on the basis of qualified immunity. The Court hereby GRANTS Defendants' Motion to Dismiss Plaintiff's claims under the California Constitution without prejudice to allow Plaintiff to reassert these claims in the state courts. Finally, the Court hereby DENIES Defendants'

Motion to Dismiss Plaintiff's claim for Intentional Infliction of Emotional Distress.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2008 WL 822562

---

**End of Document**

© 2016 Thomson Reuters. No claim to original U.S. Government Works.

2001 WL 228413
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Jason B. NICHOLAS, Plaintiff,

v.

Edward TUCKER,
Superintendent, et al., Defendants.

No. 95 CIV. 9705(LAK).
|
March 8, 2001.

ORDER

KAPLAN, District J.

**\*1** This is an action by an inmate of the New York State Correctional system. The only claim that survived defendants' summary judgment motion was Nicholas' contention that Correction Officer Cook brought an institutional disciplinary proceeding against him in retaliation for his wearing a kufi (Moslem headgear) to work and/or because he used a state-owned computer at his work station to prepare personal legal work. *See generally Nicholas v. Tucker,* 89 F.Supp.2d 475 (S.D.N.Y.2000).

At the conclusion of the non-jury trial, the Court found that the disciplinary proceeding in question was brought to retaliate against Nicholas for wearing the kufi. [1] That is, the Court found a causal connection between Nicholas' wearing of the kufi and the adverse action taken by Cook. The Court also found that Nicholas had sustained damages of $3,005. It invited briefing on Cook's contention that he nevertheless was entitled to judgment on the ground of qualified immunity.

Nicholas first contends that Cook waived the defense of qualified immunity by failing to file a second motion for summary judgment on that ground, failing to mention the defense in his opening statement, and failing to move for judgment as a matter of law on that ground. This contention, however, is without merit.

Cook pressed the defense of qualified immunity in the answer and in memoranda in support of motions for summary judgment. The failure to mention it in the opening is not probative of waiver. Nor was Cook, in this non-jury trial,

required to preserve the point by moving for judgment as a matter of law on that ground, as would have been required in a jury trial. *See, e.g., Gierlinger v. Gleason,* 160 F.3d 858, 869 (2d Cir.1998). The Court holds that the qualified immunity defense was not waived.

Before turning to the merits of the qualified immunity defense, it is important to clarify one point dealt with in the Court's bench opinion. The Court specifically found that Nicholas' wearing of the kufi motivated Cook to bring the disciplinary proceeding at issue. [2] It went on to indicate without further analysis that this had violated Nicholas' constitutional rights. [3] Consideration of the immunity defense suggests that the Court should revisit that question more carefully.

In *Burgin v. Henderson,* 536 F.2d 501, 504 (2d Cir.1976), the Second Circuit held that prisoners could wear kufis absent a showing that doing so would threaten legitimate penological interests such as a desire to avoid the concealment of weapons under the headgear. *See also Benjamin v. Coughlin,* 905 F.2d 571 (2d Cir.1990) (distinguishing loose-fitting Rastafarian crowns from tight-fitting yarmulkes and kufis), *cert. denied,* 498 U.S. 951. Here, it is likely that there were legitimate penological interests served by preventing plaintiff from wearing the kufi at his work place. The garment was sufficiently loose to permit concealment of a weapon or contraband. Moreover, the work place was in the Administration Building, not in the close confines of the prison, was considerable less secure than plaintiff's usual quarters, and was occupied in part by civilian employees in addition to correction officers. Thus, the safety concerns were greater in that environment. In consequence, it is at least arguable that there was no violation of plaintiff's constitutional rights despite the fact that Officer Cook acted out of an improper motive. But it is unnecessary to decide that point because Officer Cook in any case was protected by qualified immunity.

**\*2** Officials are immune from damage suits "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). Even where such rights are clearly established, "qualified immunity ... protects a government official 'if it was objectively reasonable for [the official] to believe that his acts did not violate those rights.'" *Russell v. Coughlin,* 910 F.2d 75, 78 (quoting *Robinson v. Via,* 821 F.2d 913, 921 (2d Cir.1987)); *accord, Tellier v. Fields,* 230 F.3d 502 (2d

Cir.2001); *Mollica v. Volker,* 229 F.3d 366 (2d Cir.2000). For a right to be "clearly established" for purposes of qualified immunity, "it is sufficient if decisions of the Supreme Court or of the appropriate circuit have defined the contours of the right with reasonable specificity." *Russell,* 910 F.2d at 78. "A right is 'clearly established' if '[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." ' *Diamondstone v. Macaluso,* 148 F.3d 113, 126 (2d Cir.1998) (quoting *Anderson v. Creighton,* 483 U.S. 635, 640 (1987)).

In this case, the Court finds that a reasonable officer in Cook's position could have concluded that a weapon or contraband could have been concealed under Nicholas' kufi. Accordingly, one in Cook's position reasonably could have concluded that interference with Nicholas' wearing of that headgear would not violate clearly established constitutional rights. Cook therefore is protected by qualified immunity.

The Court has considered Nicholas' other points and applications and concluded that they lack merit. Accordingly, the action is dismissed without costs.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2001 WL 228413

**Footnotes**

1 The Court found that Nicholas' use of the state-owned computer to prepare personal legal work, as distinguished from other personal material, played no role in Cook's action.

2 Tr., Nov. 14, 2000, at 161–62.

3 *Id.* 164.

**WESTLAW**   © 2016 Thomson Reuters. No claim to original U.S. Government Works.                                      2